**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS (WESTERN DIVISON)**

| | | |
|---|---|---|
| JACK D. McCULLOUGH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Case No. 3:17-cv-50116 |
| ILLINOIS STATE POLICE AGENT | ) | |
| BRION HANLEY; ISP SERGEANT | ) | |
| DANIEL P. SMITH; ISP AGENT TODD | ) | |
| DAMASKY; ISP AGENT LARRY KOT; | ) | |
| THE CITY OF SYCAMORE, ILLINOIS; | ) | |
| SYCAMORE PD OFFICER DANIEL | ) | |
| HOFFMAN; SYCAMORE PD OFFICER | ) | |
| TIFFANY ZIEGLER; THE CITY OF | ) | **Jury Trial Demanded** |
| SEATTLE; SEATTLE PD DETECTIVE | ) | |
| IRENE LAU; SEATTLE PD | ) | |
| DETECTIVE CLOYD STEIGER; | ) | |
| SEATTLE PD DETECTIVE MICHAEL | ) | |
| CIESYNSKI; FORMER DeKALB | ) | |
| COUNTY STATE'S ATTORNEY CLAY | ) | |
| CAMPBELL; FORMER DeKALB | ) | |
| COUNTY ASSISTANT STATE'S | ) | |
| ATTORNEYS VICTOR ESCARCIDA | ) | |
| and JULIE TREVARTHEN; DeKALB | ) | |
| COUNTY, ILLINOIS; UNIDENTIFIED | ) | |
| EMPLOYEES of the SYCAMORE | ) | |
| POLICE DEPARTMENT; | ) | |
| UNIDENTIFIED EMPLOYEES of the | ) | |
| ILLINOIS STATE POLICE; and | ) | |
| UNIDENTIFIED EMPLOYEES of the | ) | |
| SEATTLE POLICE DEPARTMENT, | ) | |
| | ) | |
| Defendants. | ) | |

NOW COMES, Plaintiff JACK D. McCULLOUGH, by his undersigned

attorneys LOEVY & LOEVY,  and complains of Defendants, ILLINOIS STATE

POLICE AGENT BRION HANLEY; ISP SERGEANT DANIEL P. SMITH; ISP

AGENT TODD DAMASKY; ISP AGENT LARRY KOT; THE CITY OF SYCAMORE, ILLINOIS; SYCAMORE PD OFFICER DANIEL HOFFMAN; SYCAMORE PD OFFICER TIFFANY ZIEGLER; THE CITY OF SEATTLE; SEATTLE PD DETECTIVE IRENE LAU; SEATTLE PD DETECTIVE CLOYD STEIGER; SEATTLE PD DETECTIVE MICHAEL CIESYNSKI; FORMER DeKALB  COUNTY STATE'S ATTORNEY CLAY CAMPBELL; FORMER DeKALB COUNTY ASSISTANT STATE'S ATTORNEYS VICTOR ESCARCIDA and JULIE TREVARTHEN; DeKALB COUNTY, ILLINOIS; UNIDENTIFIED EMPLOYEES of the SYCAMORE POLICE DEPARTMENT; UNIDENTIFIED EMPLOYEES of the ILLINOIS STATE POLICE; and UNIDENTIFIED EMPLOYEES of the SEATTLE POLICE DEPARTMENT, and states as follows:

## INTRODUCTION

1.      Plaintiff Jack D. McCullough was tragically convicted of the 1957 abduction and homicide of Maria Ridulph—a crime he absolutely did not commit.

2.      Defendants gained national notoriety by "solving" the Ridulph murder over 50 years after it occurred.

3.      In reality, Plaintiff was undeniably innocent, but Defendants accomplished their goal by fabricating false evidence and hiding exculpatory evidence to frame Mr. McCullough.

4.      In so doing, Defendants ignored contemporaneous FBI reports created in 1957 exonerating Plaintiff from having anything whatsoever to do with this murder.

5. Defendants' malicious plan succeeded, and Plaintiff was wrongfully convicted.

6. It was only when Richard Schmack was elected as the chief prosecutor of DeKalb County that an honest and objective investigation of Plaintiff's conviction done. That investigation reached the conclusion that Defendants blatantly ignored—that Mr. McCullough was undeniably innocent. Plaintiff's conviction was overturned, he was released from imprisonment under a life sentence, and later granted a certificate of innocence.

7. Nevertheless, Mr. McCullough, a United States veteran and grandfather, lost years of his life as a result of Defendants' actions. He brings this suit to redress the damages related to his wrongful conviction, and further seeks to hold accountable the individuals whose misconduct caused him irreparable harm.

## JURISDICTION AND VENUE

8. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution and applicable state law. This court has jurisdiction pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b). Most of the events giving rise to the claims asserted herein occurred here, and most parties live within or are affiliated with this District.

## THE PARTIES

9. Plaintiff Jack D. McCullough is a 77-year old military veteran who now resides in Washington State.

3

10.     At all times relevant, Defendants Daniel Hoffman, Tiffany Ziegler, and Unidentified Employees of the Sycamore Police Department were employed as law enforcement officers in the Sycamore Police Department. All are sued in their individual capacities, and acted under color of law and within the scope of their employment during the investigation and prosecution of the Plaintiff for the abduction and homicide of Maria Ridulph.

