## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Jack D. McCullough, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No: 17 C 50116 |
| | ) | |
| Brion Hanley, et al., | ) | |
| | ) | |
| *Defendants.* | ) | Judge Frederick J. Kapala |

## ORDER

The Seattle defendants' Rule 12(b)(2) motion to dismiss [85] is denied. Seattle defendants' Rule 12(b)(6) motion to dismiss [96] is granted in part and denied in part. The <u>Brady</u> claim alleged against the Seattle defendants in Count I is dismissed with prejudice. The prosecutors' motion to dismiss [100] is granted in part and denied in part. Count V is dismissed with prejudice. Count II is dismissed without prejudice to refiling within 30 days.

## STATEMENT

Plaintiff, Jack D. McCullough, has sued various police officers and prosecutors alleging civil rights violations in connection with his wrongful conviction in 2012 for the 1957 abduction and murder of seven-year-old Maria Ridulph. Before the court are a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction and two Rule 12(b)(6) motions to dismiss for failure to state claims upon which relief can be granted. For the reasons that follow, the Rule 12(b)(2) motion is denied and the Rule 12(b)(6) motions are granted in part and denied in part.

## I. ALLEGATIONS

Plaintiff seeks damages for, among other things, four years' imprisonment for a crime he asserts that he did not commit. The defendants remaining in this case fall into one of three groups: (1) Illinois State Police Agents Brion Hanley, Todd Damasky, and Larry Kot, as well as Sergeant Daniel P. Smith ("ISP defendants"); (2) the City of Seattle, Washington and Seattle Police Department Detectives Irene Lau, Cloyd Steiger, and Michael Ciesynski ("Seattle defendants"); (3) DeKalb County, Illinois, former DeKalb County State's Attorney Clay Campbell, and former DeKalb County Assistant State's Attorneys William Engerman, Victor Escarcida, and Julie Trevarthen ("prosecutor defendants").[1]

---

[1]The City of Sycamore, Illinois and Sycamore Police Officers Daniel Hoffman and Tiffany Ziegler were also named as defendants in this case. However, they have been terminated as defendants after they entered into a $350,000 settlement agreement with plaintiff.

The facts alleged in the amended complaint are as follows and are presumed true for purposes of this order. Maria was abducted near her home in Sycamore, Illinois on the evening of December 3, 1957. Agents of the Federal Bureau of Investigation ("FBI") investigated the case until April 26, 1958, when Maria's body was discovered in a forested area off Highway 20 near Galena, Illinois. At that point, the FBI ended its investigation without identifying the perpetrator because the body had not crossed state lines. However, documents from more than four months of FBI investigation revealed the following. According to Maria's mother, Maria left her house at 5:50 p.m. to play outside. At least seven people observed Maria and her friend Kathy Sigman playing together on a street corner near her house between 5:50 p.m. and 6:30 p.m. Among them, Maria's mother reported that she drove her eldest daughter to music class at 6:00 p.m., returning at 6:05 p.m., and observed Maria and Kathy playing at the corner both times. Kathy reported that at about 6:30 p.m., a man who was a stranger to them, approached and began to play with her and Maria. The man gave Maria a piggyback ride and then told Maria that he would give her another if she could find a doll. Maria went home to retrieve a doll. According to her mother, Maria came home to get a doll at 6:40 p.m. Maria's father reported that Maria got her doll while he was watching the television show "Cheyenne," which began at 6:30 p.m. Maria's brother also confirmed that Maria came for her doll after 6:30 p.m. Maria returned to the corner with her doll and received another piggyback ride from the stranger. The two girls continued to play with the stranger until Kathy went home to get a pair of mittens. Before she left, Kathy asked the stranger what time it was and he told her it was 7:00 p.m. Kathy's mother reported that Kathy came home to get her mittens at approximately 6:50 to 6:55 p.m. When Kathy returned to the corner with her mittens, Maria and the stranger were gone. Maria was never again seen alive. Based on these accounts, the FBI determined that Maria was abducted between 6:50 p.m. and 7:00 p.m. on December 3, 1957.

During their investigation, FBI agents interviewed numerous people, including plaintiff, who said that he spent December 3, 1957 at the Air Force Induction Center in Chicago, Illinois, where he had a fitness-for-duty physical. The Air Force personnel in Chicago directed plaintiff to bring a note to the recruiting office in Rockford, Illinois, stating that plaintiff could enlist if his doctor confirmed his good health. At 5:15 p.m., plaintiff boarded a train in Chicago bound for Rockford, and he arrived in Rockford at 6:45 p.m. Plaintiff walked to the United States Post Office in Rockford which housed the Air Force Recruiting Center, but he found it closed. However, an officer told plaintiff to speak to Staff Sergeant Froom. Plaintiff contacted Staff Sergeant Froom who advised plaintiff to call Recruiting Sergeant Oswald. Plaintiff called Sergeant Oswald and passed along the message from the Chicago Induction Center. At 6:57 p.m, while still at the post office, plaintiff placed a collect call to his parents' house in Sycamore seeking a ride home. Plaintiff also called his girlfriend, Jan Edwards, and arranged to see her at her home later that night. Plaintiff's father drove plaintiff back to Sycamore, a distance of approximately 30 miles, and dropped him off at Edwards' home. Plaintiff's parents confirmed that they received a call from plaintiff at 7:00 p.m. on December 3, 1957, and that plaintiff's father retrieved plaintiff in Rockford. FBI agents confirmed with the local phone company that plaintiff made a collect call from the Rockford Post Office to plaintiff's parents' house at 6:57 p.m. FBI agents also confirmed with Sergeant Oswald that he had spoken to plaintiff shortly after 7:00 p.m. on December 3, 1957, at the Rockford Recruiting Center and that he also met with plaintiff the next day. Given that plaintiff was in

Rockford at the time Maria was abducted in Sycamore, and that Rockford is approximately 30 miles away from Sycamore, the FBI cleared plaintiff as a suspect.

On December 11, 1957, plaintiff left home and served four years' in the Air Force. After his honorable discharge from the Air Force, plaintiff enlisted in the Army where he worked in intelligence, attained the rank of Captain, and served in Vietnam. Plaintiff left the Army after serving for over a decade and moved to Washington State.

Plaintiff's mother died in 1994. Plaintiff had a contentious relationship with his sister, Janet Tessier, and they were not on speaking terms after the year 2000. In 2008, fourteen years after her mother's death, Janet came forward and claimed that on her death bed her mother said that plaintiff had something to do with the "two little girls," one of whom disappeared. Janet claimed that her mother was referencing the Maria Ridulph abduction. Ignoring the obvious problems surrounding the decade-old report of this vague statement, Hanley re-opened the Ridulph case in hopes of making a name for himself.

In October 2008, Hanley and Kot began working together to build a case purposefully targeting plaintiff. In 2009, Hanley began meeting with members of the DeKalb County State's Attorney's Office, including Engerman, Trevarthen, and Escarcida. Engerman instructed the officers to follow specific leads, and to try to dig up as much dirt as possible on plaintiff. Engerman specifically requested that he be informed after every single lead was investigated and stated that he "wants to be involved as a working participant of" the investigation.

In 2010, Hanley and Damasky contacted Edwards who informed them that on the night of the abduction she had plans to see plaintiff at her home and that plaintiff was excited to be enlisting in the military. But Hanley and Damasky instead falsely reported that Edwards told them that she did not have plans to meet plaintiff on the night of the abduction and that plaintiff's enlistment was abrupt and a complete surprise to her. Two months after Hanley and Damasky contacted Edwards, she provided them with "a train ticket issued to plaintiff by the military that plaintiff had given her on the night of the abduction." Edwards had found the ticket tucked inside an old picture frame.

