# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| JACK D. McCULLOUGH, | ) | Case No. 3:17 cv 50116 |
| | ) | |
| Plaintiff, | ) | Judge Frederick J. Kapala |
| | ) | |
| v. | ) | Magistrate Judge Iain D. Johnston |
| | ) | |
| ILLINOIS STATE POLICE AGENT BRION | ) | |
| HANLEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## SEATTLE DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT

Defendants, City of Seattle, Irene Lau, Cloyd Steiger, and Michael Ciesynski ("Seattle Defendants"), answer Plaintiff's Amended Complaint as follows:

## INTRODUCTION

1. Plaintiff Jack D. McCullough was tragically convicted of the 1957 abduction and homicide of Maria Ridulph –a crime he absolutely did not commit.

**ANSWER:** Seattle Defendants admit Plaintiff was convicted of the 1957 abduction and homicide of Maria Ridulph and are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

2. Defendants gained national notoriety by "solving" the Ridulph murder over 50 years after it occurred.

**ANSWER:** Seattle Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegation of this paragraph and therefore deny the same.

3. In reality, Plaintiff was undeniably innocent, but Defendants accomplished their goal by fabricating false evidence and hiding exculpatory evidence to frame Mr. McCullough.

**ANSWER:** Seattle Defendants deny the allegations of this paragraph.

4. In so doing, Defendants ignored contemporaneous FBI reports created in 1957 exonerating Plaintiff from having anything whatsoever to do with this murder.

**ANSWER:** Seattle Defendants deny the allegations of this paragraph.

5. Defendants' malicious plan succeeded, and Plaintiff was wrongfully convicted.

**ANSWER:** Seattle Defendants deny the allegations of this paragraph.

6. It was only when Richard Schmack was elected as the chief prosecutor of DeKalb County that an honest and objective investigation of Plaintiff's conviction was done. That investigation reached the conclusion that Defendants blatantly ignored – that Mr. McCullough was undeniably innocent. Plaintiff's conviction was overturned, he was released from imprisonment under a life sentence, and later granted a certificate of innocence.

**ANSWER:** Seattle Defendants deny the first and second sentences and admit the third

sentence of this paragraph.

7. Nevertheless, Mr. McCullough, a United States veteran and grandfather, lost years of his life as a result of Defendants' actions. He brings this suit to redress the damages related to his wrongful conviction, and further seeks to hold accountable the individuals whose misconduct caused him irreparable harm.

**ANSWER:** Seattle Defendants admit Plaintiff filed this suit seeking damages related to

his conviction and that he served in the military. Seattle Defendants lack knowledge or information

sufficient to form a belief as to whether Plaintiff is a grandfather. Seattle Defendants deny the

remaining allegations of this paragraph.

## JURISDICTION AND VENUE

8. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution and applicable state law. This court has jurisdiction pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b). Most of the events giving rise to the claims asserted herein occurred here, and most parties live within or are affiliated with this District.

**ANSWER:** Seattle Defendants admit this Court has subject matter jurisdiction over

Plaintiff's federal claims under 42 U.S.C. § 1983 as stated and deny the remaining allegations in

this paragraph.

## **THE PARTIES**

9.     Plaintiff Jack D. McCullough is a 77-year old military veteran who now resides in Washington State.

**ANSWER:**     Seattle Defendants admit Plaintiff is 77 years old and served in the military.

Seattle Defendants are without knowledge or information sufficient to form a belief as to the truth

of the remaining allegations of this paragraph and therefore deny the same.

10.     At all times relevant, Defendants Sergeant Daniel P. Smith, Agent Todd Damasky, Agent Brion Hanley, Agent Larry Kot, and unidentified employees of the Illinois State Police were employed as law enforcement officers by the Illinois State Police. All are sued in their individual capacities, and acted under color of law and within the scope of their employment during the investigation and prosecution of the Plaintiff for the abduction and homicide of Maria Ridulph.

**ANSWER:**     Seattle Defendants admit Smith, Damasky, and Hanley are or were law

enforcement officers for the Illinois State Police and that they are being sued in their individual

capacities. Seattle Defendants lack knowledge or information sufficient to form a belief as to the

truth of the remaining allegations of this paragraph.

11.     At all times relevant, Defendants Detective Irene Lau, Detective Cloyd Steiger, and Detective Michael Ciesynski were police officers for the Seattle Police Department in Seattle, Washington. All are being sued in their individual capacity for actions taken under the color of law and within the scope of their employment during the investigation and prosecution of the Plaintiff for the abduction and homicide of Maria Ridulph.

**ANSWER:**     Seattle Defendants admit Lau, Steiger, and Ciesynski were police officers

for the Seattle Police Department in Seattle, Washington, that they are sued in their individual

capacities, and that they acted under the color of law and within the scope of their employment in

connection with the Maria Ridulph matter. Seattle Defendants deny the remaining allegations of

this paragraph.

12.     Defendants Smith, Damasky, Hanley, Kot, Lau, Steiger, and Ciesynski are hereinafter referred to as "the Defendant Police Officers".

**ANSWER:** Seattle Defendants admit the Complaint defines "the Defendant Police Officers" as indicated and deny any remaining allegations in this paragraph.

13.     Defendant City of Seattle is a Washington State municipal corporation under the laws of the State of Washington, and operates the Seattle Police Department.

**ANSWER:** Seattle Defendants admit the allegations in this paragraph.

14.     At all times relevant, Defendant former State's Attorney Clay Campbell headed the DeKalb County State's Attorney's Office, and former Assistant State's Attorneys William Engerman, Victor Escarcida, and Julie Trevarthen were Assistant State's Attorneys for the DeKalb County State's Attorney's Office. All are being sued in their individual capacities for actions taken under the color of law and within the scope of their employment during the investigation and prosecution of the Plaintiff for the abduction and homicide of Maria Ridulph. Defendants Campbell, Engerman, Escarcida, and Trevarthen are being sued exclusively for their actions in investigation of Plaintiff outside of court proceedings, and not for any action related to their official in-court duties, to the extent any are applicable, concerning the prosecution of Plaintiff.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

15.     When discussed collectively, Defendants Campbell, Engerman, Escarcida, and Trevarthen are hereinafter referred to as "the Prosecutor Defendants."

**ANSWER:** Seattle Defendants admit the Complaint defines "the Prosecutor Defendants" as indicated.

16.     Defendant DeKalb County, Illinois operates the DeKalb County State's Attorney's office and is named as an indemnitor of Defendants Campbell, Engerman, Escarcida, and Trevarthen.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

## FACTS

17.     Maria Ridulph was seven years old in the winter of 1957. Maria lived in Sycamore, Illinois with her parents, two sisters, and brother.

**ANSWER:** Seattle Defendants admit this paragraph.

18.     Maria was kidnapped on December 3, 1957. Her disappearance sparked a national outcry. Dozens of FBI agents descended on Sycamore, Illinois, to lead the investigation intended to rescue Maria and bring her kidnapper to justice.

**ANSWER:**     Seattle Defendants admit Maria was kidnapped on December 3, 1957, that her disappearance received national attention, and that FBI agents traveled to Sycamore, Illinois to investigate. Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

19.     To that end, two FBI agents moved to Sycamore, where they set up headquarters, so that they could dedicate more time to the investigation.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

20.     Tragically, Maria's body was recovered on April 26, 1958, near Galena, Illinois, in a heavily forested area off Highway 20. Once it was determined the body had not crossed state lines, the FBI agents concluded their investigation without identifying the perpetrator.

**ANSWER:**     Seattle Defendants admit that reports indicate Maria's body was recovered on April 26, 1958 three miles east of Woodbine, Illinois on Route 20, in a timbered area just north of the highway. Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

21.     The FBI, however, left a comprehensive record of its investigation. Over four months, the FBI meticulously documented thousands of interviews and hundreds of suspects.

**ANSWER:**     Seattle Defendants admit the FBI left a record of its investigation, including interviews. Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

22.     The following facts were documented in the FBI's exhaustive investigation, taken from interviews with the victim's family and witnesses in the days following the abduction.

**ANSWER:** Seattle Defendants admit the FBI interviewed the victim's family and witnesses following the abduction and documented facts in its investigation. Seattle Defendants lack knowledge or information sufficient to form a brief as to the truth of the remaining allegations in this paragraph.