11.     Defendant City of Sycamore is an Illinois municipal corporation under the laws of the State of Illinois, and operates the Sycamore Police Department.

12.     At all times relevant, Defendants Sergeant Daniel P. Smith, Agent Todd Damasky, Agent Brion Hanley, Agent Larry Kot, and unidentified employees of the Illinois State Police were employed as law enforcement officers by the Illinois State Police. All are sued in their individual capacities, and acted under color of law and within the scope of their employment during the investigation and prosecution of the Plaintiff for the abduction and homicide of Maria Ridulph.

13.     At all times relevant, Defendants Detective Irene Lau, Detective Cloyd Steiger, and Detective Michael Ciesynski were police officers for the Seattle Police Department in Seattle, Washington. All are being sued in their individual capacity for actions taken under the color of law and within the scope of their employment during the investigation and prosecution of the Plaintiff for the abduction and homicide of Maria Ridulph.

14.     Defendant City of Seattle is a Washington State municipal corporation under the laws of the State of Washington, and operates the Seattle Police

Department.

15.    At all times relevant, Defendant former State's Attorney Clay Campbell headed the DeKalb County State's Attorney's Office, and former Assistant State's Attorneys Victor Escarcida and Julie Trevarthen were Assistant State's Attorneys for the DeKalb County State's Attorney's Office. All are being sued in their individual capacities for actions taken under the color of law and within the scope of their employment during the investigation and prosecution of the Plaintiff for the abduction and homicide of Maria Ridulph. Defendants Campbell, Escarcida, and Trevarthen are being sued exclusively for their actions in investigation of Plaintiff outside of court proceedings, and not for any action related to their official in-court duties, to the extent any are applicable, concerning the prosecution of Plaintiff.

16.    Defendant DeKalb County, Illinois operates the DeKalb County State's Attorney's office and is named as an indemnitor of Defendants Campbell, Escarcida, and Trevarthen.

## FACTS

### The Kidnapping and Murder of Maria Ridulph

17.    Maria Ridulph was seven years old in the winter of 1957. Maria lived in Sycamore, Illinois with her parents, two sisters, and brother.

18.    Maria was kidnapped on December 3, 1957. Her disappearance sparked a national outcry. Dozens of FBI agents descended on Sycamore, Illinois, to lead the investigation intended to rescue Maria and bring her kidnapper to justice.

19.     To that end, two FBI agents moved to Sycamore, where they set up headquarters, so that they could dedicate more time to the investigation.

20.     Tragically, Maria's body was recovered on April 26, 1958, near Galena, Illinois, in a heavily forested area off Highway 20. Once it was determined the body had not crossed state lines, the FBI agents concluded their investigation without identifying the perpetrator.

21.     The FBI, however, left a comprehensive record of its investigation. Over four months, the FBI meticulously documented thousands of interviews and hundreds of suspects.

22.     The following facts were documented in the FBI's exhaustive investigation, taken from interviews with the victim's family and witnesses in the days following the abduction.

23.     The timeline of December 3, 1957, establishes that Mr. McCullough was in Rockford, over 30 miles away, at the time of the crime and thus could not possibly have been the perpetrator.

### 5:50-6:30 p.m. Maria and Kathy Play Together Alone

24.     According to her mother, Maria left her house to play outside at 5:50 p.m.

25.     At 6:02 p.m., Maria's eight year-old friend Kathy Sigman went to play with Maria.

26.     The two girls played on the corner two doors down from Maria's house (and seven doors down from Kathy's).

27.     At least seven people observed the two girls playing alone on the corner between 5:50 and 6:30 p.m.

28.     Specifically, Maria's mother reported driving her eldest daughter to music class at 6 p.m. and returning at 6:05 p.m., and that she observed Maria and Kathy playing on the corner alone both times.

29.     Other neighbors also reported observing the girls playing together on the corner in the same time frame without any adults around.

### 6:30 p.m. First Report of the Perpetrator's Arrival

30.     Kathy reported that at about 6:30 p.m., a man approached Maria and Kathy and began playing with them.

31.     The man was a stranger to Maria and Kathy.

32.     The man gave Maria a piggyback ride and then returned to the corner. The man told Maria he would give her another piggyback ride if she could find a doll.

33.     Maria went home, retrieved her doll, and returned to the corner for another piggyback ride.

34.     Maria's trip home to get a doll occurred at 6:40 p.m., as recounted by her mother.

35.     That time was confirmed by Maria's father, who reported that Maria got her doll while he was watching the television show *Cheyenne*, which began airing at 6:30 p.m. that evening, and by her brother, who also stated that Maria obtained her doll after 6:30 p.m.

36. Maria returned to the corner with her doll and received another piggyback ride. The two girls played with the stranger for a while longer until Kathy's hands got cold and she went home to get a pair of mittens. Before she left, Kathy asked the stranger the time and he told her it was 7 p.m.

37. Kathy's mother reported that Kathy came home to get her mittens at approximately 6:50-6:55 p.m.

38. When Kathy returned to the corner with her mittens, Maria and the stranger were gone. She was never seen alive again.