In September 2010, Hanley and Damasky approached the then sixty-one year old Kathy and asked her to describe the man who played with her and Maria over fifty years earlier. Kathy described him as "tall, slender face, sandy blonde hair, clean shaven, maybe twenty to thirty years of age." Following the interview, Hanley, Damasky, and Smith created a suggestive six-photo array which Engerman viewed and approved. The photo array was biased against plaintiff because the photo of plaintiff stood out among the others for the following reasons: (1) three of the photos were of men with dark hair; (2) only two photos were of a man with blond hair and a slender face; (3) all of the photos were from a high school yearbook with the exception of the photo of plaintiff; (4) each of the yearbook photos depicted a young man in suit and tie with a light background looking slightly away from the camera; (5) in his photo plaintiff was not in suit and tie, he was looking directly at the camera, and the photo had a dark background. Despite this suggestiveness, Hanley and Smith presented the photos to Kathy in September 2010. Kathy excluded the three photos of the dark-haired men and, after four minutes of contemplation, chose the photo of plaintiff. Hanley and Smith's decision to show Kathy the suggestive photo array tainted her memory and manufactured a false identification. Engerman, Hanley, Damasky, and Smith knew that based on the FBI

documents and the more than fifty years that had passed since the murder, they should not have shown Kathy the photo-array. These defendants knew that Kathy was only eight-years-old at the time of Maria's abduction and described the perpetrator as a stranger, which would have excluded plaintiff because he lived nearby in the same small town. Moreover, Kathy's description of the perpetrator changed at least three different times in the two weeks following Maria's abduction. Kathy also had previously identified three different men as being the perpetrator. Based on all these circumstances, these defendants knew that Kathy's identification could not provide probable cause to believe plaintiff was the murderer and, as a result, they did not seek to arrest him at that time.

Because it was conclusively established that plaintiff was in Rockford at 6:57 p.m. on December 3, 1957, these defendants knew that the only way they could implicate plaintiff was to fabricate an earlier abduction time. This would have allowed plaintiff enough time to abduct Maria, travel to Rockford to meet with Air Force officials, and place the collect call. Therefore, without any evidentiary support, these defendants falsely maintained that the abduction occurred between 6:00 p.m. and 6:15 p.m. However, this earlier abduction time was impossible because Maria's parents, among others, saw her alive after 6:30 p.m. and the FBI concluded that Maria was abducted between 6:50 p.m. and 7:00 p.m. Prior to the plaintiff's arrest, each of the prosecutor defendants had participated in the investigation and agreed to work with the ISP defendants to falsely implicate plaintiff.

Once Campbell was elected State's Attorney of DeKalb County in November 2010, he became personally involved in the investigation of plaintiff. Campbell took over Engerman's role directing the ISP defendants in the investigation and told them that he wanted to oversee the case. Although there was no probable cause to believe that plaintiff was involved with Maria's abduction and murder, Campbell participated in the criminal investigation alongside Trevarthen and Escarcida and in doing so agreed not to conduct a fair and impartial investigation. Instead, Campbell was focused solely on investigating and implicating plaintiff. Campbell, Trevarthen, and Escarcida continued to work closely with the ISP defendants for several months before the investigation turned to Seattle, Washington. Knowing that there was no probable cause to arrest plaintiff, the ISP and prosecutor defendants (collectively "the Illinois defendants") sought to gather more false evidence against plaintiff by coordinating with the Seattle defendants.

After being asked to assist in the Illinois investigation and understanding that they would be seeking to secure the prosecution of plaintiff in Illinois, the Seattle defendants agreed to work with the Illinois defendants to link plaintiff to the homicide. Prior to plaintiff's arrest the Seattle defendants consulted with the ISP defendants and agreed upon how the investigation would proceed, how they would arrest plaintiff, and how they would get plaintiff to provide inculpatory statements. Ciesynski and Steiger actively participated in the investigation by traveling to plaintiff's former employer's office, going to plaintiff's home, contacting plaintiff under false pretenses, and lying to plaintiff about their motives. In furtherance of their agreement, Ciesynski and Steiger met with Hanley and Damasky in Seattle to secure plaintiff's false arrest. The Seattle defendants also wrote and shared police reports with the ISP defendants. Ultimately, Steiger authored and signed the probable cause statement and the affidavit for a search warrant which led to plaintiff's arrest. With the knowledge and approval of Ciesynski, Hanley, and Damasky, Steiger included the following false information in the affidavit: (1) that Kathy immediately identified plaintiff from the photo

array; (2) that Maria disappeared at 6:15 p.m. to try to cast doubt on plaintiff's alibi; (3) that Edwards did not remember seeing plaintiff on the night Maria was abducted; (4) that plaintiff legally changed his name shortly after the abduction when that did not occur until decades later; and (5) omitting that Air Force personnel had verified plaintiff's alibi. Plaintiff was ultimately arrested based on Steiger's false affidavit and then questioned. The Seattle defendants participated in the arrest and interrogation of plaintiff alongside the ISP defendants. From Seattle, Ciesynski, Hanley, Damasky, and Lau continued to coordinate the investigation with Campbell, Trevarthen, and Escarcida.

After plaintiff's arrest in Seattle in June 2011, Lau interrogated plaintiff and then created a report in which she falsely claimed that plaintiff became calm and relaxed when he spoke of Maria and stated that she was "lovely, lovely, lovely." Following the interrogation, Steiger and Ciesynski assisted Hanley and Damasky in extraditing plaintiff to Illinois. Steiger and Ciesynski accompanied plaintiff on the flight from Seattle to Chicago and dove him to Sycamore and even to the scene of the abduction. Steiger and Ciesynski also traveled to Sycamore between December 16 and 22, 2011 and met with Hanley, Campbell, Trevarthen, and Escarcida. Steiger, Ciesynski, and Lau also traveled to Sycamore to testify at plaintiff's trial in 2012. The video tape of Lau's interview of plaintiff was withheld from plaintiff so that he could not use it to refute Lau's fabricated account.

Knowing that the case against plaintiff was weak, Hanley decided to manufacture more evidence against plaintiff by offering convicted felons, Kirk Swaggerty and Matthew Reiman, deals in exchange for their false testimony that plaintiff had confessed to them in the DeKalb County Jail. Hanley concealed the promises and impermissible incentives that he offered Swaggerty and Reimann. On September 12, 2012, Hanley, Escarcida, and Trevarthen specifically instructed Reimann to deny that there was any deal or promise relating to his agreement to testify because this would undermine the value of his testimony. At plaintiff's bench trial, Swaggerty and Reimann testified to plaintiff's purported confessions and did not disclose the incentives or promises made in exchange. Both testified that he did not receive anything in exchange for his testimony. At his trial, plaintiff and his attorneys had no knowledge of this valuable impeachment information. On September 14, 2012, plaintiff was wrongfully convicted of the kidnapping and murder of Maria Ridulph.

After plaintiff's trial, Reimann wrote letters from Stateville Correctional Center ("Stateville") expressing concern that his identity had been revealed and to determine when he would receive the promised incentives. In response, Hanley went to Stateville on November 30, 2012, and signed the visitor logbook with a fictitious name and address. Within a few months, Reimann's security classification was reduced in accordance with the undisclosed agreement he had made with defendants. On December 10, 2012, plaintiff was sentenced to life imprisonment.

Plaintiff spent four years incarcerated for a crime he did not commit. In 2016, plaintiff's conviction was vacated and he was released from prison after the new DeKalb County State's Attorney Richard Schmack moved to dismiss all charges against plaintiff due to the existence of clear and convincing evidence showing that plaintiff was convicted of a crime he did not commit. Schmack concluded that there had never been a reasonable hypothesis for the claim that the abduction occurred earlier on December 3, 1957, than was previously determined. In April 2017, plaintiff was granted a Certificate of Innocence by the DeKalb County Circuit Court.

Plaintiff filed suit in this court on April 14, 2017 and, based on the foregoing alleged facts, brings the following claims in his amended complaint: a § 1983 claim for suppressing exculpatory material against defendant police officers (Count I); a §1983 claim for suggestive identification against Hanley, Smith, Damasky, and Engerman (Count II); a §1983 claim for failure to intervene against all defendants (Count III); a §1983 claim for fabrication of evidence against all defendants (Count IV); a §1983 claim for federal malicious prosecution against all defendants (Count V); a §1983 claim for conspiracy against all defendants (Count VI); a state-law claim for malicious prosecution against all defendants (Count VII); a state-law claim for intentional infliction of emotional distress ("IIED") against all defendants (Count VIII); a state-law claim for civil conspiracy against all defendants (Count IX); a state-law claim for respondeat superior against the City of Seattle (Count X); and a state-law claim for indemnification against the City of Seattle and DeKalb County (Count XI).

## II. ANALYSIS

### A. Seattle Defendants' Rule 12(b)(2) Motion to Dismiss

The Seattle defendants contend that all the claims alleged against them should be dismissed because this court lacks specific personal jurisdiction over them. Plaintiff opposes the motion arguing that he has alleged the following facts which far exceed his burden of making a prima facie showing of this court's specific personal jurisdiction: the Seattle defendants (1) knew that the effects of their conduct would be felt in Illinois, not Washington, because they were investigating an Illinois crime that would be prosecuted in Illinois; (2) conspired with the ISP defendants to frame plaintiff for an Illinois crime knowing their was no probable cause; (3) wrote and signed an affidavit approved by Ciesynski which included false information that induced a judge to authorize plaintiff's arrest for an Illinois murder; (4) extradited plaintiff to Illinois; (5) interrogated plaintiff; (6) traveled to Illinois three times during the investigation; and (7) testified against plaintiff in Illinois.[2] The court agrees with plaintiff.