23. The timeline of December 3, 1957 establishes that Mr. McCullough was in Rockford, over 30 miles away, at the time of the crime and thus could not possibly have been the perpetrator.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

24. According to her mother, Maria left her house to play outside at 5:50 p.m.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

25. At 6:02 p.m., Maria's eight year-old friend Kathy Sigman went to play with Maria.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

26. The two girls played on the corner two doors down from Maria's house (and seven doors down from Kathy's).

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

27. At least seven people observed the two girls playing alone on the corner between 5:50 and 6:30 p.m.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

28. Specifically, Maria's mother reported driving her eldest daughter to music class at 6 p.m. and returning at 6:05 p.m., and that she observed Maria and Kathy playing on the corner alone both times.

**ANSWER:**    Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

29.    Other neighbors also reported observing the girls playing together on the corner in the same time frame without any adults around 6:30 p.m.

**ANSWER:**    Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

30.    Kathy reported that at about 6:30 p.m., a man approached Maria and Kathy and began playing with them.

**ANSWER:**    Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

31.    The man was a stranger to Maria and Kathy.

**ANSWER:**    Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

32.    The man gave Maria a piggyback ride and then returned to the corner. The man told Maria he would give her another piggyback ride if she could find a doll.

**ANSWER:**    Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

33.    Maria went home, retrieved her doll, and returned to the corner for another piggyback ride.

**ANSWER:**    Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

34.    Maria's trip home to get a doll occurred at 6:40 p.m., as recounted by her mother.

**ANSWER:**    Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

35.     That time was confirmed by Maria's father, who reported that Maria got her doll while he was watching the television show Cheyenne, which began airing at 6:30 p.m. that evening, and by her brother, who also stated that Maria obtained her doll after 6:30 p.m.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

36.     Maria returned to the corner with her doll and received another piggyback ride. The two girls played with the stranger for a while longer until Kathy's hands got cold and she went home to get a pair of mittens. Before she left, Kathy asked the stranger the time and he told her it was 7 p.m.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

37.     Kathy's mother reported that Kathy came home to get her mittens at approximately 6:50-6:55 p.m.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

38.     When Kathy returned to the corner with her mittens, Maria and the stranger were gone. She was never seen alive again.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

39.     Accordingly, the FBI determined that Maria was abducted between 6:50 p.m. and 7 p.m.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

40.     At the time the perpetrator was abducting Maria Ridulph, Mr. McCullough was stepping off a train in Rockford.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

41.     Newly eighteen years old, Mr. McCullough had spent the day of December 3, 1957, at the Air Force's induction center in Chicago, receiving an x-ray to determine his fitness for duty.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

42.     Mr. McCullough had been planning to enlist for some time and his physical was the last step. The personnel in Chicago directed Mr. McCullough to bring a note to the recruiting office in Rockford, stating that if Plaintiff's doctor confirmed his good health, he could enlist in the military.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

43.     At approximately 5:15 p.m., Plaintiff boarded a train in Chicago bound for Rockford. He arrived in Rockford at about 6:45 p.m., and walked to the United States Post Office in town, which also housed the Air Force recruiting center.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

44.     At the post office, Mr. McCullough found the recruiting center closed, but ran into a military officer, who directed him to speak to Staff Sergeant Froom.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

45.     Mr. McCullough followed this direction. While still in Rockford, Plaintiff contacted Sergeant Froom, who in turn advised Mr. McCullough to call the recruiting sergeant, Sergeant Oswald, and relay the information he had received from the induction center. In Sergeant Froom's presence, Plaintiff then called Sergeant Oswald and passed along the message from the induction center.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

46.     While still at the post office, at 6:57 p.m., Mr. McCullough placed a collect call to his parents' home, seeking a ride home to Sycamore from his father.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

47.     Mr. McCullough also called his then-girlfriend, Jan Edwards, and made a date to see her that night at her home.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

48.     Mr. McCullough ate some pie at a nearby diner while awaiting his father; his father then drove Mr. McCullough the approximately thirty miles and delivered him to Ms. Edwards' home.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

49.     As part of the wide net cast by their investigation, the FBI questioned Mr. McCullough and his parents just days after Maria's abduction.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

50.     Mr. McCullough's parents confirmed that they had received a call from Mr. McCullough at 7 p.m. on December 3, and that Plaintiff's father had driven to Rockford to retrieve him.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

51.     The local telephone company confirmed that the collect call from the post office to Mr. McCullough's parents' house was placed at 6:57 p.m. by Mr. McCullough.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

52.     The FBI questioned Plaintiff, and he related his whereabouts throughout the day, as described above.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

53.     Although Plaintiff did not know the names of any of the three Air Force personnel he spoke to in Rockford, the FBI found Sergeant Oswald, who confirmed that he spoke to Plaintiff shortly after 7 p.m. on December 3rd at the Rockford recruiting center. Sergeant Oswald also confirmed that Plaintiff had interacted with Colonel Liebovich and Sergeant Froom while in Rockford just before he called Sergeant Oswald. Sergeant Oswald related that he then met Plaintiff in person the next day.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

54.     Given his alibi – that Plaintiff was in Rockford, over thirty miles from Sycamore at the same time Maria was being abducted – the FBI cleared Mr. McCullough as a suspect.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

55.     The FBI's decision to clear Mr. McCullough as a suspect was correct because Mr. McCullough could not have committed the crime.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

56.     Mr. McCullough then carried on with his life. On December 11, 1957, he left home for a four year tour in the Air Force. He was then honorably discharged.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

57.     Mr. McCullough later re-enlisted in the Armed Services, this time in the Army. Mr. McCullough worked in Army Intelligence, working his way to become a Captain and serving in Vietnam.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

58.     Mr. McCullough left the service after spending over a decade in the Army, and moved to Washington State.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

59.     There, Mr. McCullough raised a family and he and his wife looked forward to their retirement together.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

60.     In 2008, Mr. McCullough had no inkling that a number of law enforcement officers were conspiring to frame him for the Maria Ridulph murder.

**ANSWER:**     Seattle Defendants deny that they conspired to frame McCullough for the Maria Ridulph murder, and therefore deny the allegations of this paragraph.

61.     In the fifty years after Maria's death, many tips were provided to the police, but none panned out. It was the type of notorious case that garnered attention, for better or worse.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

62.     Mr. McCullough had a contentious relationship with his step-sister, Janet Tessier, and they were not on speaking terms after the turn of the century.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

63.     Mr. McCullough's mother died in 1994, and his father passed away in 2006.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

64.     In 2008, Janet came forward with a salacious accusation—she claimed that, on her death bed fourteen years prior, while she drifted in and out of being lucid, including periods where she seemed comatose and incoherent, Plaintiff's mother had said that Plaintiff had something to do with the "two little girls," one of whom disappeared.

**ANSWER:**    Seattle Defendants admit that in 2008, Janet Tessier, told Hanley and Kot that she was by her mother's bedside in the hospital in 1994 when her mother said, "Remember the two little girls, John did it" and "John was the one who killed that girl (Maria)," and instructed her to tell the police that John killed Maria. Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

65.    Janet claimed that Plaintiff's mother was referencing the Maria Ridulph abduction.

**ANSWER:**    Seattle Defendants admit the allegations in this paragraph.

66.    In reality, Plaintiff's mother was in an altered mental state hours before her death after a long illness.

**ANSWER:**    Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

67.    In addition, Plaintiff's other half-sister, Mary, who was also present, stated that Plaintiff's mother only uttered the vague phrase, "he did it," without explaining who "he" was or what "he" did.

**ANSWER:**    Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

68.    The timing of the allegation was both suspect and prejudicial to Plaintiff. By waiting fourteen years before coming forward, until after Plaintiff's father died, Plaintiff did not have his father available to rebut the totally false claim.

**ANSWER:**    Seattle Defendants lack knowledge or information sufficient to form a believe as to McCullough's father's availability and deny the remaining allegations in this paragraph.

69.    Nevertheless, Defendant Hanley ignored the obvious problems surrounding the over a decade late report that a mentally-unstable woman made a vague statement, and set off in hopes of making a name for himself in connection with this famous crime. He started by re-opening the Ridulph case.

**ANSWER:** Seattle Defendants admit Hanley re-opened the Ridulph case and lack knowledge or information sufficient to form a believe as to the truth of the remaining allegations in this paragraph.