39. Accordingly, the FBI determined that Maria was abducted between 6:50 p.m. and 7 p.m.

## 6:57 p.m. – Records Confirm that Plaintiff is Over Thirty Miles Away

40. At the time the perpetrator was abducting Maria Ridulph, Mr. McCullough was stepping off a train in Rockford.

41. Newly eighteen years old, Mr. McCullough had spent the day of December 3, 1957, at the Air Force's induction center in Chicago, receiving an x-ray to determine his fitness for duty.

42. Mr. McCullough had been planning to enlist for some time and his physical was the last step. The personnel in Chicago directed Mr. McCullough to bring a note to the recruiting office in Rockford, stating that if Plaintiff's doctor confirmed his good health, he could enlist in the military.

43. At approximately 5:15 p.m., Plaintiff boarded a train in Chicago bound for Rockford. He arrived in Rockford at about 6:45 p.m., and walked to the United States Post Office in town, which also housed the Air Force recruiting center.

44. At the post office, Mr. McCullough found the recruiting center closed, but ran into a military officer, who directed him to speak to Staff Sergeant Froon. Mr. McCullough followed this direction. Sergeant Froon advised Mr. McCullough to call the recruiting officer, Sergeant Oswald, and relay the information he had received from the induction center, which Plaintiff did.

45. While at the post office, at 6:57 p.m., Mr. McCullough placed a collect call to his parents' house, seeking a ride home to Sycamore from his father.

46. Mr. McCullough also called his then-girlfriend, Jan Edwards, and made a date to see her that night at her home.

47. Mr. McCullough ate some pie at a nearby diner while awaiting his father; his father then drove Mr. McCullough the approximately thirty miles and delivered him to Ms. Edwards' home.

48. As part of the wide net cast by their investigation, the FBI questioned Mr. McCullough and his parents just days after Maria's abduction.

49. Mr. McCullough's parents confirmed that they had received a call from Mr. McCullough at 7 p.m. on December 3, and that Plaintiff's father had driven to Rockford to retrieve him.

50.     The local telephone company confirmed that the collect call from the post office to Mr. McCullough's parents' house was placed at 6:57 p.m. by Mr. McCullough.

51.     The FBI questioned Plaintiff, and he related his whereabouts throughout the day, as described above.

52.     Although Plaintiff did not know the names of any of the three Air Force personnel he spoke to in Rockford, the FBI found Sergeant Oswald, who confirmed that he spoke to Plaintiff shortly after 7 p.m. on December 3rd. Sergeant Oswald also confirmed that Plaintiff had interacted with Colonel Liebovich and Sergeant Froon while in Rockford just before he called Sergeant Oswald. Sergeant Oswald met Plaintiff in person the next day.

53.     Given his alibi—Plaintiff was in Rockford, over thirty miles from Sycamore at the same time Maria was being abducted—the FBI cleared Mr. McCullough as a suspect.

54.     The FBI's decision to clear Mr. McCullough as a suspect was correct because Mr. McCullough could not have committed the crime.

55.     Mr. McCullough then carried on with his life. On December 11, 1957, he left home for a four year tour in the Air Force. He was then honorably discharged.

56.     Mr. McCullough later re-enlisted in the U.S. Armed Services, this time in the Army. Mr. McCullough worked in Army Intelligence, working his way to become a Captain and serving in Vietnam.

57.     Mr. McCullough left the service after spending over a decade in the Army, and moved to Washington State.

58.     There, Mr. McCullough raised a family and he and his wife looked forward to their retirement together.

59.     In 2010, Mr. McCullough had no inkling that a number of law enforcement officers were conspiring to frame him for the Maria Ridulph murder.

## 2008 – Defendant Hanley Reopens the Ridulph Murder Investigation

60.     In the fifty years after Maria's death, many tips were provided to the police, but none panned out. It was the type of notorious case that garnered attention, for better or worse.

61.     Mr. McCullough had a contentious relationship with his step-sister, Janet Tessier, and they were not on speaking terms after the turn of the century.

62.     Mr. McCullough's mother died in 1994, and his father passed away in 2006.

63.     In 2008, Janet came forward with a salacious accusation—she claimed that, on her death bed fourteen years prior, while she drifted in and out of being lucid, including periods where she seemed comatose and incoherent, Plaintiff's mother had said that Plaintiff had something to do with the "two little girls," one of whom disappeared.

64.     Janet claimed that Plaintiff's mother was referencing the Maria Ridulph abduction.

11

65. In reality, Plaintiff's mother was in an altered mental state hours before her death after a long illness.

66. In addition, Plaintiff's other half-sister, Mary, who was also present, stated that Plaintiff's mother only uttered the vague phrase, "he did it," without explaining who "he" was or what "he" did.

67. The timing of the allegation was both suspect and prejudicial to Plaintiff. By waiting fourteen years before coming forward, until after Plaintiff's father died, Plaintiff did not have his father available to rebut the totally false claim.

68. Nevertheless, Defendant Hanley ignored the obvious problems surrounding the over a decade late report that a mentally-unstable woman made a vague statement, and set off in hopes of making a name for himself in connection with this famous crime.

69. Defendants spent the next year and a half gathering information about the crime and, specifically, finding anyone who would talk to them about Mr. McCullough. Given the passage of time, many people with knowledge of the crime had long since passed away.