A federal court has personal jurisdiction to the extent permitted by the law of the state in which it sits. Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A., 623 F.3d 440, 443 (7th Cir. 2010). Illinois law, in turn, allows personal jurisdiction over a defendant to the same extent permitted by the United States Constitution. See 735 ILCS 5/2-209(c). That means plaintiff must at least show that the Seattle defendants have "purposefully established 'minimum contacts' in the forum State" such that it is "not unreasonable to require [them] to submit to the burdens of litigation in that forum." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-76 (1985). The proper focus of the "minimum contacts" inquiry in intentional-tort cases is "the relationship among the defendant, the forum, and the litigation." Walden v. Fiore, 571 U.S. 277, ___, 134 S. Ct. 1115, 1126 (2014).

---

[2]The parties agree that this court lacks general personal jurisdiction over the Seattle defendants and that the lower standard of a prima facie showing of specific personal jurisdiction is all that is required where, as here, the court makes its decision solely based on written submissions rather than the parties submitting evidentiary support. See Purdue Research Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 782 (7th Cir. 2003) ("[W]hen the district court rules on a defendant's motion to dismiss based on the submission of written materials, without the benefit of an evidentiary hearing, . . . the plaintiff need only make out a prima facie case of personal jurisdiction.").

The Seattle defendants contend that plaintiff has failed to allege any contacts with Illinois, let alone contacts sufficient to satisfy the required minimum contacts for properly conferring specific personal jurisdiction. The Seattle defendants argue that plaintiff's allegation that they knew their conduct would result in an Illinois prosecution is merely one of "generalized foreseeability" that their actions would cause harm to plaintiff in Illinois and is insufficient. See Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 943 (7th Cir. 2000) ("The generalized foreseeability of the defendant's action causing harm in the forum is not sufficient for the exercise of jurisdiction."). But plaintiff has alleged much more than the mere fact that he felt the consequences of the Seattle defendants' actions in Illinois. Plaintiff has alleged that the Seattle defendants joined in the ongoing Illinois effort to frame him and advanced that cause by knowingly including the false information they received from an Illinois source, that is the Illinois defendants, in documents submitted to a judge in Washington to secure plaintiff's arrest for an Illinois crime. Plaintiff has also alleged that the Seattle defendants committed acts in Illinois to implement the plan to frame plaintiff. In particular, they brought plaintiff back to Illinois and continued to question him as they traveled from the airport in Chicago to Sycamore and even drove him past the location of Maria's abduction. It is further alleged that the Seattle defendants traveled to Illinois between December 16 and 22, 2011, to discuss the case with the Illinois defendants, and then traveled to Illinois on a third occasion in 2012 to testify against plaintiff at his trial. "[P]hysical entry into the State–either by the defendant in person or through an agent, goods, mail, or some other means–is certainly a relevant contact." Walden, 134 S. Ct. at 1122.

The Seattle defendants maintain that this case is like Walden, where plaintiffs brought an action in Nevada alleging that a DEA agent in an Atlanta, Georgia airport violated their Fourth Amendment rights when he seized a substantial amount of their cash and said it would be returned if they later proved they had obtained the cash from a legitimate source. Id. at 1119. The agent drafted a probable cause affidavit in connection with the forfeiture that plaintiffs asserted was false and misleading, and forwarded the affidavit to the United States Attorney's office in Georgia. Id. at 1119-20. The plaintiffs in Walden further alleged that the affidavit omitted exculpatory information related to the encounter at the Atlanta airport, namely, that there was no drug evidence and the funds were from a legitimate source (gambling winnings). Id. at 1120. Ultimately, no forfeiture complaint was filed and the money was returned to plaintiffs who then asserted a Bivens claim against the agent in Nevada. Id. The agent, in turn, argued that the Nevada court had no personal jurisdiction over him. Id. The Supreme Court held that "[the agent's] actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections." Id. at 1125. The court stressed that "no part of [the agent's] course of conduct occurred in Nevada." Id. at 1124. "[The agent] never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." Id. In sharp contrast, in this case the Seattle defendants received the false information that they included in an affidavit used to secure plaintiff's arrest from an Illinois source, namely the Illinois defendants. Moreover, the Seattle defendants traveled to Illinois on three separate occasions in connection with their alleged agreement to knowingly frame plaintiff for an Illinois crime. Therefore, this case is readily distinguishable from Walden because the Seattle defendants are alleged to have been involved in far more activities directed at and within the forum state.

The Seattle defendants also argue that the allegations that they extradited plaintiff to Illinois and

testified at his trial in Illinois do not establish the minimum contacts necessary to confer personal jurisdiction. See Steelman v. Carper,124 F. Supp. 2d 219, 224 (D. Del. 2000) ("[H]ailing [out-of-state] defendants into court in Delaware based solely upon this one act [of extraditing plaintiff to Delaware] could not be said to comport with 'traditional notions of fair play and substantial justice.'"); Webber v. Michela, 633 F.2d 518, 519 (8th Cir. 1980) ("The only contact that defendants had with the forum state occurred when the police officers testified in Minnesota at Webber's criminal trial. The record, therefore, does not show sufficient contacts to establish personal jurisdiction over the defendants in federal district court for the District of Minnesota."). However, unlike the circumstances in Steelman and Webber, in this case plaintiff's allegations go beyond the Seattle defendants' participation in his extradition to Illinois or merely testifying against plaintiff in Illinois. It is alleged that the Seattle defendants agreed to help frame plaintiff for murder knowing there was no probable cause to believe he committed the crime and came to Illinois on three occasions to help accomplish that goal.

The Seattle defendants argue further that allegations sounding in conspiracy do not support a finding of minimum contacts with Illinois sufficient for this court to exercise specific personal jurisdiction over them. While it is true that the use of the conspiracy theory of personal jurisdiction has been questioned if not rejected, see Smith v. Jefferson Cty. Bd. of Educ., 378 F. App'x 582, 585 (7th Cir. 2010), plaintiff in this case is not relying merely on his allegation that the Seattle defendants conspired with the Illinois defendants. Plaintiff's allegation is that the Seattle defendants agreed to help the Illinois defendants frame plaintiff for the abduction and murder of Maria Ridulph in violation of plaintiff's due process rights because there was no probable cause to believe that he committed the crime. At the point when the Seattle defendants knowingly agreed to do so, the Illinois defendants had already committed the overt acts of fabricating an earlier abduction time without an evidentiary basis, misrepresenting the information provided by Edwards, claiming plaintiff changed his name to escape detection, and showing Kathy a suggestive line-up. The Seattle defendants knowingly advanced the conspiracy through their own overt acts which were connected to or carried out in Illinois. These included providing false information obtained from an Illinois source in the documents used to secure plaintiff's arrest for the Illinois murder; withholding exculpatory evidence that they had a duty to turn over to prosecutors, plaintiff's counsel, or both in Illinois; transporting plaintiff to Illinois after he was extradited; meeting with the Illinois defendants in Illinois; and testifying at plaintiff's trial in Illinois. Whether the Seattle defendants knowingly committed all of these acts remains to be determined, but the allegations are sufficient to meet plaintiff's burden of making a prima facie showing of minimum contacts with Illinois for purposes of establishing specific personal jurisdiction over the Seattle defendants.

In addition, the Seattle defendants argue that even if this court finds that minimum contacts existed, additional factors show that this court's exercise of personal jurisdiction over them would offend traditional notions of fair play and substantial justice and therefore violate due process. The following factors are relevant in determining whether the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." Tamburo v. Dworkin, 601 F.3d 693, 709 (7th Cir. 2010).

The Seattle defendants maintain that they will face significant costs and burdens in litigating this case 2000 miles from home including the need to employ local counsel. But parties always endure the cost of counsel and the Seattle defendants have not shown that the additional cost of local counsel will be an undue burden. In fact, the Seattle defendants have not provided any evidence in the form of affidavits or other documentation establishing the additional burden of litigating in Illinois. The Seattle defendants mention that an investigation into their conduct by a special prosecutor is ongoing and precludes their providing affidavits. However, they fail to explain how the provision of affidavits concerning their burden of litigating in Illinois would compromise the Seattle defendants in that investigation.