70. In October 2008, less than two weeks after the case was re-opened, Defendants Hanley and Kot began working together to build a case that purposefully targeted Mr. McCullough.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

71. Along the way, these Defendants expanded the reach of their agreement to include law enforcement officials from other jurisdictions—including the Seattle Police Department and the Individually-named Seattle Defendants, and DeKalb County State's Attorney' office and the Individually-named prosecutor Defendants.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

72. Over the next year and a half, Defendants spent countless hours gathering information about the crime and, specifically, finding anyone who would talk to them about Mr. McCullough.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

73. Given the passage of time, many people with knowledge of the crime had long since passed away.

**ANSWER:** Seattle Defendants admit the allegations in this paragraph.

74. Inexplicably, all of the Defendants wrongly decided that Mr. McCullough had something to do with Maria's death.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

75. Through the course of the investigation, each of the individually- named defendants reached this erroneous conclusion and then, in different ways and at different times, agreed to pursue Mr. McCullough as the murderer despite his innocence.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

76.     Due to their tunnel vision, the Defendants reached – and maintained – this conclusion despite obtaining the FBI's file, including the documents conclusively establishing Mr. McCullough's innocence via his alibi.

**ANSWER:**     Seattle Defendants admit they obtained at least part of the FBI's file and deny the allegations in this paragraph.

77.     In 2009, the DeKalb County State's Attorney's Office began actively working on the Ridulph investigation with the Illinois State Police.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

78.     With Plaintiff already in mind, Defendant Hanley began meeting and coordinating the Ridulph investigation with members of the DeKalb County State's Attorney's office, including but not limited to Defendants Engerman, Trevarthen, and Escarcida.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

79.     Defendant Engerman was the second in command of the DeKalb State's Attorney's Office, and decided to direct the investigation into Jack McCullough. Defendant Engerman instructed the Defendant Police Officers to follow specific leads, including trying to dig up as much dirt as possible on Plaintiff. Defendant Engerman specifically requested he be informed after every single lead was investigated by the Police Officer Defendants, and stated that he "wants to be involved as a working participant of" the McCullough investigation.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

80.     In 2010, Defendants Hanley and Damasky contacted Jan Edwards. Ms. Edwards informed the investigators what she recalled from the night of the abduction – that she had a date to see Mr. McCullough at her home, Plaintiff arrived at her home, and he was excited to be enlisting in the military. Two months later, Ms. Edwards provided these Defendants with a train ticket issued to Plaintiff by the military that he had given to her on the night of the abduction, which she had found tucked inside an old picture frame.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

81. Working with others, Defendants Hanley and Damasky, however, concocted an entirely false version of their interview with Edwards.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

82. They falsely reported that Ms. Edwards stated that she did not remember seeing Mr. McCullough that night, that they did not have a date to meet, and that Mr. McCullough's enlistment in the military was both abrupt and a complete surprise to her.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

83. In September 2010, Defendants Hanley and Damasky approached Kathy Sigman, now sixty-one years old.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

84. Defendants Hanley and Damasky spoke with Ms. Sigman for over an hour. During this interview, Hanley and Damasky asked Ms. Sigman to describe the man who played with her and Maria over fifty years prior. Ms. Sigman indicated that the man was "tall, slender face, sandy blonde hair, clean shaven, maybe twenty to thirty years of age."

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

85. Following the interview, Defendants Hanley, Damasky, and Smith concocted a photo array that was obviously biased against Mr. McCullough and did not fit the description Ms. Sigman gave Defendants Hanley and Damasky.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

86. Defendant Engerman viewed and approved the overtly suggestive photo array and encouraged Defendants Hanley and Smith to show it to Ms. Sigman.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

87.     The bias of the photo array was apparent. For one thing, although Kathy described the perpetrator as having blond hair, three of the photos in the array had dark hair.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

88.     Indeed, only two of the six photos (one of which was Plaintiff's) might fit the description of the perpetrator as having blond hair and a slender face.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

89.     To make matters worse, Defendants used an old photograph of Plaintiff and five fillers pulled from a high school yearbook.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

90.     The yearbook photos were uniform in that each photograph depicted a young man in a suit and tie, with a light background, looking slightly away from the camera. Each of these photos was on light background.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

91.     By contrast, Plaintiff's photograph depicted him wearing neither a suit nor a tie, looking directly at the camera, and was set in front of a dark background.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

92.     As a result, Plaintiff's photograph was the only photograph that stood out from the others.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

93.     Nevertheless, Defendants Hanley and Smith, presented the photo array to Sigman in September 2010.

**ANSWER:** Seattle Defendants admit that Hanley presented a photo array to Kathy Sigman in September 2010 and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

94. Following protocol, Defendants Hanley and Smith presented each photograph from the array sequentially, indicating that they understood that a side by side comparison of photos might lead to an unreliable identification.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

95. Sigman did not select any of the photographs from the initial presentation of the array. The procedure should have stopped there, with a result of no identification.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

96. Instead, these Defendants permitted Sigman to exclude three photos (the three dark haired fillers) and compare the remaining three photographs together. After four minutes of contemplation, Sigman chose Defendants' suspect, Mr. McCullough.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

97. This identification was totally unreliable. Defendants Hanley and Smith's decision to show Sigman the photo array was unnecessarily suggestive, tainted her memory, and manufactured a false identification.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

98. But, Defendants Engerman, Hanley, Damasky, and Smith knew that they had to put their thumbs on the scale in order to obtain an identification from Ms. Sigman that would implicate Plaintiff. Indeed, these Defendants knew that – based on the FBI documents and the more than fifty years that had passed since the murder – no line-up should have ever been shown to Ms. Sigman.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

99.     Kathy Sigman was only eight years old at the time of the crime and was shown thousands of photographs by the FBI. Her initial description indicated that the perpetrator was a stranger and was missing an eyetooth. This description excluded Mr. McCullough, who lived just a few blocks away in the small town, and was not missing any teeth.

**ANSWER:**     Seattle Defendants admit Sigman was eight years old at the time of the

crime, and lack knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in this paragraph.

100.     Moreover, Kathy's description had changed significantly over time.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

101.     In fact, in the two weeks following Maria's abduction, Kathy's description of "Johnny" changed at least three different times, with some of the identifying characteristics changing significantly, including age, height, hair color and even the way she described the perpetrator's teeth.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

102.     For example, in the first two weeks, Kathy first description of "Johnny's" age started as between "24 and 25," expanded to a range of "25 and 35" and then morphed into the claim that "Johnny" actually just told her he was 24. At the same time, the perpetrator, according to Kathy, got shorter—he started out at about 6 feet tall, but that description shifted to 5'8." Similarly, Kathy's description of "Johnny's" teeth varied—beginning with the claim that they were "even" and "pretty" which later became a description of "large and yellowish."

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in this paragraph, and therefore deny the same.

103.     Sigman had previously identified two other men as being the perpetrator prior to been shown the photo array in 2011.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

104. To bolster the shaky identification, Defendants falsely claimed that Ms. Sigman had "immediately pointed to the photo of [Plaintiff] and said, 'that's him.'" Similarly, the Defendants also lied in alleging that Ms. Sigman's description indicated that the perpetrator had a gap in his front teeth, which happened to fit Plaintiff's description. This was a further fabrication.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

105. Based on the above, all of the Defendants knew that Sigman's "identification" could not provide probable cause to believe that Mr. McCullough had anything to do with the murder. Indeed, none of the Defendants moved to arrest Plaintiff until nine months after Sigman's unreliable identification.

**ANSWER:** Seattle Defendants admit Plaintiff was arrested in June 2011 and deny the remaining allegations in this paragraph.

106. Moreover, Mr. McCullough's alibi wholly exculpated him from having anything to do with Maria's death. Unfazed, Defendants decided to manipulate the evidence in an attempt to falsely suggest that Plaintiff had the opportunity to commit the crime.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

107. Knowing that Plaintiff was conclusively established to have been in Rockford at 6:57 p.m., these Defendants knew that the only way they could charge Plaintiff was if the time of the abduction was fabricated to make it earlier.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

108. Accordingly, without any evidentiary support whatsoever, these Defendants falsely maintained throughout the investigation that the crime occurred between 6 and 6:15 p.m.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

109. This notion was, of course, impossible. Maria's parents both saw her alive after 6:30 p.m., when the television show Cheyenne began, and by all accounts the abduction occurred between 6:50 and 7 p.m.