70. Inexplicably, Defendants wrongly concluded that Mr. McCullough had something to do with Maria's death.

71. Through the course of the investigation, each of the individually-named defendants reached this erroneous conclusion and then, in different ways

and at different times, agreed to pursue Mr. McCullough as the murderer despite his innocence.

72.     Defendants reached—and maintained—this conclusion despite obtaining the FBI's file, including the documents conclusively establishing Mr. McCullough's innocence via his alibi.

### 2010—Defendants' Engage in Pervasive Misconduct To Target Plaintiff Without Basis

73.     In April 2010, Defendants Hanley and Damasky contacted Jan Edwards. Ms. Edwards informed the investigators what she recalled from the night of the abduction – that she had a date to see Mr. McCullough at her home, Plaintiff arrived at her home, and he was excited to be enlisting in the military. Two months later, Ms. Edwards provided these Defendants with a train ticket issued to Plaintiff by the military that he had given to her on the night of the abduction, which she had found tucked inside an old picture frame.

74.     Working with others, including but not limited to Defendant Kot, Defendants Hanley and Damasky, however, concocted an entirely different version of events. They falsely reported that Ms. Edwards stated that she did not remember seeing Mr. McCullough that night, that they did not have a date to meet, and that Mr. McCullough's enlistment in the military was both abrupt and a complete surprise to her.

75.     In September 2010, Defendant Officers, including but not limited to Defendants Hanley, Smith, and Damasky approached Kathy Sigman, now sixty-one years old.

76.     These Defendants concocted a photo array that was obviously biased against Mr. McCullough.

77.     For one thing, although Ms. Sigman described the perpetrator as having blond hair, three of the photos in the array had dark hair.

78.     Indeed, only two of the six photos (one of which was Plaintiff's) might fit the description of the perpetrator as having blond hair and a slender face.

79.     Making matters worse, Defendants also used an old photograph of Plaintiff and five fillers pulled from a high school yearbook.

80.     The yearbook photos were uniform in that each photograph depicted a young man in a suit and tie, with a light background, looking slightly away from the camera. Each of these photos was on light background.

81.     By contrast, Plaintiff's photograph depicted him wearing neither a suit nor a tie, looking directly at the camera, and was set in front of a dark background.

82.     As a result, Plaintiff's photograph was the only photograph that stood out from the others.

83.     Nevertheless, Defendants Hanley and Smith, and possibly others, presented the photo array to Sigman in September 2010.

84.     Following protocol, these Defendants presented each photograph from the array sequentially, indicating that the Defendants understood that a side by side comparison of photos might lead to an unreliable identification.

14

85. Sigman did not select any of the photographs from the initial presentation of the array. The procedure should have stopped there, with a result of no identification.

86. Instead, the Defendants permitted Sigman to exclude three photos (the three dark haired fillers) and compare the remaining three photographs together. After four minutes of contemplation, Sigman chose the Defendants' suspect, Mr. McCullough.

87. Defendants' decision to show Sigman the photo array was unnecessarily suggestive, tainted her memory, and manufactured a false identification.

88. But, Defendants knew that they had to manufacture false and unreliable evidence in order to obtain an identification from Ms. Sigman that would implicate Plaintiff. Indeed, Defendants knew that—based on the FBI documents and the more than fifty years that had passed since the murder—no line-up should have ever been shown to Ms. Sigman.

89. Kathy Sigman was only eight years old at the time of the crime and was shown thousands of photographs by the FBI. Her initial description indicated that the perpetrator was a stranger and was missing an eyetooth. This description excluded Mr. McCullough, who lived just a few blocks away in the small town, and was not missing any teeth.

90. Moreover, Kathy's description had changed significantly over time— including at least two different false identifications in the months after the crime.

15

91.     In fact, in the two weeks following Maria's abduction, Kathy's description of "Johnny" changed at least three different times, with some of the identifying characteristics changing significantly, including age, height, hair color and even the way she described the perpetrator's teeth.

92.     For example, in the first two weeks, Kathy first description of "Johnny's" age started as between "24 and 25," expanded to a range of "25 and 35" and then morphed into the claim that "Johnny" actually just told her he was 24. At the same time, the perpetrator, according to Kathy, got shorter—he started out at about 6 feet tall, but that description shifted to 5'8." Similarly, Kathy's description of "Johnny's" teeth varied—beginning with the claim that they were "even" and "pretty" which later became a description of "large and yellowish."

93.     To bolster the shaky identification, these Defendants falsely claimed that Ms. Sigman had "immediately pointed to the photo of [Plaintiff] and said, 'that's him.'" Similarly, the Defendants also lied in alleging that Ms. Sigman's description indicated that the perpetrator had a gap in his front teeth, which happened to fit Plaintiff's description. This was a further fabrication.

94.     Janet's false claims and Kathy's identification did not inculpate Mr. McCullough, however, because of his alibi. Unfazed, the Defendants decided to manipulate the evidence in an attempt to falsely suggest that Plaintiff had the opportunity to commit the crime.

95.     As but one example, acting pursuant to their agreement to falsely implicate Plaintiff, Defendants Hoffman and Ziegler "investigated" the discovery of Maria's body although it was clear that their false narrative could not work.