Illinois has a strong interest in adjudicating claims that its own State police officers and state's attorney's have violated the civil rights of an individual convicted of an Illinois crime, sentenced to prison, released, and then given a certificate of innocence. While this court would agree with the Seattle defendants that the State of Washington also has an interest in adjudicating accusations of wrongdoing against its law enforcement officers, under the circumstances of this case Washington's interest does not outweigh that of Illinois. This is true even though plaintiff himself now lives in Washington State.

As for convenient and effective relief, it would be less efficient and convenient to present this case first to an Illinois jury and then to a Washington jury. "A single suit in Illinois also promotes the most efficient resolution of these claims." Id. at 710. In the same respect, the interstate judicial system's interest in obtaining the most efficient resolution of controversies is served.

With regard to the shared interest of the several States in furthering fundamental substantive social policies, the Seattle defendants argue that this court's exercise of personal jurisdiction over them would chill the practice of cooperation among law enforcement agencies in different states. They fear it would discourage the assistance of out-of-state law enforcement with extradition and the provision of testimony at out-of-state trials. This fear, however, is unfounded because, as this court has explained in this order, plaintiff has alleged more tortious conduct on the part of the Seattle defendants than simply aiding in plaintiff's extradition and testifying against him. If the Seattle defendants knowingly helped frame plaintiff for murder in Illinois as plaintiff alleges, it is reasonable to conclude that they should have anticipated being sued in Illinois for their actions. Thus, the court finds that the exercise of personal jurisdiction over the Seattle defendants comports with traditional notions of fair play and substantial justice and their Rule 12(b)(2) motion to dismiss is denied.

## B. Seattle Defendants' Rule 12(b)(6) Motion to Dismiss

In their Rule 12(b)(6) motion to dismiss, the Seattle defendants contend (1) plaintiff's "group pleading" fails to put them on notice; (2) plaintiff has failed to state a due process claim; (3) probable cause and the statute of limitations bars plaintiff's unlawful detention claim in Count VI; (4) plaintiff's failure to intervene claim lacks the requisite specificity; (5) plaintiff's civil conspiracy claims are not pleaded with requisite plausibility; (6) probable cause, absence of favorable termination, and lack of malice bar plaintiff's malicious prosecution claims; and (7) the allegations of plaintiff's IIED claim are conclusory and it is time barred. In addition, the Seattle defendants argue that (8) plaintiff failed to comply with Washington's notice-of-claim statute, RCW 4.96.020.

When deciding a defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court accepts all of the well-pleaded factual allegations of the complaint as true, and draws all reasonable inferences in favor of the plaintiff. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). To state a claim under the Federal Rules, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[D]etailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true . . . state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## 1. Specificity

The Seattle defendants contend that plaintiff's utilization of "group pleading" in his amended complaint fails to provide them with sufficient notice of the particular acts they are alleged to have committed. In particular, the Seattle defendants complain that many of the paragraphs in the amended complaint contain allegations that "defendants" engaged in certain conduct without specifying which defendant.

This contention might have some traction if the individual paragraphs using the terms "defendants" were read in isolation, but that is not how courts evaluate complaints under Rule 12(b)(6). See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007) (holding that individual allegations are not to be "scrutinized in isolation" but rather the court should consider "all of the facts alleged, taken collectively"). When read as a whole, the particular defendants referred to in these paragraphs become clear. For example, the Seattle defendants maintain that they cannot discern which defendants are referred to in paragraphs 74, 76, and 104. But these paragraphs fall under sections of the amended complaint styled "2008-Defendant Hanley Reopens the Ridulph Murder Investigations" and "2009-Defendants Engage in Pervasive Misconduct To Target Plaintiff Without Any Basis." Clearly, the "defendants" referred to in these sections are the Illinois defendants because, among other reasons, there are no allegations that the Seattle defendants were involved in the investigation in 2008 and 2009. There is nothing improper about using the term "defendants" when alleging conduct by an identifiable group of defendants. See Brooks v. Ross, 578 F.3d 574, 582 (7th Cir. 2009) ("Brooks adequately pleads personal involvement, because he specifies that he is directing this allegation at all of the defendants.").

The Seattle defendants also maintain that it is impossible to attribute to them any allegations concerning events that pre-dated their involvement. But plaintiff makes no attempt to do so in his amended complaint. Instead, plaintiff alleges that the Seattle defendants, identified as Lau, Steiger, and Ciesynski, began collaborating with the Illinois defendants in 2011, and that each Seattle defendant knowingly took steps to falsely implicate plaintiff in the abduction and murder of Maria. It is specifically alleged that Steiger authored and signed, and Ciesynski approved, the probable cause statement and affidavit for the search warrant that led to plaintiff's arrest and that these documents included false information in an attempt to make it appear that there was probable cause to arrest plaintiff.[3] The false information included statements that Kathy immediately identified

---

[3]The Seattle defendants also make a cursory argument that there are insufficient allegations as to Ciesynski of his personal involvement because the complaint is "largely silent" as to his conduct. However, plaintiff has alleged that "[d]efendant Steiger, with knowledge and approval of Defendant Ciesynski, Hanley, and Damasky, included false

plaintiff from the photo array; that Maria disappeared at 6:15 p.m., and not between 6:50 p.m. and 7:00 p.m. as determined by the contemporaneous FBI investigation, in order to eliminate plaintiff's alibi; that Edwards did not remember seeing plaintiff on the night of the abduction; that plaintiff changed his name shortly after Maria's disappearance; and omitting that Air Force Personnel verified plaintiff's presence in Rockford.

In connection with their specificity argument, the Seattle defendants argue further for the first time in their reply brief that they are entitled to rely on the facts given to them and analysis conducted by the Illinois defendants under the collective knowledge doctrine. While it is true that the collective knowledge doctrine permits law enforcement officers to act upon information provided by other officers of which they have no personal knowledge, it does not apply where, as alleged here, the officer knows the conveyed information is false. This is because "the officer providing the information . . . must have facts supporting the level of suspicion required," United States v. Williams, 627 F.3d 247, 252 (7th Cir. 2010), and plaintiff specifically alleges that the information provided and included in the affidavit was false and defendants knew it was false.[4]

As for Lau, it is alleged that she fabricated an account of plaintiff's interrogation to make it appear that plaintiff made inculpatory statements when he did not. In addition, it is alleged that Lau concealed the video of the interrogation, which prevented plaintiff from impeaching her false trial testimony with the video. These and other allegations in the amended complaint put the Seattle defendants on notice of the particular conduct they allegedly engaged in and, consequently, their contrary contention is rejected.

## 2. Due Process Claims

The Seattle defendants also contend that plaintiff has not stated a Brady claim against them in Count I because (1) he has not alleged their involvement in the identification of plaintiff from the photo array, obtaining the jailhouse informants' testimony, or the incriminating statement provided by plaintiff's mother; (2) plaintiff was aware of the statements he made when he was interviewed by Lau and knew the interview was being videotaped; and (3) no Brady claim can be stated based on the Seattle defendants' alleged false testimony at his trial. In response, plaintiff states that, as to the Seattle defendants, his Brady claim is that Lau falsely noted in her police reports, and later testified at trial, that plaintiff made statements during the interrogation showing that he was fixated on the victim and her appearance and Lau withheld the video of the interrogation which would have shown otherwise. Plaintiff alleges that he was deprived of the use of this valuable impeachment material at trial.

---

information in that affidavit in an attempt to make it appear that probable cause to arrest Plaintiff existed." Contrary to the Seattle defendants' position, McCauley v. City of Chicago, 671 F.3d 611, 615 (7th Cir. 2011), does not hold that an allegation of "knowledge and approval" is insufficient to plausibly plead personal involvement.

[4]The Seattle defendants also point out that there is no allegation that they ever received the FBI's file on their 1957-58 investigation. This circumstance does not, however, make implausible the allegation that the Seattle defendants had knowledge that the backed-up abduction time and other facts provided to them by the Illinois defendants were false. This knowledge could have been provided in another manner such as the Illinois defendants' recitation of their activities and investigation as compared to the FBI's contemporaneous investigation of the Ridulph murder.