**ANSWER:** Seattle Defendants deny the allegations of the first sentence of this paragraph. Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the second sentence in this paragraph.

110. In fabricating evidence, these Defendants created a false timeline to attempt to support the false idea that Plaintiff had enough time to commit the crime and then traveled to Rockford in time to meet with the Air Force officials and place the collect call to his parents.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

111. Prior to Mr. McCullough's arrest, interrogation, and lie detector test, each of the Prosecutor Defendants had participated in the investigation of the Ridulph homicide and agreed to work with the Defendant Officers to falsely implicate Plaintiff.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

112. In November 2010, Defendant Campbell was elected State's Attorney of DeKalb County.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

113. Shortly following his election, Defendant Campbell became personally involved in the McCullough investigation.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

114. Eager to "solve" the nation's oldest cold case, Defendant Campbell took over Defendant Engerman's previous role as the main person in the DeKalb County State's Attorney's Office directing the Defendant Police Officers in the investigation.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

115. In his eagerness, Defendant Campbell indicated to the Illinois Defendant Officers that he wanted to oversee the case long before Plaintiff was even arrested.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

116.    Although there was no probable cause to believe that Mr. McCullough was involved with Maria Ridulph's disappearance and murder, Defendant Campbell participated in the criminal investigation of Mr. McCullough, alongside Defendants Trevarthen, and Escarcida.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

117.    In so doing, Defendants Campbell, Trevarthen, and Escarcida had agreed not to conduct a fair, impartial investigation. Instead, quite apart from seeking honest evidence or probable cause, Defendant Campbell was focused solely on investigating and implicating Plaintiff.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

118.    Defendants Campbell, Trevarthen, and Escarcida, worked closely with the Illinois Defendant Officers to continue the criminal investigation for several months before the investigation turned to Seattle. This included regularly consulting with the Defendant Police Officers, maintaining close communication and direction of the investigation, and using the resources of their office to investigate the crime.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

119.    Defendants Smith, Damasky, Hanley, Kot, Campbell, Trevarthen, and Escarcida knew that there was no probable cause to arrest Mr. McCullough for this cold case.

**ANSWER:**     Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

120.    Accordingly, these Defendants sought to gather more bogus and false evidence against Plaintiff by coordinating with police officers in another state – Washington – to attempt to secure his false arrest.

**ANSWER:**     Seattle Defendants deny the allegations in this paragraph.

121.    The individual defendants from the Illinois State Police and DeKalb County State's Attorney's Office had learned that that Mr. McCullough relocated to Seattle. To further implement

their agreement, Defendants contacted officers from the Seattle Police Department, including Defendants Lau, Steiger, and Ciesynski, and possibly others.

**ANSWER:**     Seattle Defendants admit the first sentence of this paragraph and deny the

remaining allegations of this paragraph.

122.     After being asked to assist in investigating a homicide in Illinois, and understanding that they would be seeking to secure the prosecution of Plaintiff in Illinois (and not Washington State), Defendants Lau, Steiger, and Ciesynski agreed to work with the Illinois-based Defendants from the Illinois State Police and DeKalb County State's Attorney's Office to attempt to link Plaintiff to the homicide, even though he was innocent.

**ANSWER:**     Seattle Defendants admit Lau, Steiger, and Ciesynski were asked to assist

in the investigation of a homicide in Illinois and provide some assistance to the Illinois-based

Defendants. Seattle Defendants deny the remaining allegations in this paragraph.

123.     Defendants Lau, Steiger, and Ciesynski knew they had agreed to participate in investigating a "cold-case murder'" in Illinois and that any prosecution of Plaintiff would take place in Illinois, not Seattle.

**ANSWER:**     Seattle Defendants admit they knew the investigation of Plaintiff related to

a murder that was committed in 1957 and deny the remaining allegations in this paragraph.

124.     These Defendants also understood that, though they would be conducting investigative activities in Washington, using their authority as Seattle PD officers, and even using the facilities and resources of the Seattle Police Department, that the aim of their investigation was Sycamore, DeKalb County, Illinois.

**ANSWER:**     Seattle Defendants admit they conducted activities within the state of

Washington, using their authority as Seattle Police Department officers, and using the facilities

and resources of the Seattle Police Department and deny the remaining allegations in this

paragraph.

125.     In so doing, Defendants Ciesynski and Steiger met with the Illinois- based Defendants Hanley and Damasky who had traveled to Seattle in an attempt to secure Plaintiff's false arrest for the Ridulph homicide.

**ANSWER:** Seattle Defendants admit that Hanley and Damasky were based in Illinois and that Steiger and Ciesynski met Hanley and Damasky in Seattle and deny the remaining allegations of this paragraph.

126.    In furtherance of their agreement to coordinate their investigation, the Seattle Defendant Officers and Illinois Defendants collaborated extensively throughout the investigation; including, for example, writing police reports in conjunction with one another and exchanging other contemporaneously-generated reports when they had not been written together.

**ANSWER:** Seattle Defendants admit they exchanged documents regarding the investigation with the Illinois Defendants and that they wrote reports about their activities in connection with the investigation and deny the remaining allegations of this paragraph.

127.    In fact, Defendant Steiger both authored and signed the Statement of Probable Cause and the Affidavit for Search Warrant that led to Plaintiff's arrest. Defendant Steiger, with knowledge and approval of Defendants Ciesynski, Hanley, and Damasky, included false information in that affidavit in an attempt to make it appear that probable cause to arrest Plaintiff existed, where it did not.

**ANSWER:** Seattle Defendants admit Steiger authored and signed the Statement of Probable Cause and the Affidavit for Search Warrant pertaining to Plaintiff's arrest and deny the remaining allegations in this paragraph.

128.    Some of the false facts in that affidavit included: falsely claiming that Sigman "immediately" identified Plaintiff from a photo array; falsely stating that Maria disappeared at 6:15 p.m., to try to cast doubt on Plaintiff's alibi; repeating the above lies that Jan Edwards did not remember seeing Mr. McCullough the night of the abduction and that her parents would not have let her out of the house on that night, when in fact she never said those things; claiming that Plaintiff had legally changed his name shortly after Maria's disappearance, when that did not occur until many decades later; and omitting the fact that Air Force personnel had verified Plaintiff's alibi, in a further effort to delegitimize Plaintiff's alibi.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

129.    Based on Defendant Steiger's false affidavit, Mr. McCullough was ultimately arrested and questioned.

**ANSWER:** Seattle Defendants admit Plaintiff was arrested and questioned, and deny the remaining allegations of this paragraph.

130. Prior to the arrest and interrogation, the Seattle Defendant Officers consulted with the Defendants based in Illinois, and agreed upon the manner in which the investigation would proceed, how they would arrest Plaintiff, and how they would attempt to get him to provide an inculpatory statement in the decades- old, Illinois-based homicide of Maria Ridulph.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

131. To that end, Defendants Ciesynski and Steiger actively participated in the investigation, including: traveling to Plaintiff's former employer's office, going to Plaintiff's home, contacting Plaintiff under false pretenses, lying to Plaintiff about why they had gone to his former employers, and lying about why they eventually went to his home looking for him.

**ANSWER:** Seattle Defendants admit Ciesynski and Steiger went to Plaintiff's residence and deny the remaining allegations in this paragraph.

132. Thereafter, the Seattle Officers participated in the arrest and interrogation of Mr. McCullough alongside the ISP Defendants.

**ANSWER:** Seattle Defendants admit Ciesynski and Steiger participated in Plaintiff's arrest and that Steiger participated in the Plaintiff's interview alongside certain Illinois-based Defendants and deny the remaining allegations of this paragraph.

133. From Seattle, the Defendant Officers Ciesynski, Steiger, Hanley, Damasky, and Lau continued the coordination of the investigation with Defendants Campbell, Trevarthen, and Escarcida.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

134. In doing so, Defendants Ciesynski, Steiger, and Lau knowingly participated in the investigation of Mr. McCullough for the murder of Maria Ridulph in Illinois.

**ANSWER:** Seattle Defendants admit the allegations in this paragraph.

135. At no point did any of the Seattle Defendant Officers refuse to participate in the investigation or intervene on behalf of Mr. McCullough to ensure that his constitutional rights were not violated.