96.     Knowing that Plaintiff was conclusively established to have been in Rockford at 6:57 p.m., the Defendants knew that the only way they could charge Plaintiff was if the time of the abduction was fabricated to make it earlier.

97.     Accordingly, without any evidentiary support whatsoever, the Defendants falsely told prosecutors that the crime occurred between 6 and 6:15 p.m.

98.     This misrepresentation was, of course, impossible. Maria's parents both saw her alive after 6:30 p.m., when the television show *Cheyenne* began, and by all accounts the abduction occurred between 6:50 and 7 p.m.

99.     But, having no reason to believe that the Defendants were lying, the prosecution was left with the belief that Plaintiff had enough time to commit the crime and then traveled to Rockford in time to meet with the Air Force officials and place the collect call to his parents.

100.     Accordingly, Defendants sought to gather more bogus and false evidence against Plaintiff by coordinating with police officers in another state—Washington—to attempt to secure his false arrest.

**Seattle Police Officers Agree to Work to Frame Plaintiff**

101.     The individual defendants in Illinois—from the Illinois State Police and the Sycamore Police Department—had learned that that Mr. McCullough relocated to Seattle. To further implement their plan, Defendants contacted officers

from the Seattle Police Department, Defendants Lau, Seiger, and Ciesynski, and possibly others.

102.    Defendants Lau, Steiger, and Ciesynski agreed to work with the ISP and Sycamore PD Defendants to attempt to link Plaintiff to the homicide, even though he was innocent.

103.    Defendants Lau, Steiger, and Ciesynski knew they had agreed to participate in investigating a "cold-case murder" in Illinois and that any prosecution of Plaintiff would take place in Illinois, not Seattle. These Defendants also understood that, though they would be conducting investigative activities in Washington, using their authority as Seattle PD officers, and even using the facilities and resources of the Seattle Police Department, that the aim of their investigation was Sycamore, DeKalb County, Illinois.

104.    In so doing, Defendants Ciesynski and Steiger met with the Illinois-based defendants who had traveled to Seattle in an attempt to secure Plaintiff's false arrest for the Ridulph homicide. Defendants Ciesynski and Steiger took a number of steps to participate in the investigation, including contacting Plaintiff under false pretenses and lying to him about why they had gone to his former employers and eventually his home looking for him.

105.    From Seattle, the Defendant Officers also coordinated their investigation with State's Attorney Clay Campbell and all agreed that there was probable cause to arrest Plaintiff for murder even though they knew that there was not.

**Plaintiff's False Arrest, Interrogation, and Prosecution**

106.    Nonetheless, Plaintiff was arrested in Seattle, Washington in June 2011, over fifty years after the murder.

107.    Given the crime's notoriety and the half a century gap between crime and arrest, Mr. McCullough's arrest made headlines in media sources across the country.

108.    Given the widespread media coverage, the Defendants were even more determined to ensure Plaintiff's conviction.

109.    Following Plaintiff's arrest, he was brought to Defendant Seattle Police Detective Lau to be interrogated.

110.    Before doing so, and even though he was in custody, the arresting Defendants failed to provide Plaintiff with his *Miranda* warnings and launched into an interview—a mistake they would later attempt to "cure."

111.    Defendant Lau created a report of her interrogation, in which she attempted to falsely portray Mr. McCullough as unnaturally fixated on Maria.

112.    Defendant Lau falsely claimed that Mr. McCullough "described [Maria Ridulph] as being very stunningly beautiful with big brown eyes and he stated that she was 'lovely, lovely, lovely.'"

113.    As the video of the interrogation bears out, it was Defendant Lau who called Maria beautiful, not Mr. McCullough, and Mr. McCullough said nothing about Maria's appearance until Lau tried to goad him by saying "bi-racial" couples "make the most beautiful kids," suggesting that Maria had multi-ethnic parents.

19

Mr. McCullough simply agreed with Lau that Maria was adorable with big brown eyes. Defendant Lau's report omitted her own precursor statements about Maria's appearance.

114.    Further, Defendant Lau suggested that Mr. McCullough's (fabricated) statements were even more incriminating because of his demeanor when he made them.  According to Defendant Lau, when Mr. McCullough discussed Maria Ridulph, his "entire face changed. It softened and…he had just totally relaxed at this point." Driving the point further, Defendant Lau claimed that Mr. McCullough "was pretty angry" and "alternated between rage and calm," during his interview, but that when he discussed Maria he supposedly became eerily calm. The video demonstrates that there was no significant change in Mr. McCullough's volume, posture, or demeanor when he mentioned Maria, nor was there any indication that Mr. McCullough was angry or enraged during the interview.

115.    Unfortunately, at his trial, the video evidence that would disprove Defendant Lau's testimony was withheld from him and he had no means to rebut her fabricated account. The prosecution relied on Defendant Lau's false evidence in closing arguments.

### Defendants Fabricate False "Informant" Testimony And Conceal Their Misconduct

116.    Knowing their false case against Plaintiff rested on thin reeds, Defendants decided to manufacture more false evidence against Plaintiff through convicted felons, to whom they offered deals to falsely claim that Plaintiff had confessed.