Plaintiff does not take issue with the fact that he knew what statements he made during the interrogation and knew that the interrogation was being videotaped.[5] Consequently, plaintiff has not stated a Brady claim against Lau because, as alleged, he knew both what he said during the interrogation and that the interrogation was being videotaped. See Sornberger v. City of Knoxville, 434 F.3d 1006, 1029 (7th Cir.2006) ("Teresa knew herself what occurred during the interrogation, and the police were under no Brady obligation to tell her again that they coerced her into confessing."). Plaintiff should have moved for the disclosure of the video during the pretrial discovery phase of his criminal case or subpoenaed it if he thought it would be useful at trial. Plaintiff knew about the video evidence early in the proceedings, and defense counsel could have subpoenaed its production. See Ontiveros v. Miller, No. 2:14-cv-1423 JAM KJMP, 2015 WL 1751958, at *15 (E.D. Cal. Apr. 16, 2015). The court notes further that there is no allegation that the video was not turned over to the prosecutor defendants, which would be required for Lau to be liable for the purported civil Brady violation as opposed to the prosecutor defendants. See Cairel v. Alderden, 821 F.3d 823, 832 (7th Cir. 2016) (holding that if evidence is turned over to the prosecutors, it has not been concealed by the officer). For these reasons, the Seattle defendants' Rule 12(b)(6) motion is granted as to the Brady claim against them in Count I.

With regard to plaintiff's due process claims based on fabrication of evidence, the Seattle defendants argue that plaintiff cannot state such a claim where Illinois law provides a tort remedy.[6] This argument is premised on outdated law and is therefore rejected. It is now clear that the Fourteenth Amendment's Due Process Clause "forbids the state from depriving a person of liberty (including by pre-trial detention) based on manufactured evidence" regardless of the availability of a state-law tort remedy. Hurt v. Wise, 880 F.3d 831, 843 (7th Cir. 2018). Therefore, the court will not dismiss plaintiff's fabrication-of-evidence due process claims on this basis.

### 3. Unlawful Detention

Next, the Seattle defendants argue that plaintiff's unlawful-detention claim in Count VI is barred by the statute of limitations and the existence of probable cause.[7] As to the statute of limitations issue, the Seattle defendants argue that plaintiff's unlawful detention claim accrued at the time he was arrested or at the time his detention terminated. Count VI is a federal claim labeled "conspiracy

---

[5]Accordingly, the court need not decide if it is appropriate to consider the videotape of the interrogation which the Seattle defendants have attached to their response and contend that they can be considered under the analysis in cases such as Phillips v. City of Chicago, No. 14 C 9372, 2015 WL 5675529, at *5 (N.D. Ill. Sept. 24, 2015), because it is referred to in plaintiff's amended complaint and central to his Brady claim against Lau.

[6]The Seattle defendants argue further that plaintiff cannot in good faith allege that his due process rights under the Fifth Amendment were violated by the Seattle defendants based on a failed to Mirandize him prior to the interrogation. The Seattle defendants maintain that the video of that interrogation shows that plaintiff was Mirandized prior to the interrogation. Plaintiff has stated that there is no claim in his amended complaint based on a failure to give him Miranda warnings.

[7]In their reply brief, the Seattle defendants state that plaintiff's unlawful detention claim is in Count V. While allegations of initiation of proceedings against plaintiff without probable cause are contained therein, Count V is a federal claim for malicious prosecution which in Section II.C.6 of this order the court deems duplicative of the suppression and fabrication of evidence claims alleged in counts I and IV.

12

to deprive constitutional rights." There is no stand-alone Fourth Amendment unlawful-arrest or detention claim alleged in the amended complaint. Consequently, it is not appropriate to consider the accrual time of an unlawful-detention claim to determine if such a claim is timely. See Wallace v. Kato, 549 U.S. 384, 397 (2007) (holding that the statute of limitations upon a § 1983 claim seeking damages for unlawful detention in violation of the Fourth Amendment accrues at the time the claimant becomes detained pursuant to legal process."); Logan v. Wilkins, 644 F.3d 577, 582 (7th Cir. 2011) (holding that conspiracy claim accrues when plaintiff "was aware of every act allegedly committed pursuant to that conspiracy that injured him"). Nor do the Seattle defendants advance an argument that the conspiracy claim alleged in Count VI is untimely whether it is based on a purported violation of Fourteenth Amendment Due Process or Fourth Amendment unlawful detention. Accordingly, any such argument will have to be advanced in a motion for summary judgment.

As to the Seattle defendants' probable cause argument, the court finds that plaintiff has adequately pleaded a lack of probable cause. The Seattle defendants reiterate their collective knowledge doctrine argument in support of their position that plaintiff has not alleged facts demonstrating a lack of probable cause to arrest him. The court rejected this argument in section II.B.1 of this order because the argument assumed that plaintiff did not allege that the Seattle defendants had knowledge that the information provided by the Illinois defendants was false. The Seattle defendants continue to maintain that under the collective knowledge doctrine they were entitled to rely on the information conveyed to them by the Illinois defendants which gave them probable cause to arrest plaintiff. Specifically, the Seattle defendants maintain that nothing in the amended complaint suggests how or why they knew that plaintiff's mother's statement inculpating plaintiff and Kathy's identification of plaintiff as the stranger were unreliable.

The Court finds the Seattle defendants' reading of Iqbal and Twombly to require such specificity in the amended complaint to be incorrect. In fact, the majority in Twombly stated, "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 570; see also Swanson v. Citibank, N.A., 614 F.3d 400, 404 (7th Cir. 2010) (noting that Iqbal and Twombly's plausibility pleading requirement does not "reinstate the old fact-pleading system"). Plaintiff has pleaded that the Seattle defendants knew plaintiff was innocent, knew that the Illinois defendants were planning to frame him, agreed to help, and carried out various overt acts in furtherance of that plan. In this court's view, in consideration of all the allegations in the amended complaint, this is sufficient to plausibly allege a lack of probable cause. Therefore, the court will not dismiss Count VI for the reasons the Seattle defendants advance.

### 4. Failure to Intervene

The Seattle defendants contend further that plaintiff's failure-to-intervene claim lacks requisite specificity. They maintain that plaintiff must "establish" that they actually knew others were violating plaintiff's rights and that they intentionally chose to do nothing about it rather than basing his failure to intervene claim on their assisting the Illinois defendants' investigation. The Seattle defendants also assert that plaintiff's allegations are wholly conclusory because plaintiff does not specify which Seattle defendants failed to intervene or how they failed to do so. In response, plaintiff argues that he has alleged that the three individual Seattle defendants knowingly joined and

actively participated in the plot to frame plaintiff for a crime he did not commit by collaborating to create an evidentiary record that falsely pointed at plaintiff.

To state a failure-to-intervene claim under § 1983, plaintiff must allege that a "constitutional violation has been committed by a [state actor]; and the [defendant] had a realistic opportunity to intervene to prevent the harm from occurring." Abdullahi v. City of Madison, 423 F.3d 763, 774 (7th Cir. 2005). While the court understands that the Seattle defendants' position is that no such plot existed or that they had no knowledge of such a plot, those arguments will have to wait for summary judgment proceedings or trial. At this point, the court agrees that plaintiff has stated plausible failure to intervene claims against the Seattle defendants.

### 5. Civil Conspiracy

Next, the Seattle defendants contend that plaintiff's allegations of federal and state civil conspiracy in Counts VI and IX fall short of meeting the heightened pleading standard required for these types of claims. However, the Seventh Circuit has expressly rejected the existence of a heightened pleading standard for conspiracy claims. Walker v. Thompson, 288 F.3d 1005, 1007 (7th Cir. 2002) ( "[I]t is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with."). This reamins the rule even after Twombly and Iqbal. See Cooney v. Rossiter, 583 F.3d 967, 970-71 (7th Cir. 2009) (noting Twombly/Iqbal's requirement that a plaintiff "make plausible allegations" and citing Walker, 288 F.3 at 1007-08, for the pleading standard in conspiracy cases); see also Geinosky v. City of Chicago, 675 F.3d 743, 749 (7th Cir. 2012) ("Under Twombly, all plaintiff needed to allege was a plausible account of a conspiracy."). In his amended complaint, plaintiff alleges that the Seattle defendants:

> agreed to work with the Illinois-based Defendants from the Illinois State Police and DeKalb County State's Attorney's Office to attempt to link Plaintiff to the homicide, even though he was innocent.
>
> . . . .
>
> Ciesynski and Steiger met with the Illinois-based Defendants Hanley and Damasky who traveled to Seattle in an attempt to secure Plaintiff's false arrest for the Ridulph homicide.
>
> . . . .
>
> Steiger both authored and signed the Statement of Probable Cause and the Affidavit for Search Warrant that led to Plaintiff's arrest. Defendant Steiger, with knowledge and approval of Defendants Ciesynski, Hanley, and Damasky, included false information in the affidavit in an attempt to make it appear that probable cause to arrest Plaintiff existed, where it did not.
>
> . . . .
>
> Ciesynski, Steiger, and Lau knowingly participated in the investigation of [plaintiff] for the murder of Maria Ridulph in Illinois.
>
> . . . .

the Seattle Defendants agreed to participate, conduct, and cooperate in the investigation . . .