**ANSWER:** Seattle Defendants admit that they did not refuse to participate in the investigation and deny the remaining allegations in this paragraph.

136. Instead, in concert with the Illinois Defendant Officers, and DeKalb County State's Attorney Defendants including but not limited to Defendants Campbell, Trevarthen, and Escarcida, the Seattle Defendant Officers agreed to participate, conduct, and cooperate in the investigation just as they would have done if the crime they were investigating were in Washington.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

137. While the Defendant Officers were in Seattle, Defendants Campbell, Trevarthen, and Escarcida thus coordinated with the Defendants who made the trip to Seattle, including maintaining frequent communication with them and providing guidance on how to conduct the on-going investigation.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

138. Even though no new non-fabricated evidence was discovered between the FBI's initial investigation and the reopened investigation in 2009, the Defendant Officers and Defendants Campbell, Trevarthen, and Escarcida all agreed to claim that there was probable cause to arrest Plaintiff for the murder even though they knew that there was not.

**ANSWER:** Seattle Defendants deny the allegations in this Paragraph.

139. Nonetheless, Plaintiff was arrested in Seattle, Washington in June 2011, over fifty years after the murder.

**ANSWER:** Seattle Defendants admit Plaintiff was arrested in Seattle, Washington in June 2011.

140. Given the crime's notoriety and the half a century gap between crime and arrest, Mr. McCullough's arrest made headlines in media sources across the country.

**ANSWER:** Seattle Defendants admit Plaintiff's arrest received media coverage, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

141.    Given the widespread media coverage, the Defendants were even more determined to ensure Plaintiff's conviction.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

142.    Following Plaintiff's arrest, he was brought to Defendant Seattle Police Detective Lau to be interrogated.

**ANSWER:**    Seattle Defendants admit Lau was asked to conduct a polygraph

examination of Plaintiff and deny the remaining allegations of this paragraph.

143.    Before doing so, and even though he was in custody, the arresting Defendants failed to provide Plaintiff with his Miranda warnings and launched into an interview – a mistake they would later attempt to "cure."

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

144.    Defendant Lau created a report of her interrogation, in which she attempted to falsely portray Mr. McCullough as unnaturally fixated on Maria.

**ANSWER:**    Seattle Defendants admit Lau wrote a report of her interactions with

Plaintiff and deny the remaining allegations in this paragraph.

145.    Defendant Lau falsely claimed that Mr. McCullough "described [Maria Ridulph] as being very stunningly beautiful with big brown eyes and he stated that she was 'lovely, lovely, lovely.'"

**ANSWER:**    Seattle Defendants admit Lau's report of her interactions with McCullough

states: "I asked him to describe Maria" and "He stated, 'She was stunningly beautiful, with big

brown eyes. She was lovely, lovely, lovely." Seattle Defendants deny the remaining allegations in

this paragraph.

146.    As the video of the interrogation bears out, it was Defendant Lau who called Maria beautiful, not Mr. McCullough, and Mr. McCullough said nothing about Maria's appearance until Lau tried to goad him by saying "bi-racial" couples "make the most beautiful kids," suggesting that Maria had multi-ethnic parents. Mr. McCullough simply agreed with Lau that Maria was adorable with big brown eyes. Defendant Lau's report omitted her own precursor statements about Maria's appearance.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

147.    Further, Defendant Lau suggested that Mr. McCullough's (fabricated) statements were even more incriminating because of his demeanor when he made them. According to Defendant Lau, when Mr. McCullough discussed Maria Ridulph, his "entire face changed. It softened and…he had just totally relaxed at this point." Driving the point further, Defendant Lau claimed that Mr. McCullough "was pretty angry" and "alternated between rage and calm," during his interview, but that when he discussed Maria he supposedly became eerily calm. The video demonstrates that there was no significant change in Mr. McCullough's volume, posture, or demeanor when he mentioned Maria, nor was there any indication that Mr. McCullough was angry or enraged during the interview.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

148.    Following his interrogation in Seattle, Defendants Steiger and Ciesynski assisted Defendants Hanley and Damasky with extraditing Plaintiff from Washington to Illinois. Defendants Steiger and Ciesynski accompanied Plaintiff on the flight from Seattle to Chicago, and then drove him to Sycamore, including to the scene of the abduction.

**ANSWER:**    Seattle Defendants admit the allegations in this paragraph.

149.    Throughout this transportation, Defendants Steiger and Ciesynski questioned Plaintiff continuously.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

150.    Defendants Steiger, Ciesynski, and Lau's work with the Illinois-based Defendants did not end there. Both Steiger and Ciesynski traveled to Illinois between December 16 and 22, 2011, meeting with Defendants Hanley, Campbell, Trevarthen, Escarcida, and possibly other Defendants, and discussing this case.

**ANSWER:**    Seattle Defendants admit that Steiger and Ciesynski traveled to Illinois in December 2011 to testify at a court hearing in Plaintiff's criminal case and they met with Hanley on that trip. Seattle Defendants deny the remaining allegations in this paragraph.

151.    When Mr. McCullough's trial took place in 2012, Defendants Steiger, Ciesynski, and Lau traveled to Illinois to participate and testify in the trial. This participation included Defendant Lau reiterating the false information that was used to implicate Mr. McCullough in Maria's disappearance and murder.

**ANSWER:**    Seattle Defendants admit Steiger, Lau, and Ciesynski testified at McCullough's trial in 2012 and deny the remaining allegations in this paragraph.

152.    At this trial, the video evidence from Mr. McCullough's polygraph interview that would disprove Defendant Lau's testimony was withheld from him and he had no means to rebut

28

her fabricated account. The prosecution relied on Defendant Lau's false evidence in closing arguments.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

153.    According to the director of the Illinois State Police, "had it not been for the assistance of the Seattle Police Department, it is unlikely that charges against Mr. McCullough would have been approved."

**ANSWER:**    Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

154.    Knowing their false case against Plaintiff rested on thin reeds, Defendant Hanley decided to manufacture more false evidence against Plaintiff through convicted felons, to whom they offered deals to falsely claim that Plaintiff had confessed.

**ANSWER:**    No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

155.    As a result, Defendant Hanley was able to get two of the felons to falsely implicate Plaintiff in Maria's kidnapping and murder – Kirk Swaggerty and Matthew Reimann. These individuals gave false testimony that Plaintiff had suggested and even confessed that he had been involved in the crime, when, in fact, Mr. McCullough never said any such thing to anyone, let alone these men.

**ANSWER:**    No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

156.    Defendant Hanley recruited these so-called "informants" and caused them to provide false evidence implicating Plaintiff in the crime, all while knowing that these statements were entirely false.

**ANSWER:** No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

157. Defendant Hanley made improper, undisclosed promises and offered impermissible incentives to these individuals. The entire time, Defendant Hanley concealed information about the improper promises he made and the misconduct used to secure these false statements.

**ANSWER:** No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

158. At the time of Mr. McCullough's trial, both Swaggerty and Reimann had petitions before a trial court to either reconsider their sentence or vacate their convictions.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

159. When they testified at Mr. McCullough's trial, both Swaggerty and Reimann stated that they were not offered anything in return for their testimony, and that no deals or promises had been made. These statements were false.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

160. To elaborate, Kirk Swaggerty was another inmate housed at the DeKalb County Jail while Plaintiff was incarcerated there awaiting trial.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

161. In February 2012, Defendant Hanley traveled to Menard Correctional Center to meet with Swaggerty. Defendant Hanley knew that Plaintiff was innocent, but nonetheless wanted to see if he could induce Swaggerty to falsely implicate Mr. McCullough.

**ANSWER:** No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

162. Although Swaggerty was initially reluctant, he agreed to make falsely claim that Plaintiff had confessed to him.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

163. After two days of meeting with Defendant Hanley, Swaggerty agreed to implicate Plaintiff, but his account of Mr. McCullough's purported confession lacked enough detail to be believable. Hanley indicated to Swaggerty that if he fabricated an account of how Mr. McCullough committed the murder, his account would be more believable and he would be eligible to get a deal from the prosecution on his current sentence. Hanley also suggested to Swaggerty that he could help their prosecution of Plaintiff if he claimed that Mr. McCullough was fixated on Maria's beauty, thereby corroborating Defendant Lau's lies detailed above.

**ANSWER:** As to the first and second sentences in this paragraph, no response is required as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same. As to the third paragraph, Seattle Defendants deny the same.