117.   As a result, Defendants were able to get two of the felons to falsely implicate Plaintiff in Maria's kidnapping and murder—Kirk Swaggerty and Matthew Reimann. These individuals gave false testimony that Plaintiff had suggested and even confessed that he had been involved in the crime, when, in fact, Mr. McCullough never said any such thing to anyone, let alone these men.

118.   Defendants recruited these so-called "informants" and caused them to provide false evidence implicating Plaintiff in the crime, all while knowing that these statements were entirely false.

119.   Defendants made improper, undisclosed promises and offered impermissible incentives to these individuals. The entire time, Defendants concealed information about the improper promises they made and the misconduct used to secure these false statements.

120.   At the time of Mr. McCullough's trial, both Swaggerty and Reimann had petitions before a trial court to either reconsider their sentence or vacate their convictions.

121.   When they testified at Mr. McCullough's trial, both Swaggerty and Reimann stated that they were not offered anything by the State's Attorney's Office in return for their testimony, and that no deals or promises had been made. These statements were false.

122.   To elaborate, Kirk Swaggerty was another inmate housed at the DeKalb County Jail while Plaintiff was incarcerated there awaiting trial.

21

123.    In April 2012, Mr. Swaggerty was approached by Defendant Clay Campbell, the DeKalb County State's Attorney, to see if he would be willing to testify in Plaintiff's case.

124.    Although Mr. Swaggerty was initially reluctant, he agreed to make inculpatory statements about Plaintiff in exchange for having Defendant Trevarthen testify on his behalf at an upcoming sentencing hearing.

125.    As a result of this arrangement, Mr. Swaggerty made false inculpatory statements about Plaintiff at his trial.

126.    At Plaintiff's trial, Mr. Swaggerty did not disclose the incentives he had been promised.

127.    When Plaintiff was convicted, he did not know that Swaggerty's testimony was induced by a promise that the prosecution would assist him to get a reduced sentence.

128.    Likewise, Matthew Reimann was briefly incarcerated at the DeKalb County Jail from August 30, 2012 to September 5, 2012 while his post-conviction petition was pending.  During this time, Reimann and Plaintiff were both housed at DeKalb County Jail.

129.    On September 6, 2012, Reimann returned to Stateville Correctional Center near Joliet, a maximum security prison.  The next day, Defendants Hanley and Hoffman visited him at Stateville to interview him about his interactions with Plaintiff, but he was reluctant to cooperate.

130.    Nevertheless, Defendants persisted.  To coax him into providing false testimony, and in exchange for his agreement to testify, Defendants Hanley and Hoffman agreed to waive the untimeliness defense for Reimann's post-conviction petition and to reduce his security classification so that he would receive a favorable transfer to a different facility with a lower security classification. Defendants Hanley and Hoffman also agreed to obtain a gag-order to conceal Reimann's identity.

131.    On September 12, 2012, Reimann was remanded back to the DeKalb County Jail and was placed in an interrogation room with Defendants Hanley, Hoffman, Escarcida, and Trevarthen.  During this meeting, Defendants assured Reimann that his identity would be concealed.  They also instructed Reimann to deny that there was a "deal" or any "promises" relating to his agreement to testify, as this would undermine the value of his testimony.

132.    As a result of the incentives that he was promised, Reimann made inculpatory statements about Plaintiff during the trial, falsely claiming that Plaintiff had confessed to him and that he had not received anything in exchange for his testimony.

133.    When Plaintiff was convicted, Plaintiff had no idea that Reimann had been provided incentives for his testimony.

134.    Upon his return to Stateville Correctional Center, Reimann became concerned that his identity had been revealed.  He wrote his attorney several times

to inquire about potential violations of the gag-order and to determine when he would receive the incentives he had been promised.

135.    In response, and as an act of further misconduct, on November 30, 2012, Defendant Hanley arranged to have a secret meeting with Reimann.  The November 30 log entry from the Stateville visitor log reflects that Hanley used an alias, Quinn Brady, in order to disguise his identity when he signed in to see Reimann. In addition, Hanley listed his address as "506 N. County Road, Wheaton, Illinois," an address which does not exist. The DuPage County Sheriff's Department, however, resides at 501 N. County Farm Road, Wheaton, Illinois, and the DuPage County Courthouse is located at 505 N. County Farm Road, Wheaton, Illinois.

136.    Within a few months, Reimann's classification was reduced in accordance with the agreement he had made with Defendants.

137.    Defendants' misconduct was not limited to the two witnesses that they actually succeeded in getting to provide false testimony but included others who, when offered the deal, refused to provide false testimony against Plaintiff. For example, sometime between November 2012 and January 2013, Defendant Hanley and another investigator contacted Mike Greenwall, another inmate at Stateville who had spent time at DeKalb County Jail.

138.    Defendant Hanley met with Greenwall to see if he could persuade Greenwall to provide false testimony against Plaintiff.

139.    Greenwall was unwilling to lie for Hanley.

24

140. Nevertheless, at the conclusion of their meeting, Defendant Hanley asked whether Reimann had been reclassified yet and stated that he was working on obtaining a transfer for him, in hopes that Greenwall would understand that Hanley could provide similar services for him as well. Defendant Hanley then left a card with Greenwall with instructions to let him know if there was ever anything that he could for him.