. . . .

Even though no new non-fabricated evidence was discovered between the FBI's initial investigation and the reopened investigation in 2009, the Defendant Officers and [the prosecutor defendants] all agreed to claim that there was probable cause to arrest Plaintiff for the murder even though they knew that there was not.

These allegations are more than bare conclusions that the Seattle defendants joined a conspiracy. While these allegations remain subject to proof, they state plausible conspiracy claims and give the Seattle defendants sufficient notice of the contours of the conspiracy claims alleged against them. Therefore, the court declines to dismiss Counts VI and IX against the Seattle defendants.[8]

### 6. Malicious Prosecution

The Seattle defendants also seek dismissal of plaintiff's federal and state malicious prosecution claims. For the reasons stated below in section II.C.6 the court dismisses plaintiff's federal malicious prosecution claim, Count V, as superfluous. In order to plead a malicious prosecution action under Illinois law, plaintiffs must allege facts showing: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." Swick v. Liautaud, 169 Ill. 2d 504, 512 (1996). The Seattle defendants argue that a failure to plead lack of probable cause bars plaintiff's state and federal malicious prosecution claims. As for a failure to plead lack of probable case, for the reasons stated above in sections II.B.1 & 3 of this order, this argument is rejected.

The Seattle defendants also argue that plaintiff has not sufficiently alleged the second element, favorable termination, because where a prosecution is abandoned, plaintiffs must allege a lack of reasonable grounds to pursue the criminal prosecution. See id. at 514. Swick does not state that a lack of reasonable grounds to pursue the criminal prosecution must be pleaded. Nevertheless, plaintiff has specifically alleged a lack of reasonable grounds to pursue the criminal prosecution in that after his conviction was vacated and the new DeKalb County State's Attorney moved to dismiss all charges against plaintiff, the "State's Attorney's office declared that the People of the State of Illinois were compelled to admit the existence of clear and convincing evidence showing that Plaintiff was convicted for a crime he did not commit." Hence, the favorable termination element of a state-law malicious prosecution is sufficiently alleged.[9]

---

[8]The Seattle defendants argue further that the federal conspiracy claim must be dismissed because plaintiff has failed to adequately plead an actual denial of a constitutional right and there is no such thing as a "stand-alone conspiracy." See Goldschmid v. Patchett, 686 F.2d 582, 585 (7th Cir. 1982) ("Section 1983 does not, however, punish conspiracy; an actual denial of a civil right is necessary before a cause of action arises."). Obviously, this argument fails because this court has determined that plaintiff has adequately pleaded the denial of various constitutional rights.

[9]The Seattle defendants also argue that plaintiff's certificate of innocence is immaterial because it "shall not have res judicata effect on any other proceedings," 735 ILCS 5/2-702(j). The statute does so provide, but in the court's opinion the issuance of a certificate of innocence certainly makes it plausible that there was "a lack of reasonable grounds to pursue the criminal prosecution." See Swick 169 Ill. 2d at 514. Nevertheless, plaintiff does not need to rely on his

The Seattle defendants argue further that plaintiff fails to allege facts demonstrating malice. But plaintiff has alleged that the Seattle defendants participated in framing him for murder knowing he was innocent and did so without probable cause. Because malice may be inferred from an absence of probable cause, Williams v. City of Chicago, 733 F.3d 749, 760 (7th Cir. 2013), the malice element has been adequately alleged. For these reasons, the court will not dismiss plaintiff's state-law malicious prosecution claim.

### 7. IIED

The Seattle defendants next contend that plaintiff has failed to state a claim for IIED in Count VIII because his allegations are conclusory. The Seattle defendants' argument is one sentence which is itself conclusory and reason enough to reject it. Nevertheless, the elements of the Illinois tort of IIED are: (1) extreme and outrageous conduct, (2) the intention to, or knowledge of a high probability that the conduct would, cause severe emotional distress, and (3) the conduct actually caused severe emotional distress. Zoretic v. Darge, 832 F.3d 639, 645 (7th Cir. 2016). Plaintiff alleges that all of the defendants' conduct, including that of the Seattle defendants which was part of an intentional and knowing effort to frame him for a crime he did not commit–namely the abduction and murder of a seven-year-old child 57 years ago, was extreme and outrageous. Such conduct, if it occurred, certainly meets that criteria, see Alexander v. United States, 721 F.3d 418, 425 (7th Cir. 2013) (finding allegations that FBI agents conspired with prosecutors and others to frame plaintiff for bribery were sufficient allegations of extreme and outrageous conduct), and the allegations are not merely conclusory. Plaintiff has further pleaded that defendants' actions were "with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff," in satisfaction of element two. Plaintiff has also plausibly pleaded element three in alleging that he actually suffered severe emotional distress over the last decade "including physical harm and mental suffering" proximately caused by defendants' conduct resulting in a life sentence and him serving "4 years in prison for a crime he did not commit."

Next, citing Bridewell v. Eberle, 730 F.3d 672, 678 (7th Cir. 2013), the Seattle defendants maintain that plaintiff's IIED claim accrued upon his arrest in June 2011 and that because this case was not filed until April 2017, it was filed outside the applicable one-year statute of limitations. However, in Bridewell the plaintiff was never convicted of the charge that related to the IIED claim. Consequently, the Seventh Circuit in Bridewell did not need to review the claim in light of Heck v. Humphrey, 512 U.S. 477 (1994), which holds generally that if a claim impugns the validity of a criminal conviction it does not accrue until the conviction is overturned or otherwise set aside. Id. at 488. In this case, plaintiff's claim is that the Seattle defendants knowingly joined the on-going effort to frame plaintiff and committed overt acts to further that cause and that by these actions he suffered emotional distress. That being so, a successful IIED claim based on this conduct would necessarily call into question the validity of plaintiff's conviction and the Heck principle controls the limitations issue. Thus, the one-year statute of limitations did not begin to run until plaintiff's conviction was overturned in 2016, so plaintiff timely filed this lawsuit in April of 2017. For these reasons, the Seattle defendants' motion to dismiss Count VIII fails.

---

certificate of innocence because the court has concluded that he has sufficiently pleaded favorable termination.

### 8. Washington's Notice-of-Claim Statute

Finally, the Seattle defendants contend that plaintiff failed to comply with Washington's notice-of-claim statute, RCW 4.96.020. In response, plaintiff argues that the Washington statute has no application because Illinois law applies to the claims against the Seattle defendants and Illinois has no such tort-claim-notice provision. The Seattle defendants have no substantive reply to plaintiff's argument, but note that they have a Rule 12(b)(2) motion pending and do not wish to waive the defense in the event that motion is granted. This court agrees with plaintiff that Illinois' choice-of-law rules apply and that the "most significant relationship" test requires application of the law of the State where plaintiff suffered his injury. See Robinson v. McNeil Consumer Healthcare, 615 F.3d 861, 865 (7th Cir. 2010). Here, plaintiff ultimately suffered his wrongful conviction and imprisonment in Illinois. Consequently, the Seattle defendants' contention that Washington's notice-of-claim statute applies is rejected.

For all these reasons, the Seattle defendant's Rule 12(b)(6) motion is granted in part and denied in part. The Brady claim alleged against the Seattle defendants in Count I is dismissed with prejudice as is Count V. The motion is denied in all other respects.

### C. Prosecutor Defendants' Rule 12(b)(6) Motion to Dismiss

In their Rule 12(b)(6) motion to dismiss, the prosecutor defendants contend that (1) plaintiff's lack of specificity requires dismissal of the complaint; (2) absolute immunity applies to the specific conduct alleged against them; (3) plaintiff fails to state a claim for suggestive identification; (4) plaintiff fails to state a claim for failure to intervene; (5) plaintiff fails to state a cause of action for evidence fabrication; (6) federal malicious prosecution is not actionable under § 1983; (7) plaintiff fails to state a claim for conspiracy under § 1983 or state law; (8) plaintiff fails to state a claim for IIED and the claim is time barred; and (9) prosecutor defendants are not employees of DeKalb County.