164. Sure enough, less than two weeks after meeting with Hanley, Swaggerty wrote Hanley claiming that he had just "remembered" that Plaintiff suffocated Maria and that he described Maria as "very pretty."

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

165. At Plaintiff's trial, Mr. Swaggerty testified to these false statements as a direct result of Hanley's manipulation and promises of leniency. Swaggerty did not disclose the incentives he had been promised.

**ANSWER:** No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

166. When Plaintiff was convicted, he did not know that Swaggerty's testimony was fabricated by Hanley or provided based on a promise that the prosecution would assist him to get a reduced sentence.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

167. Likewise, Matthew Reimann was briefly incarcerated at the DeKalb County Jail from August 30, 2012 to September 5, 2012 while his post-conviction petition was pending. During this time, Reimann and Plaintiff were both housed at DeKalb County Jail.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

168. On September 6, 2012, Reimann returned to Stateville Correctional Center near Joliet, a maximum security prison. The next day, Defendant Hanley visited him at Stateville to interview him about his interactions with Plaintiff, but he was reluctant to cooperate.

**ANSWER:** No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

169. Nevertheless, Defendant Hanley persisted. To coax Reimann into providing false testimony, and in exchange for his agreement to testify, Defendant Hanley told him he would have the prosecutor waive an untimeliness defense for Reimann's post-conviction petition and to reduce his security classification so that he would receive a favorable transfer to a preferable facility. Defendant Hanley also agreed to obtain a gag-order to conceal Reimann's identity.

**ANSWER:** No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

170. On September 12, 2012, Reimann was remanded back to the DeKalb County Jail and was placed in an interrogation room with Defendants Hanley, Escarcida, and Trevarthen During this meeting, Defendants assured Reimann that his identity would be concealed. They also instructed Reimann to deny that there was a "deal" or any "promises" relating to his agreement to testify, as this would undermine the value of his testimony.

**ANSWER:** No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

171. As a result of the incentives that he was promised, Reimann made inculpatory statements about Plaintiff during the trial, falsely claiming that Plaintiff had confessed to him and that he had not received anything in exchange for his testimony.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

172. When Plaintiff was convicted, Plaintiff had no idea that Reimann had been provided incentives for his testimony.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

173. Upon his return to Stateville Correctional Center, Reimann became concerned that his identity had been revealed. He wrote his attorney several times to inquire about potential violations of the gag-order and to determine when he would receive the incentives he had been promised.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

174.    In response, and as an act of further misconduct, Defendant Hanley arranged to have a secret meeting with Reimann on November 30, 2012. The November 30 entry from the Stateville visitor log reflects that Hanley used an alias, Quinn Brady, in order to disguise his identity when he signed in to see Reimann. In addition, Hanley listed his address as "506 N. County Road, Wheaton, Illinois," an address which does not exist. The DuPage County Sheriff's Department, however, resides at 501 N. County Farm Road, Wheaton, Illinois, and the DuPage County Courthouse is located at 505 N. County Farm Road, Wheaton, Illinois.

**ANSWER:**    No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

175.    Within a few months, Reimann's classification was reduced in accordance with the undisclosed agreement he had made with Defendants.

**ANSWER:**    Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

176.    Defendant Hanley's misconduct was not limited to the two witnesses that he actually succeeded in getting to provide false testimony, but also included others who, when offered the deal, refused to provide false testimony against Plaintiff. For example, sometime between November 2012 and January 2013, Defendant Hanley and another investigator contacted Mike Greenwall, an inmate at Stateville who had spent time at DeKalb County Jail.

**ANSWER:**    No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

177.    Defendant Hanley met with Greenwall to see if he could persuade Greenwall to provide false testimony against Plaintiff.

**ANSWER:**    No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

178.    Greenwall was unwilling to lie for Hanley

**ANSWER:**    No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

179.    Nevertheless, at the conclusion of their meeting, Defendant Hanley asked Greenwall whether Reimann had been reclassified yet and stated that he was working on obtaining a transfer for him, in hopes that Greenwall would understand that Hanley could provide similar services for him as well. Defendant Hanley then left a card with Greenwall with instructions to let him know if there was ever anything that he could for him.

**ANSWER:**    No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

180.    The suppression of the foregoing information was prejudicial to Plaintiff. If Mr. McCullough had been given access to this information about witnesses, it would have been powerful evidence of his innocence and critical evidence by which he could have impeached the prisoners who testified falsely against him.

**ANSWER:**    No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

181.    However, Defendant Hanley concealed the misconduct described above from Plaintiff and his criminal defense attorneys.

**ANSWER:** No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

182. The Defendants' misconduct deprived Plaintiff of evidence that would have established further that he had no connection to the kidnappings and murder of Maria Ridulph.

**ANSWER:** No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

183. On September 14, 2012, following a bench trial in the DeKalb County Circuit Court, Jack McCullough was wrongfully convicted of the kidnapping and murder of Maria Ridulph. On December 10, 2012, Mr. McCullough received a life sentence.

**ANSWER:** Seattle Defendants admit Plaintiff was convicted of the murder of Maria Ridulph on September 14, 2012 after a bench trial in the DeKalb County Circuit Court, and that he received a life sentence on December 10, 2012. Seattle Defendants deny that they committed any wrongdoing and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

184. Neither Plaintiff nor his criminal defense counsel were aware at the time of Plaintiff's criminal trial of the concealment of exculpatory evidence, fabrication of inculpatory evidence, and manipulation of the eyewitness that is set forth in this Complaint. Had these facts been disclosed, Plaintiff would not have been convicted.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

185. Throughout his wrongful incarceration, Jack McCullough maintained his innocence and that he was wrongfully convicted.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

186. Mr. McCullough spent four years incarcerated for a crime that he did not commit.

**ANSWER:** Seattle Defendants admit Plaintiff was incarcerated but lack knowledge or information sufficient to form a believe as to the truth of the remaining allegations in this paragraph.

187. In 2016, Plaintiff's conviction was vacated and he was released from prison. Plaintiff's conviction was vacated after the new DeKalb County State's Attorney Richard Schmack – who had replaced Defendant Campbell – moved to dismiss all charges against Plaintiff.

**ANSWER:** Seattle Defendants admit the allegations in this paragraph.

188. In so doing, the DeKalb County State's Attorney's office declared that the People of the State of Illinois were compelled to admit the existence of clear and convincing evidence showing that Plaintiff was convicted for a crime he did not commit. In so doing, acting on behalf of the People of the State of Illinois, State's Attorney Schmack admitted that the FBI's initial investigation of Plaintiff was accurate in excluding him as being the perpetrator. On behalf of the People of the State of Illinois, District Attorney Schmack further admitted that there had not ever been a reasonable hypothesis for the false claim proffered by the Defendants that the abduction happened earlier in the day than previously reported.

**ANSWER:** Seattle Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the same.

189. In addition to admitting many of the other claims alleged above, the State also acknowledged that the warrant for Plaintiff's arrest contained false and materially misleading statements, and that Plaintiff's indictment was secured through false and/or misleading testimony.

**ANSWER:** Seattle Defendants deny they committed any wrongdoing and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

190. Subsequently, in April of 2017, Plaintiff was granted a Certificate of Innocence by the Circuit Court for the Twenty Third Judicial Circuit in DeKalb County, Illinois.

**ANSWER:** Seattle Defendants admit the allegations in this paragraph.

191.    After four years of incarceration, and over seven years of struggles and difficulties as a result of Defendants' misconduct, Plaintiff has been made free – as a formal matter – from his wrongful conviction.

**ANSWER:**    Seattle Defendants admit Plaintiff was incarcerated for four years and is now free, deny they engaged in any misconduct, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

192.    However, Plaintiff is not free of the severe damages that have been inflicted upon him over the greater part of the last decade due to Defendants' misconduct.

**ANSWER:**    Seattle Defendants deny they engaged in any misconduct, and therefore deny Plaintiff suffered any damages due to their conduct. Seattle Defendants deny any remaining allegations of this paragraph.

193.    Mr. McCullough spent over 4 years in prison for a crime he did not commit, and over 7 years fighting to clear his name. While in prison, Plaintiff was targeted owing to the nature of the crime for which he had been wrongfully convicted and given a life sentence. Plaintiff was attacked, despite being at a physical disadvantage due to his age. As but one example, a fellow inmate tried to kill Mr. McCullough by stabbing him in the eye, which Plaintiff survived only by using combat technique he learned in the military.