141. The suppression of the foregoing information was prejudicial to Plaintiff. If Mr. McCullough had been given access to this information about witnesses, it would have been powerful evidence of his innocence and critical evidence by which he could have impeached the prisoners who testified falsely against him.

142. However, Defendants concealed the misconduct described above from Plaintiff and his criminal defense attorneys.

143. The Defendants' misconduct deprived Plaintiff of evidence that would have established further that he had no connection to the kidnappings and murder of Maria Ridulph.

144. On September 14, 2012, following a bench trial in the DeKalb County Circuit Court, Jack McCullough was wrongfully convicted of the kidnapping and murder of Maria Ridulph. On December 10, 2012, Mr. McCullough received a life sentence.

145. Neither Plaintiff nor his criminal defense counsel were aware at the time of Plaintiff's criminal trial of the concealment of exculpatory evidence,

fabrication of inculpatory evidence, and manipulation of the eyewitness that is set forth in this Complaint. Had these facts been disclosed, Plaintiff would not have been convicted.

## Plaintiff's Exoneration

146. Throughout his wrongful incarceration, Jack McCullough maintained his innocence and that he was wrongfully convicted.

147. Mr. McCullough spent four years incarcerated for a crime that he did not commit.

148. In 2016, Plaintiff's conviction was vacated and he was released from prison. Plaintiff's conviction was vacated after the new DeKalb County State's Attorney Richard Schmack—who had replaced Defendant Campbell—moved to dismiss all charges against Plaintiff.

149. In so doing, the DeKalb County State's Attorney's office declared that the People of the State of Illinois were compelled to admit the existence of clear and convincing evidence showing that Plaintiff was convicted for a crime he did not commit. In so doing, acting on behalf of the People of the State of Illinois, State's Attorney Schmack admitted that the FBI's initial investigation of Plaintiff was accurate in excluding him as being the perpetrator. On behalf of the People of the State of Illinois, District Attorney Schmack further admitted that there had not ever been a reasonable hypothesis for the false claim proffered by the Defendants that the abduction happened earlier in the day than previously reported.

150.     In addition to admitting many of the other claims alleged above, the State also acknowledged that the warrant for Plaintiff's arrest contained false and materially misleading statements, and that Plaintiff's indictment was secured through false and/or misleading testimony.

151.     Subsequently, in April of 2017, Plaintiff was granted a Certificate of Innocence by the Circuit Court for the Twenty Third Judicial Circuit in DeKalb County, Illinois.

152.     After four years of incarceration, and over seven years of struggles and difficulties as a result of Defendants' misconduct, Plaintiff has been made free—as a formal matter—from his wrongful conviction.

## Plaintiff's Damages

153.     However, Plaintiff is not free of the severe damages that have been inflicted upon him over the greater part of the last decade due to Defendants' misconduct.

154.     Mr. McCullough spent over 4 years in prison for a crime he did not commit, and over 7 years fighting to clear his name. While in prison, Plaintiff was targeted owing to the nature of the crime for which he had been wrongfully convicted and given a life sentence. Plaintiff was attacked, despite being at a physical disadvantage due to his age. As but one example, a fellow inmate tried to kill Mr. McCullough by stabbing him in the eye, which Plaintiff survived only by using combat technique he learned in the military.

155.    Although exonerated, Mr. McCullough must now attempt to resume his life despite the horrors he endured while imprisoned for a crime he did not commit.

156.    Plaintiff was due to retire, but those efforts have been hampered by his wrongful conviction. In addition, Plaintiff has lost the precious time to be with his family, and watch his grandchildren age—something he can never get back.

157.    As a result of the foregoing, Mr. McCullough has suffered tremendous damage, including physical harm and mental suffering, all proximately caused by Defendants' misconduct.

## COUNT I– Federal Law
## Fifth & Fourteenth Amendments (Due Process, Fair Trial)

158.    Each paragraph of this Complaint is incorporated as if restated fully herein.

159.    As described more fully above, all of the Defendant Officers while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

160.    In the manner described more fully above, the Defendant Officers and individually, jointly, and/or in concert and in conspiracy:

(a) fabricated evidence  including but not limited to police false police reports, false informant testimony, and unreliable "identification" evidence;

(b) used improper and suggestive procedures to taint the pretrial identifications of Plaintiff and caused Plaintiff to be misidentified as the perpetrator; and

(c) deliberately withheld and concealed exculpatory evidence—including but not limited to their misconduct in procuring, or attempting to procure, false informant testimony, as well as secreting other misconduct related to interviews they took. In doing so, the Defendants violated their clearly established duty to disclose and report all material exculpatory and impeachment information.

161. Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been further prosecuted, and Plaintiff would not have been convicted.

162. The Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiff and his continuing wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in violation of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

163. As a direct and proximate result of this violation of his constitutional rights to due process and to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

164.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## COUNT II – Federal Law
## Fourth Amendment—Unlawful Detention

165.    Each paragraph of this Complaint is incorporated as if restated fully herein.

166.    The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

167.    The Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury.

168.    Statements of the Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false. Information presented to secure a warrant for Plaintiff's arrest was false and the officers knew, or were recklessly ignoring, the false and/or misleading nature of the information they used to procure Plaintiff's arrest. The Defendants also fabricated evidence through their actions in obtaining an "identification" of Plaintiff through their use of a suggestive photo array. The Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the Ridulph abduction and homicide.