### 1. Specificity

Initially, the prosecutor defendants contend that the amended complaint lacks specific allegations of their respective personal involvement in the alleged constitutional violations because plaintiff only alleges that "defendants" are responsible for the conduct in paragraphs 104-106, 108, and 110, without identifying which of the eleven defendants allegedly engaged in the conduct. The prosecutor defendants argue further that the paragraphs in which they are actually named, merely contain conclusory allegations of their personal involvement in the investigation without any factual support. Specifically, the prosecutor defendants argue that mere allegations that they "consulted with the officers," "participated in," or "coordinated" the investigation cannot substitute for specific factual allegations indicating how each prosecutor defendant was involved in the investigation. As to defendant Campbell, the prosecutor defendants argue that plaintiff fails to allege a single act actually committed by Campbell in paragraphs 113-114.

As with the similar argument advanced by the Seattle defendants, the prosecutor defendants' argument might have some traction if these paragraphs were considered in isolation, but that is not how courts evaluate complaints under Rule 12(b)(6). See Tellabs, Inc., 551 U.S. at 323. Read together, the paragraphs of the amended complaint contain allegations that the ISP defendants

knowingly presented a suggestive photo array to Kathy, which Engerman "viewed and approved," and then the ISP defendants falsified the manner in which she chose plaintiff's photograph. Reading the paragraphs as a whole and in conjunction with the other paragraphs in the amended complaint also puts the ISP defendants on notice that they are alleged to have falsified the time of Maria's abduction in order to defeat plaintiff's alibi. More specifically, it is alleged that the factual accounts within the FBI reports–including the accounts of Kathy, Maria's parents, Maria's brother, Kathy's mother, and others, indicating that the abduction occurred between 6:50 p.m. and 7:00 p.m.–were knowingly ignored. Instead, the ISP defendants fabricated an earlier abduction time so that plaintiff's indisputable presence in Rockford by 6:57 p.m. would not exonerate him of the crime. It is alleged further that, as early as 2009, Engerman, Escarcida, and Trevarthen participated in this fabrication which was accomplished by law enforcement consulting with and coordinating their efforts with these prosecutors. As for Campbell, it is alleged that once he became DeKalb County State's Attorney he took over for Engerman directing the ISP defendants in their investigation. It is also alleged that although there was no probable cause to believe that plaintiff was involved in Maria's abduction and murder, Campbell participated in the criminal investigation of plaintiff alongside Trevarthen and Escarcida and agreed with them and the ISP defendants to frame plaintiff. Therefore, the court finds that the prosecutor defendants are on notice of the specific acts they are alleged to have been personally involved in which caused violations of plaintiff's constitutional rights.

## 2. Absolute Immunity

Next, the prosecutor defendants contend that they are absolutely immune from liability for the only specific conduct alleged against them in the amended complaint: (1) their agreement to claim there was probable cause to arrest plaintiff when they knew there was not; and (2) instructing witness Reimann to deny that there was any deal or promises made to him. Plaintiff acknowledges that the prosecutor defendants are shielded by absolute immunity with regard to their alleged conduct with the jail-house informants. Thus, to the extent that any of plaintiffs' claims are based on that conduct they are dismissed.

As for the prosecutor defendants' alleged agreement to claim there was probable cause to arrest plaintiff when there was not, the court agrees with plaintiff that there are sufficient allegations of the prosecutor defendants acting in an investigatory capacity, as opposed to a prosecutorial capacity, such that absolute immunity does not apply. See Fields v. Wharrie, 672 F.3d 505, 510 (7th Cir. 2012) (explaining that a prosecutor is absolutely immune from suit for all actions and decisions undertaken in furtherance of his prosecutorial duties but not for investigatory duties).

The prosecutor defendants maintain that the allegations made against them are of prosecutorial conduct because they were acts undertaken as an advocate for the state in preparing for the initiation of judicial proceedings. In response, plaintiff argues that he has alleged that beginning in 2009 and throughout their course of action during the investigation, the prosecutor defendants participated in the pre-prosecution fabrication of evidence and acted without probable cause to believe that plaintiff was guilty of murder. Consequently, plaintiff maintains that all of these actions cannot be considered as actions taken as advocates of the state. The court agrees with plaintiff.

The Seventh Circuit has stated that "[a] prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial." Fields, 740 F.3d at 1113-14, quoting Buckley v. Fitzsimmons, 509 U.S. 259, 275-76 (1993); see also Whitlock v. Brueggemann, 682 F.3d 567, 580 (7th Cir. 2012) (holding that a prosecutor acting in an investigatory capacity is subject to the same rules as a police officer because a "prosecutor who manufactures evidence when acting in an investigatory role can cause a due process violation just as easily as a police officer."). Therefore, the prosecutor defendants' motion to dismiss on the basis of absolute immunity is denied.

### 3. Suggestive Identification

The Due Process Clause of the Fourteenth Amendment "is violated if unduly suggestive identification techniques are allowed to taint the trial." Alexander v. City of S. Bend, 433 F.3d 550, 555 (7th Cir. 2006). However, there can be no liability for an unduly suggestive pretrial identification procedure unless plaintiff can show how the flaws in that procedure made his trial unfair. Id. Engerman, the only prosecutor defendant implicated in Count II, contends that plaintiff has failed to allege facts to even suggest that the purported unduly suggestive photo array undermined the fairness of his trial. In particular, Engerman argues that plaintiff has not pleaded a single fact regarding the presentation of Kathy's pretrial identification during his trial or whether Kathy identified him at trial. Plaintiff's response is not convincing because he only complains that Alexander was a summary judgment case while the instant case is at the motion to dismiss stage. While it is true that the Seventh Circuit in Alexander was reviewing an order granting summary judgment, it made clear that an essential element of a due process claim based on an unduly suggestive pretrial identification procedure is that the procedure undermined the fairness of the trial. The court agrees with Engerman that this element has not been plausibly stated as is required at this stage. In particular, plaintiff does not allege that Kathy, or any other witness, testified at his trial concerning the pretrial identification of plaintiff from the photo array. Consequently, Count II is dismissed without prejudice to refiling if plaintiff can do so in accordance with Alexander and in accordance with his counsel's Rule 11 obligations.

### 4. Failure to Intervene

The prosecutor defendants contend that prosecutors have no duty to prevent the police from violating a suspect's constitutional rights and cite three cases in support of their contention: Hobbs v. Cappelluti, 899 F. Supp. 2d 738, 773 (N.D. Ill. 2012) (stating that "prosecutors do not have a duty to intervene to prevent the police from violating suspect's constitutional rights"); Gordon v. Devine, No. 08 C 377, 2008 WL 4594354, at *17 (N.D. Ill. Oct. 14, 2008) ("[N]either the Seventh Circuit, nor any Northern District of Illinois court, has recognized a failure to intervene claim against a prosecutor."); Andrews v. Burge, 660 F. Supp. 2d 868, 876 n.6 (N.D. Ill. 2009) ("In Illinois . . . a prosecutor does not have police powers, nor do prosecutors have command of police operations. . . . [T]he duty to intervene applicable to police officers is not to be imposed on prosecutors."). In response, plaintiff dismisses these authorities as pre-Whitlock or contrary to Whitlock which made clear that prosecutors and police are subject to the same duties when acting in an investigatory capacity. See 682 F.3d at 580 ("The only question is whether a prosecutor who is acting in an

investigatory capacity is subject to rules that are any different. We think not."). Post-Whitlock, courts in this district have denied motions to dismiss failure-to-intervene claims against prosecutors, where, as here, it is alleged that they were involved in the investigation and had knowledge of the constitutional violation and, thus, would have had a realistic opportunity to prevent an officer from violating plaintiff's rights. Saunders v. City of Chicago, No. 12-CV-09158, 2013 WL 6009933, at *10 (N.D. Ill. Nov. 13, 2013); Rivera v. Lake Cty., 974 F. Supp. 2d 1179, 1191 (N.D. Ill. 2013). Accordingly, the court will not dismiss Count III on this basis.

The prosecutor defendants contend further that plaintiff has failed to plead facts to support a failure to intervene action against them and, in particular, has not pleaded that they had any knowledge of the police officer defendants' actions. Instead, according to the prosecutor defendants, plaintiff has only made conclusory allegations. The court disagrees.

Plaintiff alleges as follows. Engerman, Trevarthen, and Escarcida began working with the ISP defendants in a functionally investigative role in 2009, and Campbell joined in the investigation in 2010, shortly after he was elected. Campbell, Trevarthen, and Escarcida then began working jointly with the ISP defendants and, despite knowing that there was no probable cause to investigate plaintiff, Damasky, Hanley, Kot, Trevarthen, Escarcida, and Campbell sought to gather or to continue to utilize false evidence to secure plaintiff's false arrest and eventual conviction. The prosecutor defendants also worked with the Seattle defendants to implement their plan to target plaintiff, including offering guidance and maintaining frequent communication. The prosecutor defendants did all of these things to facilitate the ultimate fabrication of evidence that led to plaintiff's conviction. Taking these allegations as true, as the court must do at this stage of the litigation, plaintiff has sufficiently alleged that the prosecutor defendants had a realistic opportunity to step in at any time during the investigation and prevent the police officer defendants from violating plaintiff's right but failed to do so. Accordingly, the prosecutor defendants' motion to dismiss is denied as to Count III.