**ANSWER:**    Seattle Defendants admit that Plaintiff spent four years in prison and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

194.    Although exonerated, Mr. McCullough must now attempt to resume his life despite the horrors he endured while imprisoned for a crime he did not commit.

**ANSWER:**    Seattle Defendants deny that they engaged in any misconduct, and therefore deny Plaintiff suffered any damages due to their conduct. Seattle Defendants deny any remaining allegations of this paragraph.

195.    Plaintiff was due to retire, but those efforts have been hampered by his wrongful conviction. In addition, Plaintiff has lost the precious time to be with his family, and watch his grandchildren age – something he can never get back.

**ANSWER:** Seattle Defendants deny that they engaged in any misconduct, and therefore deny Plaintiff suffered any damages due to their conduct. Seattle Defendants deny any remaining allegations of this paragraph.

196.    As a result of the foregoing, Mr. McCullough has suffered tremendous damage, including physical harm and mental suffering, all proximately caused by Defendants' misconduct.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

### COUNT I – 42 U.S.C. § 1983
**Suppression of Exculpatory Material**

The *Brady* claim against the Seattle Defendants in Count I of Plaintiff's First Amended Complaint ("FAC") was dismissed with prejudice by the Court on July 20, 2018. (Dkt. 149.) Seattle Defendants answer this Count to the extent it purports to set forth a fabrication of evidence due process claim and/or the paragraphs of this Count are incorporated in other Counts of Plaintiff's FAC.

197.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** Seattle Defendants reallege and incorporate all preceding answers.

198.    As described more fully above, all of the Defendant Police Officers while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

199.    In the manner described more fully above, the Defendant Police Officers and individually, jointly, and/or in concert and in conspiracy: a) fabricated evidence including but not limited to police false police reports, false informant testimony, and unreliable "identification" evidence; b) used improper and suggestive procedures to taint the pretrial identifications of Plaintiff and caused Plaintiff to be misidentified as the perpetrator; and c) deliberately withheld and concealed exculpatory evidence-including but not limited to their misconduct in procuring, or attempting to procure, false informant testimony, as well as secreting other misconduct related to interviews they took. In doing so, the Defendants violated their clearly established duty to disclose and report all material exculpatory and impeachment information.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

200.    Absent these Defendants' misconduct, Plaintiff' could not and would not have been further prosecuted, and Plaintiff would not have been convicted.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

201.    These Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiff and his continuing wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in violation of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

202.    As a direct and proximate result of this violation of his constitutional rights to due process and to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

203.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

## COUNT II – 42 U.S.C. § 1983
### Suggestive Identification

204.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    Seattle Defendants reallege and incorporate all preceding answers.

205.    As described more fully above, Defendants Hanley, Smith, Damasky, and Engerman, acting individually and in conspiracy with each other, used improper and suggestive procedures to cause Plaintiff to be misidentified as the perpetrator. This misconduct tainted the pretrial identification of Mr. McCullough, which was offered at trial.

**ANSWER:**    No response is required to the allegations in this paragraph, as the

allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle

Defendants deny the same.

206.    As a result of this violation, Plaintiff was deprived of his right to a fair trial and was falsely convicted of a crime for which he was innocent.

**ANSWER:** No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants deny the same.

207. These Defendants were acting under color of law and within the scope of their employment when they took these acts.

**ANSWER:** No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants deny the same.

208. As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries including the period of time following his arrest and before his conviction, as set forth above, including pain and suffering.

**ANSWER:** No response is required to the allegations in this paragraph, as the allegations are not directed to Seattle Defendants. To the extent an answer is required, Seattle Defendants deny the same.

### COUNT III – 42 U.S.C. § 1983
### Failure to Intervene

209. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** Seattle Defendants reallege and incorporate all preceding answers.

210. In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, each of the Defendants stood by without intervening to prevent the violation of Plaintiffs constitutional rights, even though they had the opportunity to do so.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

211. As a direct and proximate result of the Defendants' failure to intervene to prevent the violation of Plaintiffs constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

**ANSWER:** Seattle Defendants deny the allegations in this paragraph.

212.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**ANSWER:**     Seattle Defendants deny the allegations in this paragraph.

### COUNT IV – 42 U.S.C. § 1983
### Fabrication of Evidence

213.     Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**     Seattle Defendants reallege and incorporate all preceding answers.

214.     In the manner described more fully above, all of the Defendants, individually, jointly and in conspiracy with each other, fabricated evidence, including fabricated testimony offered at trial proceedings.

**ANSWER:**     Seattle Defendants deny the allegations in this paragraph.

215.     The Defendants knowingly fabricated this evidence. A reasonable likelihood exists that the false evidence affected the decision of the jurors and the courts that considered this false evidence.

**ANSWER:**     Seattle Defendants deny the allegations in this paragraph.

216.     Defendants were acting under color of law and within their scope of employment when they took these actions.

**ANSWER:**     Seattle Defendants deny that they engaged in the alleged acts and therefore

deny the allegations in this paragraph.

217.     The Defendants' misconduct directly resulted in Plaintiff's unjust incarceration, thereby denying his constitutional right to due process as guaranteed by the U.S. Constitution. Absent this misconduct, there would have been no probable cause for Plaintiff's detention, and Plaintiff's prosecution could not and would not have been pursued.

**ANSWER:**     Seattle Defendants deny the allegations in this paragraph.

218.     As a direct and proximate result of the Defendant' actions, Plaintiff's constitutional rights were violated and Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:**     Seattle Defendants deny the allegations in this paragraph.

## COUNT V – 42 U.S.C. § 1983
### Federal Malicious Prosecution

Seattle Defendants make no answer to Count V of Plaintiff's FAC as it was dismissed with

prejudice by the Court on July 20, 2018. (Dkt. 149.)

## COUNT VI – FEDERAL LAW
### Conspiracy to Deprive Constitutional Rights

219.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    Seattle Defendants reallege and incorporate all preceding answers.

220.    In an effort to implicate Plaintiff in solving a "cold case," each the Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to be free of detention in the absence of probable cause, his right to due process, and his right to a fair trial, all as described in the various paragraphs of this Complaint.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

221.    Additionally, before and after Plaintiff's conviction, the Defendants further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more timely exoneration.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

222.    In this manner, each of the Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

223.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above and was an otherwise willful participant in joint activity.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

224.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

225.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.


## COUNT VII – STATE LAW CLAIM
### Malicious Prosecution

226.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    Seattle Defendants reallege and incorporate all preceding answers.

227.    The Defendant Police Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

228.    These Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

229.    Statements of these Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false. Information presented to secure a warrant for Plaintiff's arrest was false and the officers knew, or were recklessly ignoring, the false and/or misleading nature of the information they used to procure Plaintiff's arrest. These Defendants also fabricated evidence through their actions in obtaining an "identification." The Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the Ridulph abduction and homicide.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

230.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

231.    In 2016, the prosecution terminated in Plaintiff's favor when, after his conviction was vacated, the State dismissed the charges against him.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

232.    As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including pain and suffering.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

## COUNT VIII – STATE LAW CLAIM
### Intentional Infliction of Emotional Distress

233.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    Seattle Defendants reallege and incorporate all preceding answers.

234.    The acts and conduct of all of the Defendants, as set forth above, were extreme and outrageous. The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

235.    As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

## COUNT IX – STATE LAW CLAIM
### Civil Conspiracy

236.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    Seattle Defendants reallege and incorporate all preceding answers.

237.    As described more fully in the preceding paragraphs, all of the Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

238.    In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

**ANSWER:**    Seattle Defendants deny the allegations in this paragraph.

239.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:**     Seattle Defendants deny the allegations in this paragraph.

240.     As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

**ANSWER:**     Seattle Defendants deny the allegations in this paragraph.

## COUNT X – STATE LAW CLAIM
**Respondeat Superior**

241.     Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**     Seattle Defendants reallege and incorporate all preceding answers.

242.     In committing the acts alleged in the preceding paragraphs, Defendants Lau, Steiger, and Ciesynski were members of, and agents of, the Seattle Police Department, acting at all relevant times within the scope of their employment and under color of law.

**ANSWER:**     Seattle Defendants deny that they engaged in the alleged acts and therefore deny the allegations in this paragraph.