169.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

170.    In 2016, the prosecution terminated in Plaintiff's favor when, after his conviction was vacated, the State dismissed the charges against him.

171.    As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries including the period of time following his arrest and before his conviction, as set forth above, including pain and suffering.

## COUNT III – 42 U.S.C. § 1983
## Failure to Intervene

172.    Each paragraph of this Complaint is incorporated as if restated fully herein.

173.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

174.    As a direct and proximate result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

175.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## COUNT IV – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

176.    Each paragraph of this Complaint is incorporated as if restated fully herein.

177.    In an effort to implicate Plaintiff in solving a "cold case," the Defendant Officers acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to be free of detention in the absence of probable cause, his right to due process, and his right to a fair trial, all as described in the various paragraphs of this Complaint.

178.    Additionally, before and after Plaintiff's conviction, the Defendant Officers further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more timely exoneration.

179.    In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

180.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above and was an otherwise willful participant in joint activity.

181.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were

32

violated, and he suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

182.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights.

## COUNT V – State Law Claim
## Malicious Prosecution

183.    Each paragraph of this Complaint is incorporated as if restated fully herein.

184.    The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

185.    The Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury.

186.    Statements of the Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false. Information presented to secure a warrant for Plaintiff's arrest was false and the officers knew, or were recklessly ignoring, the false and/or misleading nature of the information they used to procure Plaintiff's arrest. The Defendants also fabricated evidence through their actions in obtaining an "identification." The Defendants were aware that, as

described more fully above, no true or reliable evidence implicated Plaintiff in the Ridulph abduction and homicide.

187.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

188.    In 2015, the prosecution terminated in Plaintiff's favor when, after his conviction was vacated, the State dismissed the charges against him.

189.    As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including pain and suffering.

## COUNT VI – State Law Claim
## Intentional Infliction of Emotional Distress

190.    Each paragraph of this Complaint is incorporated as if restated fully herein.

191.    The acts and conduct of the Defendants as set forth above were extreme and outrageous. The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

192.    As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress.

## Count VII —State Law Claim
## Civil Conspiracy

193.    Each paragraph of this Complaint is incorporated as if restated fully herein.

194.    As described more fully in the preceding paragraphs, the Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

195.    In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

196.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

197.    As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

## COUNT VIII – State Law Claim
## Respondeat Superior

198.    Each paragraph of this Complaint is incorporated as if restated fully herein.

199.    In committing the acts alleged in the preceding paragraphs, Defendants Lau, Steiger, and Ciesynski were members of, and agents of, the Seattle

Police Department, acting at all relevant times within the scope of their employment and under color of law.

200.    Defendant City of Seattle is liable as principals for all torts committed by its agents.

201.    In committing the acts alleged in the preceding paragraphs, Defendants Hoffman and Ziegler were members of, and agents of, the Sycamore Police Department, acting at all relevant times within the scope of their employment and under color of law.

202.    Defendant City of Sycamore is liable as principals for all torts committed by its agents.

**COUNT IX – State Law Claim**
**Indemnification**

203.    Each paragraph of this Complaint is incorporated as if restated fully herein.

204.    Illinois and Washington law provide that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

205.    The Individual Defendants are or were employees of either the City of Sycamore, the City of Seattle, the Illinois State Police, or the County of DeKalb, Illinois, who were acting within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, JACK D. McCULLOUGH, respectfully requests that this Court enter judgment in his favor and against Defendants, ILLINOIS

STATE POLICE AGENT BRION HANLEY; ISP SERGEANT DANIEL P. SMITH; ISP AGENT TODD DAMASKY; ISP AGENT LARRY KOT; THE CITY OF SYCAMORE, ILLINOIS; SYCAMORE PD OFFICER DANIEL HOFFMAN; SYCAMORE PD OFFICER TIFFANY ZIEGLER; THE CITY OF SEATTLE; SEATTLE PD DETECTIVE IRENE LAU; SEATTLE PD DETECTIVE CLOYD STEIGER; SEATTLE PD DETECTIVE MICHAEL CIESYNSKI; FORMER DeKALB COUNTY STATE'S ATTORNEY CLAY CAMPBELL; FORMER DeKALB COUNTY ASSISTANT STATE'S ATTORNEYS VICTOR ESCARCIDA and JULIE TREVARTHEN; DeKALB COUNTY, ILLINOIS; UNIDENTIFIED EMPLOYEES of the SYCAMORE POLICE DEPARTMENT; UNIDENTIFIED EMPLOYEES of the ILLINOIS STATE POLICE; and UNIDENTIFIED EMPLOYEES of the SEATTLE POLICE DEPARTMENT, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, JACK D. MCCULLOUGH, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**JACK D. MCCULLOUGH**

By: /s/ Russell Ainsworth
*One of Plaintiff's attorneys*

Arthur Loevy
Jon Loevy
Russell Ainsworth
David B. Owens
Aisha N. Davis
LOEVY & LOEVY
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
(312) 243-5902 (Fax)