### 5. Evidence Fabrication

The prosecutor defendants contend that plaintiff has failed to identify a single piece of evidence that was fabricated by them and introduced at trial and, therefore, fails to state a claim for fabrication of evidence. In response, plaintiff points to the false abduction time and the false identification.

It is a violation of due process to manufacture false evidence against a criminal defendant if that evidence is later used to deprive the defendant of his liberty in some way. Whitlock, 682 F.3d at 580. Fabricated testimony is madeup, manufactured, or created by the fabricator and therefore known by him to be false. Petty v. City of Chicago, 754 F.3d 416, 422 (7th Cir. 2014); Whitlock, 682 F.3d at 570-71 (finding evidence fabricated where the prosecutor was a part of an investigative team that told witnesses what to say knowing that the information they gave the witnesses was false).

As noted in section II.C.3 above, plaintiff does not allege whether any evidence concerning Kathy's pretrial identification of plaintiff from the suggestive photo array was introduced at trial. However, this does not mean that the false identification resulting from the suggestive photo array, which was part of the evidence used to secure plaintiff's arrest and pretrial detention, cannot form the basis of a due process violation. See Whitlock, 682 F.3d at 580 ("[A] police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later

used to deprive the defendant of her liberty in some way."). A due process violation is plausibly stated because plaintiff has alleged that the prosecutor defendants knew about and facilitated the ISP defendants' fabrication of the earlier abduction time which eliminated plaintiff's alibi and led to plaintiff's conviction and incarceration. It is further alleged that this earlier abduction time and other fabricated evidence was included in the documents used to secure an arrest warrant which resulted in plaintiff's detention leading ultimately to four years' imprisonment. A due process claim based on fabrication of evidence, although most commonly based on the presentation of the fabricated evidence at trial which results in a wrongful conviction followed by incarceration, can also be based on the use of fabricated evidence to secure an arrest or indictment which leads to pre-trial incarceration. See Saunders-El v. Rohde, 778 F.3d 556, 561 (7th Cir. 2015); Alexander v. McKinney, 692 F.3d 553, 557 (7th Cir. 2012); Patrick v. City of Chicago., 213 F. Supp. 3d 1033, 1048 (N.D. Ill. 2016) ("[W]hat matters for a due-process fabrication claim is simply whether fabricated evidence caused a plaintiff to be wrongfully confined ("in some way").". Thus, the court is satisfied that plaintiff has alleged a plausible fabrication of evidence claim against the prosecutor defendants and will not dismiss Count IV.

## 6. Federal Malicious Prosecution Under § 1983

The prosecutor defendants contend that plaintiff's federal malicious prosecution claim under § 1983 should be dismissed because such a claim is not actionable where Illinois law recognizes a tort claim for malicious prosecution. As noted in section II.B.2 of this order, this contention is based on outdated law. Nevertheless, defendants are correct that Count V must be dismissed. Since the parties filed their briefs, the Seventh Circuit has explained that:

> We said in Newsome v. McCabe, 256 F.3d 747 (7th Cir. 2001), that there is no free-standing constitutional tort of malicious prosecution, though there are other constitutional rights (e.g., such as those under the Due Process Clause and the Fourth Amendment) that protect people against abusive arrests, fabrication of evidence, etc. While Manuel rejected some aspects of Newsome's holding, nothing in Manuel changed the general rule that the federal constitution does not codify state tort law. But in this case, the fact that the plaintiffs have used the terminology "malicious prosecution" is of no moment. What matters is whether they have identified the constitutional right at issue, and they have done so. The Fourteenth Amendment's Due Process Clause is the relevant constitutional source; it forbids the state from depriving a person of liberty (including by pre-trial detention) based on manufactured evidence.

Hurt, 880 F.3d at 843. It is now clear that there is no free-standing constitutional tort of malicious prosecution but, rather, such a claim must be based on an identified constitutional right. Plaintiff's § 1983 malicious prosecution claim is expressly based upon the same alleged constitutional deprivations as are alleged in Counts I through IV. As such, Count V, no matter how it is styled, is merely redundant of those claims and is therefore superfluous. Therefore, Count V is dismissed.

## 7. Conspiracy

Next, the prosecutor defendants contend that plaintiff has failed to state claims in Counts VI and IX for conspiracy to deprive him of his federal constitutional rights and conspiracy under Illinois law, respectively. In particular, the prosecutor defendants maintain that plaintiff does not plead

instances of conduct by them but, rather, seeks to hold them liable for the misconduct of the police officer defendants by pleading in conclusory fashion that the prosecutor defendants agreed to join the officers in falsely implicating plaintiff in the murder. The court disagrees.

Plaintiff has alleged that the prosecutor defendants, Engerman, Trevarthen, and Escarcida, entered into an agreement with each other and the ISP defendants, Hanley, Damasky, and Smith. Plaintiff also alleges that Engerman knew of and approved of a suggestive photo array, and did so in an effort to falsely implicate plaintiff. The ISP defendants then knowingly falsified the abduction time in order to eviscerate plaintiff's alibi. Plaintiff alleges further that Campbell joined Trevarthen and Escarcida and knowingly continued to use the falsified abduction time and false identification in directing the investigation of plaintiff culminating in his arrest in Seattle. These factual allegations of an agreement amongst the prosecutor defendants and the other defendants to frame plaintiff for the murder state a claim to relief that is plausible on its face. See Iqbal, 556 U.S. at 678. Therefore, the prosecutor defendants' motion to dismiss the conspiracy claims alleged against them is denied.

### 8. IIED

The prosecutor defendants advance two of the same arguments as did the Seattle defendants in attacking plaintiff's IIED claim alleged in Count VIII: that it fails to allege extreme and outrageous conduct and it is untimely. As explained in section II.B.7 above, plaintiff has alleged that all of the defendants' conduct, including that of the prosecutor defendants, was part of an intentional and knowing effort to frame him for a crime he did not commit and was therefore extreme and outrageous. Such conduct, if it occurred, certainly meets that criteria, see Alexander, 721 F.3d at 425. Like the Seattle defendants, the prosecutor defendants rely on Bridewell in support of their argument that plaintiff's IIED claim is untimely. However, as explained in section II.B.7, because the plaintiff in Bridewell did not suffer a conviction, Heck did not apply. In contrast, in this case a successful IIED claim based on the conduct alleged would necessarily call into question the validity of plaintiff's conviction. Consequently, under Heck, the one-year statute of limitations did not begin to run until plaintiff's conviction was overturned in 2016. For these reasons, the prosecutor defendants' motion to dismiss Count VIII fails.

### 9. DeKalb County Employees

Lastly, the prosecutor defendants contend that the indemnification claim against DeKalb County alleged in Count XI should be dismissed because they are State employees and not employees of DeKalb County. This contention is without merit because the County has a duty to indemnify State officials, like State's Attorneys, because the County funds the office of that official. Robinson v. Sappington, 351 F.3d 317, 339 (7th Cir. 2003) ("The fact that some of the parties involved are state officials, as opposed to employees of the [County], does not alter that fiscal responsibility."); see also Cannon v. Burge, No. 05 C 2192, 2006 WL 273544, at *21 (N.D. Ill. Feb. 2, 2006) ("[T]hat [the State's Attorney] was not an employee of the County does not automatically release the County from liability for indemnification."). Therefore, the court denies the prosecutor defendants' motion to dismiss count XI.

Thus, the prosecutor defendants' Rule 12(b)(6) motion to dismiss is granted in part and denied in part. Count V is dismissed with prejudice as superfluous. Count II is dismissed without prejudice to refiling.

### III. CONCLUSION

For the foregoing reasons, the Seattle defendants' Rule 12(b)(2) motion to dismiss is denied and their Rule 12(b)(6) motion to dismiss is granted in part and denied in part. The Brady claim alleged against the Seattle defendants in Count I is dismissed with prejudice. The prosecutors' Rule 12(b)(6) motion to dismiss is granted in part and denied in part. Count V is dismissed with prejudice. Count II is dismissed without prejudice to refiling within 30 days.

Date: 7/20/2018

ENTER:

FREDERICK J. KAPALA

District Judge