243.     Defendant City of Seattle is liable as principals for all torts committed by its agents.

**ANSWER:**     The allegations in this paragraph call for a legal conclusion to which no response is required.

## COUNT XI – STATE LAW CLAIM
**Indemnification**

244.     Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**     Seattle Defendants reallege and incorporate all preceding answers.

245.     Illinois and Washington law provide that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

**ANSWER:**     The allegations in this paragraph call for a legal conclusion to which no response is required.

246. The Individual Defendants are or were employees of either the City of Seattle, the Illinois State Police, or the County of DeKalb, Illinois, who were acting within the scope of their employment in committing the misconduct described herein.

**ANSWER:** Seattle Defendants deny they engaged in the alleged acts and therefore deny the allegations in this paragraph.

## AFFIRMATIVE DEFENSES

Seattle Defendants, without prejudice to their denials and all other statements in their answer and elsewhere, for their affirmative defenses to plaintiff's FAC, state:

1. Plaintiff has failed to state a claim upon which relief may be granted.

2. Seattle Defendants have not violated any rights, privileges or immunities under the Constitution or laws of the United States or the State of Washington or any political subdivision thereof or the State of Illinois or any political subdivision thereof.

3. To the extent any injuries or damages claimed by plaintiff were proximately caused, in whole or in part, by negligent, willful, wanton and/or other wrongful conduct on the part of plaintiff, any verdict or judgment obtained by plaintiff must be reduced by an amount commensurate with the degree of fault attributed to plaintiff by the jury in this case.

4. There was probable cause for plaintiff's detention, arrest, initiation of charges, and prosecution.

5. Seattle Defendants' conduct was at all times objectively reasonable and did not violate any of Plaintiff's clearly established Constitutional rights. Defendants Lau, Steiger, and Ciesynski are governmental officials who perform discretionary functions in the course of their work. At all times material to the events alleged in plaintiff's FAC, a reasonable police officer, objectively viewing the facts and circumstances that confronted the Seattle Defendants, could have

believed their actions to be lawful in light of clearly established law and the information that they possessed. Accordingly, Seattle Defendants are entitled to the defense of qualified immunity.

6. Seattle Defendants are entitled to absolute immunity for testifying in court proceedings, including proceedings relating to the Ridulph murder. *See, e.g.*, *Briscoe v. LaHue*, 460 U.S. 325 (1983).

7. Plaintiff's claims are untimely and barred by the applicable statute of limitations.

8. Plaintiff's claims in the FAC are barred by the doctrines of *res judicata* and collateral estoppel.

9. The chain between any Seattle Defendant's actions and plaintiff's conviction and/or imprisonment was broken by one or more intervening/superseding exercises(s) of independent judgment by another, including but not limited to plaintiff, prosecutors, Illinois-based law enforcement officers, witnesses, judges, and jurors.

10. Seattle Defendants are immune from plaintiff's state law claims under 745 ILCS 10/2-201 of the Illinois Tort Immunity Act which provides as follows: "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201.

11. Seattle Defendants were public employees engaged in the execution and/or enforcement of the law and did not act in a manner constituting willful or wanton conduct. Under the Illinois Tort Immunity Act, public employees and are not liable for their acts or omissions in the execution or enforcement of any law unless such acts or omissions constitute willful and wanton conduct." 745 ILCS 10/2-202.

48

12.     Seattle Defendants were public employees acting in the scope of their employment and are immune pursuant to this provision to the extent this Complaint seeks recovery based on acts or omissions of another person. Under the Illinois Tort Immunity Act, "[e]xcept as otherwise provided by statute, a public employee, as such and acting within the scope of his employment, is not liable for any injury caused by the act or omission of another person." 745 ILCS 10/2-204.

13.     To the extent plaintiff failed to mitigate any of his claimed injuries or damages, any verdict or judgment obtained by plaintiff must be reduced by application of the principle that plaintiff has a duty to mitigate commensurate with the degree of failure to mitigate attributed to plaintiff by the jury in this case.

14.     To the extent any injuries or damages claimed by plaintiff against the Seattle Defendants were caused in whole or in part by negligent, willful and wanton, and intentional conduct of plaintiff, even if Seattle Defendants are liable in damages, the total amount of damages to which plaintiff would otherwise be entitled must be reduced by application of the principles of comparative fault in proportion to the amount of the negligent, willful and wanton, and intentional conduct of plaintiff which were the proximate cause of their injuries.

15.     To the extent any individual employees of the City of Seattle are not liable as alleged in plaintiff's Complaint, the City is not liable. 745 ILCS 10/2-109.

16.     The City of Seattle, a municipal corporation, is immune from the imposition of punitive damages under both state and federal law. Punitive damages cannot be imposed against a municipality in a § 1983 action. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271 (1981). Moreover, under Illinois law, the City cannot be required to indemnify an employee for punitive damages, nor may it pay a judgment for punitive damages on behalf of an employee. 745 ILCS 10/2-102.

17.     As to plaintiff's state law claims, Defendant City of Seattle is not liable to pay attorney's fees as "the law in Illinois clearly is that absent a statute or contractual agreement 'attorney fees and the ordinary expenses and burdens of litigation are not allowable to the successful party.'" *See Kerns v. Engelke*, 76 Ill. 2d 154, 166 (1979).

Seattle Defendants reserve the right to supplement these affirmative defenses as more information becomes available throughout the litigation of this matter. Seattle Defendants' investigation continues.

WHEREFORE, Seattle Defendants deny that Plaintiff is entitled to any relief and request that this Court dismiss Plaintiff's Amended Complaint and grant any other relief that the Court deems just.

## JURY DEMAND

Seattle Defendants hereby demand a trial by jury pursuant to Federal Rule of Civil

Procedure 38(b) on all issues so triable.

Dated: August 17, 2018                    Respectfully submitted,

                                          CITY OF SEATTLE, IRENE LAU, CLOYD
                                          STEIGER, MICHAEL CIESYNSKI

                                      By: */s/ Ghazal Sharifi*
                                          Ghazal Sharifi

Kerala T. Cowart
Ghazal Sharifi
Seattle City Attorney's Office, Civil Division
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7097
Phone: 206-733-9001
Phone: 206-684-8217
Fax: 206-684-8284
Kerala.Cowart@seattle.gov
Ghazal.Sharifi@seattle.gov

Daniel M. Noland
Paul A. Michalik
Elizabeth A. Ekl
Reiter Burns LLP
311 South Wacker Drive, Suite 5200
Chicago, IL 60606
*Attorneys for Defendants City of Seattle,
Irene Lau, Cloyd Steiger, Michael
Ciesynski*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2018, I electronically filed the foregoing Seattle Defendants' Answer to Plaintiff's Amended Complaint with the Clerk of the Court using the ECF system, which sent electronic notification of the filing on the same day to all counsel of record.

| **Attorneys for Plaintiff** | **Attorneys for Defendants Clay Campbell, Victor Escarcida, Julie Trevarthen, William Engerman, and County of DeKalb, Illinois** |
|---|---|
| Arthur Loevy | |
| Jon Loevy | |
| Russell Ainsworth | Terry Ekl |
| David B. Owens | Patrick Provenzale |
| Aisha N. Davis | Nemura G. Pencyla |
| Loevy & Loevy | Vincent Mancini |
| 311 N. Aberdeen St., 3rd Floor | Tracy L. Stanker |
| Chicago, IL 60607 | Ekl, Williams & Provenzale LLC |
| 312-243-5900 | 901 Warrenville Rd., #175 |
| jon@loevy.com | Lisle, IL 60532 |
| russell@loevy.com | 630-654-0045 |
| david@loevy.com | tekl@eklwilliams.com |
| aisha@loevy.com | vmancini@eklwilliams.com |
| | pprovenzale@eklwilliams.com |
| | npencyla@eklwilliams.com |
| | tstanker@eklwilliams.com |

**Attorneys for Defendants Brion Hanley, Daniel P. Smith, Todd Damasky, Larry Kot**
Michael T. Dierkes
T. Andrew Horvat
Illinois Attorney General's Office
100 W. Randolph St., 13th Floor
Chicago, IL 60601
312-814-3672
mdierkes@atg.state.il.us
thorvat@atg.state.il.us

/s/ *Ghazal Sharifi*
Ghazal Sharifi