**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| MCCULLOUGH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.:  17-cv-50116 |
| vs. | ) | |
| | ) | Hon. Frederick J. Kapala |
| | ) | Magistrate Judge Iain D. Johnston |
| HANLEY et al., | ) | |
| | ) | Jury Trial Demanded |
| Defendants. | ) | |

**ISP DEFENDANTS' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

Defendants Brion Hanley, Daniel P. Smith, Todd Damasky, and Larry Kot (hereinafter the "ISP Defendants"), by and through their attorney, Lisa Madigan, Illinois Attorney General, answer plaintiff's second amended complaint as follows:

**INTRODUCTION**

1.     Plaintiff Jack D. McCullough was tragically convicted of the 1957 abduction and homicide of Maria Ridulph—a crime he absolutely did not commit.

**ANSWER:  ISP Defendants admit that McCullough was convicted of the 1957 abduction and homicide of Maria Ridulph, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

2.     Defendants gained national notoriety by "solving" the Ridulph murder over 50 years after it occurred.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

3.    In reality, Plaintiff was undeniably innocent, but Defendants accomplished their goal by fabricating false evidence and hiding exculpatory evidence to frame Mr. McCullough.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

4.    In so doing, Defendants ignored contemporaneous FBI reports created in 1957 exonerating Plaintiff from having anything whatsoever to do with this murder.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

5.    Defendants' malicious plan succeeded, and Plaintiff was wrongfully convicted.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

6.    It was only when Richard Schmack was elected as the chief prosecutor of DeKalb County that an honest and objective investigation of Plaintiff's conviction done. That investigation reached the conclusion that Defendants blatantly ignored—that Mr. McCullough was undeniably innocent. Plaintiff's conviction was overturned, he was released from imprisonment under a life sentence, and later granted a certificate of innocence.

**ANSWER:  ISP Defendants deny the first and second sentences of this paragraph, and admit the third sentence of this paragraph.**

7.    Nevertheless, Mr. McCullough, a United States veteran and grandfather, lost years of his life as a result of Defendants' actions. He brings this suit to redress the damages related to his wrongful conviction, and further seeks to hold accountable the individuals whose misconduct caused him irreparable harm.

**ANSWER:  ISP Defendants admit that McCullough filed this suit seeking damages related to his conviction, lack knowledge or information sufficient to form a belief as to whether**

McCullough is a veteran and grandfather, and deny the remaining allegations of this paragraph.

## JURISDICTION AND VENUE

8.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution and applicable state law. This court has jurisdiction pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b). Most of the events giving rise to the claims asserted herein occurred here, and most parties live within or are affiliated with this District.

**ANSWER:  ISP Defendants admit that plaintiff brings this action pursuant to Section 1983, but deny that plaintiff is entitled to any relief.  ISP Defendants admit that this Court has jurisdiction over the claims against them and that venue is proper as to the claims against them.  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

## THE PARTIES

9.      Plaintiff Jack D. McCullough is a 77-year old military veteran who now resides in Washington State.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

10.      At all times relevant, Defendants Sergeant Daniel P. Smith, Agent Todd Damasky, Agent Brion Hanley, Agent Larry Kot, and unidentified employees of the Illinois State Police were employed as law enforcement officers by the Illinois State Police. All are sued in their individual capacities, and acted under color of law and within the scope of their

employment during the investigation and prosecution of the Plaintiff for the abduction and homicide of Maria Ridulph.

**ANSWER:  ISP Defendants admit that Smith, Damasky, and Hanley are or were employed as law enforcement officers by the Illinois State Police, that Kot was employed by the Illinois State Police, that they are sued in their individual capacities, and that they acted under the color of law and within the scope of their employment in connection with the Maria Ridulph matter.  ISP Defendants deny the remaining allegations of this paragraph.**

11.     At all times relevant, Defendants Detective Irene Lau, Detective Cloyd Steiger, and Detective Michael Ciesynski were police officers for the Seattle Police Department in Seattle, Washington. All are being sued in their individual capacity for actions taken under the color of law and within the scope of their employment during the investigation and prosecution of the Plaintiff for the abduction and homicide of Maria Ridulph.

**ANSWER:  ISP Defendants admit that Lau, Steiger, and Ciesynski are or were police officers in the Seattle Police Department and that they are being sued in their individual capacities. ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

12.     Defendants Smith, Damasky, Hanley, Kot, Lau, Steiger, and Ciesynski are hereinafter referred to as "the Defendant Police Officers."

**ANSWER:  This allegation contains a definition to which no response is required.  To the extent that a response is required, ISP Defendants admit that the Complaint defines "the Defendant Police Officers" as indicated and deny any remaining allegations in this paragraph.**

13.     Defendant City of Seattle is a Washington State municipal corporation under the laws of the State of Washington, and operates the Seattle Police Department.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

14.     At all times relevant, Defendant former State's Attorney Clay Campbell headed the DeKalb County State's Attorney's Office, and former Assistant State's Attorneys William Engerman, Victor Escarcida, and Julie Trevarthen were Assistant State's Attorneys for the DeKalb County State's Attorney's Office. All are being sued in their individual capacities for actions taken under the color of law and within the scope of their employment during the investigation and prosecution of the Plaintiff for the abduction and homicide of Maria Ridulph. Defendants Campbell, Engerman, Escarcida, and Trevarthen are being sued exclusively for their actions in investigation of Plaintiff outside of court proceedings, and not for any action related to their official in-court duties, to the extent any are applicable, concerning the prosecution of Plaintiff.

**ANSWER:  ISP Defendants admit that Campbell headed the DeKalb County State's Attorney's Office, that Engerman, Escarcida and Trevarthen were Assistant State's Attorneys for the DeKalb County State's Attorney's Office, and that they are being sued in their individual capacities. ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

15.     When discussed collectively, Defendants Campbell, Engerman, Escarcida, and Trevarthen are hereinafter referred to as "the Prosecutor Defendants."

**ANSWER:  This allegation contains a definition to which no response is required.  To the extent that a response is required, ISP Defendants admit that the Complaint defines "the Prosecutor Defendants" as indicated and deny any remaining allegations in this paragraph.**

16.    Defendant DeKalb County, Illinois operates the DeKalb County State's Attorney's office and is named as an indemnitor of Defendants Campbell, Engerman, Escarcida, and Trevarthen.

**ANSWER: ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

## FACTS
### 1957-The Kidnapping and Murder of Maria Ridulph

17.    Maria Ridulph was seven years old in the winter of 1957. Maria lived in Sycamore, Illinois with her parents, two sisters, and brother.

**ANSWER:  ISP Defendants admit that Maria Ridulph was seven years old in 1957 and lived in Sycamore, Illinois.  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

18.    Maria was kidnapped on December 3, 1957. Her disappearance sparked a national outcry. Dozens of FBI agents descended on Sycamore, Illinois, to lead the investigation intended to rescue Maria and bring her kidnapper to justice.

**ANSWER:  ISP Defendants admit that Maria was kidnapped on December 3, 1957, that her disappearance received national attention, and that FBI agents traveled to Sycamore, Illinois to investigate.   ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

19.     To that end, two FBI agents moved to Sycamore, where they set up headquarters, so that they could dedicate more time to the investigation.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

20.     Tragically, Maria's body was recovered on April 26, 1958, near Galena, Illinois, in a heavily forested area off Highway 20. Once it was determined the body had not crossed state lines, the FBI agents concluded their investigation without identifying the perpetrator.

**ANSWER:  ISP Defendants admit that reports indicate that Maria's body was recovered on April 26, 1958 three miles east of Woodbine, Illinois on Route 20, in a timbered area just north of the highway.  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

21.     The FBI, however, left a comprehensive record of its investigation. Over four months, the FBI meticulously documented thousands of interviews and hundreds of suspects.

**ANSWER:  ISP Defendants admit that the FBI left a record of its investigation, including interviews.  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

22.     The following facts were documented in the FBI's exhaustive investigation, taken from interviews with the victim's family and witnesses in the days following the abduction.

**ANSWER: ISP Defendants admit that the FBI interviewed the victim's family and witnesses following the abduction and that the FBI documented facts in its investigation.  ISP Defendants lack knowledge or information sufficient to form a brief as to the truth of the remaining allegations in this paragraph.**

23.     The timeline of December 3, 1957, establishes that Mr. McCullough was in Rockford, over 30 miles away, at the time of the crime and thus could not possibly have been the perpetrator.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

**5:50-6:30 p.m. Maria and Kathy Play Together Alone**

24.     According to her mother, Maria left her house to play outside at 5:50 p.m.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

25.     At 6:02 p.m., Maria's eight year-old friend Kathy Sigman went to play with Maria.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

26.     The two girls played on the corner two doors down from Maria's house (and seven doors down from Kathy's).

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

27.     At least seven people observed the two girls playing alone on the corner between 5:50 and 6:30 p.m.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

28.     Specifically, Maria's mother reported driving her eldest daughter to music class at 6 p.m. and returning at 6:05 p.m., and that she observed Maria and Kathy playing on the corner alone both times.

**ANSWER:** ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

29. Other neighbors also reported observing the girls playing together on the corner in the same time frame without any adults around.

**ANSWER:** ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

### 6:30 p.m. First Report of the Perpetrator's Arrival

30. Kathy reported that at about 6:30 p.m., a man approached Maria and Kathy and began playing with them.

**ANSWER:** ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

31. The man was a stranger to Maria and Kathy.

**ANSWER:** ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

32. The man gave Maria a piggyback ride and then returned to the corner. The man told Maria he would give her another piggyback ride if she could find a doll.

**ANSWER:** ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

33. Maria went home, retrieved her doll, and returned to the corner for another piggyback ride.

**ANSWER:** ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

34.     Maria's trip home to get a doll occurred at 6:40 p.m., as recounted by her mother.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

35.     That time was confirmed by Maria's father, who reported that Maria got her doll while he was watching the television show *Cheyenne*, which began airing at 6:30 p.m. that evening, and by her brother, who also stated that Maria obtained her doll after 6:30 p.m.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

36.     Maria returned to the corner with her doll and received another piggyback ride. The two girls played with the stranger for a while longer until Kathy's hands got cold and she went home to get a pair of mittens. Before she left, Kathy asked the stranger the time and he told her it was 7 p.m.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

37.     Kathy's mother reported that Kathy came home to get her mittens at approximately 6:50-6:55 p.m.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

38.     When Kathy returned to the corner with her mittens, Maria and the stranger were gone. She was never seen alive again.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

39.     Accordingly, the FBI determined that Maria was abducted between 6:50 p.m. and 7 p.m.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

**6:57 p.m. – Records Confirm that
Plaintiff is Over Thirty Miles Away**

40.     At the time the perpetrator was abducting Maria Ridulph, Mr. McCullough was stepping off a train in Rockford.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

41.     Newly eighteen years old, Mr. McCullough had spent the day of December 3, 1957, at the Air Force's induction center in Chicago, receiving an x-ray to determine his fitness for duty.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

42.     Mr. McCullough had been planning to enlist for some time and his physical was the last step. The personnel in Chicago directed Mr. McCullough to bring a note to the recruiting office in Rockford, stating that if Plaintiff's doctor confirmed his good health, he could enlist in the military.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

43.     At approximately 5:15 p.m., Plaintiff boarded a train in Chicago bound for Rockford. He arrived in Rockford at about 6:45 p.m., and walked to the United States Post Office in town, which also housed the Air Force recruiting center.

**ANSWER: ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

44. At the post office, Mr. McCullough found the recruiting center closed, but ran into a military officer, who directed him to speak to Staff Sergeant Froom.

**ANSWER: ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

45. Mr. McCullough followed this direction. While still in Rockford Plaintiff contacted Sergeant Froom, who in turn advised Mr. McCullough to call the recruiting sergeant, Sergeant Oswold, and relaty the information he had received from the induction center. In Sergeant Froom's presence, Plaintiff then called Sergeant Oswald and passed along the message from the induction center.

**ANSWER: ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

46. While still at the post office, at 6:57 p.m., Mr. McCullough placed a collect call to his parents' home, seeking a ride home to Sycamore from his father.

**ANSWER: ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

47. Mr. McCullough also called his then-girlfriend, Jan Edwards, and made a date to see her that night at her home.

**ANSWER: ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

48.     Mr. McCullough ate some pie at a nearby diner while awaiting his father; his father then drove Mr. McCullough the approximately thirty miles and delivered him to Ms. Edwards' home.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

49.     As part of the wide net cast by their investigation, the FBI questioned Mr. McCullough and his parents just days after Maria's abduction.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

50.     Mr. McCullough's parents confirmed that they had received a call from Mr. McCullough at 7 p.m. on December 3, and that Plaintiff's father had driven to Rockford to retrieve him.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

51.     The local telephone company confirmed that the collect call from the post office to Mr. McCullough's parents' house was placed at 6:57 p.m. by Mr. McCullough.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

52.     The FBI questioned Plaintiff, and he related his whereabouts throughout the day, as described above.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

53. Although Plaintiff did not know the names of any of the three Air Force personnel he spoke to in Rockford, the FBI found Sergeant Oswald, who confirmed that he spoke to Plaintiff shortly after 7 p.m. on December 3rd at the Rockford recruiting center. Sergeant Oswald also confirmed that Plaintiff had interacted with Colonel Liebovich and Sergeant Froom while in Rockford just before he called Sergeant Oswald. Sergeant Oswald related that he then met Plaintiff in person the next day.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

54. Given his alibi—Plaintiff was in Rockford, over thirty miles from Sycamore at the same time Maria was being abducted—the FBI cleared Mr. McCullough as a suspect.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

55. The FBI's decision to clear Mr. McCullough as a suspect was correct because Mr. McCullough could not have committed the crime.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

56. Mr. McCullough then carried on with his life. On December 11, 1957, he left home for a four year tour in the Air Force. He was then honorably discharged.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

57. Mr. McCullough later re-enlisted in the U.S. Armed Services, this time in the Army. Mr. McCullough worked in Army Intelligence, working his way to become a Captain and serving in Vietnam.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

58.    Mr. McCullough left the service after spending over a decade in the Army, and moved to Washington State.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

59.    There, Mr. McCullough raised a family and he and his wife looked forward to their retirement together.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

60.    In 2008, Mr. McCullough had no inkling that a number of law enforcement officers were conspiring to frame him for the Maria Ridulph murder.

**ANSWER:  ISP Defendants deny that they conspired to frame McCullough for the Maria Ridulph murder, and therefore deny the allegations of this paragraph.**

**2008 – Defendant Hanley Reopens
the Ridulph Murder Investigation**

61.    In the fifty years after Maria's death, many tips were provided to the police, but none panned out. It was the type of notorious case that garnered attention, for better or worse.

**ANSWER:  ISP Defendants admit that ISP received some tips about the Ridulph case, and that the case received some media attention.  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

62.    Mr. McCullough had a contentious relationship with his step-sister, Janet Tessier, and they were not on speaking terms after the turn of the century.

**ANSWER:** ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

63. Mr. McCullough's mother died in 1994, and his father passed away in 2006.

**ANSWER:** ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

64. In 2008, Janet came forward with a salacious accusation—she claimed that, on her death bed fourteen years prior, while she drifted in and out of being lucid, including periods where she seemed comatose and incoherent, Plaintiff's mother had said that Plaintiff had something to do with the "two little girls," one of whom disappeared.

**ANSWER:** ISP Defendants admit that in 2008, Janet told Hanley and Kot that she was by her mother's bedside in the hospital in 1994 when her mother said "Remember the two little girls, John did it" and "John was the one who killed that girl (Maria)," and instructed her to tell the police that John killed Maria. ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

65. Janet claimed that Plaintiff's mother was referencing the Maria Ridulph abduction.

**ANSWER:** ISP Defendants admit the allegations of this paragraph.

66. In reality, Plaintiff's mother was in an altered mental state hours before her death after a long illness.

**ANSWER:** ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

67. In addition, Plaintiff's other half-sister, Mary, who was also present, stated that Plaintiff's mother only uttered the vague phrase, "he did it," without explaining who "he" was or what "he" did.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

68. The timing of the allegation was both suspect and prejudicial to Plaintiff. By waiting fourteen years before coming forward, until after Plaintiff's father died, Plaintiff did not have his father available to rebut the totally false claim.

**ANSWER: ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

69. Nevertheless, Defendant Hanley ignored the obvious problems surrounding the over a decade late report that a mentally-unstable woman made a vague statement, and set off in hopes of making a name for himself in connection with this famous crime. He started by re-opening the Ridulph case.

**ANSWER: ISP Defendants admit that Hanley re-opened the Ridulph case, and deny the remaining allegations of this paragraph.**

70. In October 2008, less than two weeks after the case was re-opened, Defendants Hanley and Kot began working together to build a case that purposefully targeted Mr. McCullough.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

71. Along the way, these Defendants expanded the reach of their agreement to include law enforcement officials from other jurisdictions—including the Seattle Police Department and the Individually-named Seattle Defendants, and DeKalb County State's Attorney' office and the Individually-named prosecutor Defendants.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

72.     Over the next year and a half, Defendants spent countless hours gathering information about the crime and, specifically, finding anyone who would talk to them about Mr. McCullough.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

73.     Given the passage of time, many people with knowledge of the crime had long since passed away.

**ANSWER:** **ISP Defendants admit the allegations of this paragraph**

74.     Inexplicably, all of the Defendants wrongly decided that Mr. McCullough had something to do with Maria's death.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

75.     Through the course of the investigation, each of the individually-named defendants reached this erroneous conclusion and then, in different ways and at different times, agreed to pursue Mr. McCullough as the murderer despite his innocence.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

76.     Due to their tunnel vision, the Defendants reached – and maintained – this conclusion despite obtaining the FBI's file, including the documents conclusively establishing Mr. McCullough's innocence via his alibi.

**ANSWER:** **ISP Defendants admit that they obtained at least part of the FBI's file, and deny the remaining allegations of this paragraph.**

**2009—Defendants' Engage in Pervasive Misconduct
To Target Plaintiff Without Basis**

77. In 2009, the DeKalb County State's Attorney's Office began actively working on the Ridulph investigation with the Illinois State Police.

**ANSWER: ISP Defendants admit the allegations of this paragraph.**

78. With Plaintiff already in mind, Defendant Hanley began meeting and coordinating the Ridulph investigation with members of the DeKalb County State's Attorney's office, including but not limited to Defendants Engerman, Trevarthen, and Escarcida.

**ANSWER: ISP Defendants admit that Hanley began meeting with the DeKalb County State's Attorney's Office including Engerman regarding the Ridulph investigation, and deny the remaining allegations of this paragraph.**

79. Defendant Engerman was the second in command of the DeKalb State's Attorney's Office, and decided to direct the investigation into Jack McCullough. Defendant Engerman instructed the Defendant Police Officers to follow specific leads, including trying to dig up as much dirt as possible on Plaintiff. Defendant Engerman specifically requested he be informed after every single lead was investigated by the Police Officer Defendants, and stated that he "wants to be involved as a working participant of" the McCullough investigation.

**ANSWER: ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of this paragraph, and deny the remaining allegations of this paragraph.**

80. In 2010, Defendants Hanley and Damasky contacted Jan Edwards. Ms. Edwards informed the investigators what she recalled from the night of the abduction – that she had a date to see Mr. McCullough at her home, Plaintiff arrived at her home, and he was excited to be enlisting in the military. Two months later, Ms. Edwards provided these Defendants with a

train ticket issued to Plaintiff by the military that he had given to her on the night of the abduction, which she had found tucked inside an old picture frame.

**ANSWER: ISP Defendants admit the first sentence of this paragraph and deny the second sentence of this paragraph. ISP Defendants admit that in June 2010, Jan Edwards (Janice Swafford) provided Hanley with an Illinois Central Railroad Co. coach train ticket, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of the third sentence of this paragraph.**

81. Working with others, Defendants Hanley and Damasky, however, concocted an entirely false version of their interview with Edwards.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

82. They falsely reported that Ms. Edwards stated that she did not remember seeing Mr. McCullough that night, that they did not have a date to meet, and that Mr. McCullough's enlistment in the military was both abrupt and a complete surprise to her.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

83. In September 2010, Defendants Hanley and Damasky approached Kathy Sigman, now sixty-one years old.

**ANSWER: ISP Defendants admit that Hanley and Damasky met with Kathy Sigman (Kathy Chapman) and lack knowledge or information sufficient to firm a belief as to the truth of the remaining allegations of this paragraph.**

84. Defendants Hanley and Damasky spoke with Ms. Sigman for over an hour. During this interview, Hanley and Damasky asked Ms. Sigman to describe the man who played with her and Maria over fifty years prior. Ms. Sigman indicated that the man was "tall, slender face, sandy blonde hair, clean shaven, maybe twenty to thirty years of age."

**ANSWER:** **ISP Defendants admit that Hanley and Damasky met with Ms. Sigman from approximately 6pm to 7:22pm, that Sigman was asked to describe to the best of her knowledge the male that approached her and Ridulph on the night of Ridulph's disappearance, and that Sigman described the male as "being tall, slender face, sandy blonde hair, clean shaven, maybe twenty (20) to thirty (30) years of age, but was unsure the age range and had pants and possibly a multi-colored sweater." ISP Defendants deny any remaining allegations in this paragraph.**

85.     Following the interview, Defendants Hanley, Damasky, and Smith concocted a photo array that was obviously biased against Mr. McCullough and did not fit the description Ms. Sigman gave Defendants Hanley and Damasky.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

86.     Defendant Engerman viewed and approved the overtly suggestive photo array and encouraged Defendants Hanley and Smith to show it to Ms. Sigman.

**ANSWER:** **ISP Defendants admit that Engerman reviewed and approved the photo array, and deny the remaining allegations of this paragraph.**

87.     The bias of the photo array was apparent. For one thing, although Kathy described the perpetrator as having blond hair, three of the photos in the array had dark hair.

**ANSWER:** **ISP Defendants deny the first sentence of this paragraph. ISP Defendants state that one cannot ascertain exact hair colors from the black and white photographs in the photo array, and therefore deny the remaining allegations of this paragraph.**

88.     Indeed, only two of the six photos (one of which was Plaintiff's) might fit the description of the perpetrator as having blond hair and a slender face.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

89.     To make matters worse, Defendants used an old photograph of Plaintiff and five fillers pulled from a high school yearbook.

**ANSWER: ISP Defendants admit that the photo array included an old photograph of McCullough and five photographs from a high school year book, and deny the remaining allegations of this paragraph.**

90.     The yearbook photos were uniform in that each photograph depicted a young man in a suit and tie, with a light background, looking slightly away from the camera. Each of these photos was on light background.

**ANSWER: ISP Defendants admit that the yearbook photos depict young men in suitcoats, that several of the subjects appear to be looking slightly away from the camera, and that the photos are on light backgrounds. ISP Defendants deny the remaining allegations of this paragraph.**

91.     By contrast, Plaintiff's photograph depicted him wearing neither a suit nor a tie, looking directly at the camera, and was set in front of a dark background.

**ANSWER: ISP Defendants admit that McCullough's photograph does not depict him wearing a suitcoat and that the background of his photograph is somewhat darker. ISP Defendants further state that one cannot ascertain from the photograph whether he was wearing a tie or looking directly at the camera, and deny the remaining allegations of this paragraph.**

92.     As a result, Plaintiff's photograph was the only photograph that stood out from the others.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

93.     Nevertheless, Defendants Hanley and Smith, presented the photo array to Sigman in September 2010.

**ANSWER:  ISP Defendants admit that Hanley presented the photo array to Sigman in September 2010 and that Smith was present, and deny the remaining allegations of this paragraph.**

94.     Following protocol, Defendants Hanley and Smith presented each photograph from the array sequentially, indicating that they understood that a side by side comparison of photos might lead to an unreliable identification.

**ANSWER:  ISP Defendants admit that following protocol, Hanley presented each photograph from the array sequentially. ISP Defendants deny the remaining allegations of this paragraph.**

95.     Sigman did not select any of the photographs from the initial presentation of the array. The procedure should have stopped there, with a result of no identification.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

96.     Instead, these Defendants permitted Sigman to exclude three photos (the three dark haired fillers) and compare the remaining three photographs together. After four minutes of contemplation, Sigman chose Defendants' suspect, Mr. McCullough.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

97.     This identification was totally unreliable. Defendants Hanley and Smith's decision to show Sigman the photo array was unnecessarily suggestive, tainted her memory, and manufactured a false identification.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

98. But, Defendants Engerman, Hanley, Damasky, and Smith knew that they had to put their thumbs on the scale in order to obtain an identification from Ms. Sigman that would implicate Plaintiff. Indeed, these Defendants knew that – based on the FBI documents and the more than fifty years that had passed since the murder – no line-up should have ever been shown to Ms. Sigman.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

99. Kathy Sigman was only eight years old at the time of the crime and was shown thousands of photographs by the FBI. Her initial description indicated that the perpetrator was a stranger and was missing an eyetooth. This description excluded Mr. McCullough, who lived just a few blocks away in the small town, and was not missing any teeth.

**ANSWER: ISP Defendants admit that Sigman was eight years old at the time of the crime, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

100. Moreover, Kathy's description had changed significantly over time.

**ANSWER: ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

101. In fact, in the two weeks following Maria's abduction, Kathy's description of "Johnny" changed at least three different times, with some of the identifying characteristics changing significantly, including age, height, hair color and even the way she described the perpetrator's teeth.

**ANSWER: ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

102. For example, in the first two weeks, Kathy first description of "Johnny's" age started as between "24 and 25," expanded to a range of "25 and 35" and then morphed into the claim that "Johnny" actually just told her he was 24. At the same time, the perpetrator, according to Kathy, got shorter—he started out at about 6 feet tall, but that description shifted to 5'8." Similarly, Kathy's description of "Johnny's" teeth varied—beginning with the claim that they were "even" and "pretty" which later became a description of "large and yellowish."

**ANSWER: ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

103. Sigman had previously identified two other men as being the perpetrator prior to been shown the photo array in 2011.

**ANSWER: ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

104. To bolster the shaky identification, Defendants falsely claimed that Ms. Sigman had "immediately pointed to the photo of [Plaintiff] and said, 'that's him.'" Similarly, the Defendants also lied in alleging that Ms. Sigman's description indicated that the perpetrator had a gap in his front teeth, which happened to fit Plaintiff's description. This was a further fabrication.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

105. Based on the above, all of the Defendants knew that Sigman's "identification" could not provide probable cause to believe that Mr. McCullough had anything to do with the murder. Indeed, none of the Defendants moved to arrest Plaintiff until nine months after Sigman's unreliable identification.

**ANSWER:** ISP Defendants admit that McCullough was arrested in June 2011 and deny the remaining allegations in this paragraph.

106.     Moreover, Mr. McCullough's alibi wholly exculpated him from having anything to do with Maria's death. Unfazed, Defendants Hanley, Kot, Smith, Damasky, Engerman, Trevarthen, and Escarida decided to manipulate the evidence in an attempt to falsely suggest that Plaintiff had the opportunity to commit the crime.

**ANSWER:** ISP Defendants deny the allegations of this paragraph as to them, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

107.     Knowing that Plaintiff was conclusively established to have been in Rockford at 6:57 p.m., these Defendants knew that the only way they could charge Plaintiff was if the time of the abduction was fabricated to make it earlier.

**ANSWER:** ISP Defendants deny the allegations of this paragraph.

108.     Accordingly, without any evidentiary support whatsoever, these Defendants falsely maintained that the crime occurred between 6 and 6:15 p.m. throughout the investigation.

**ANSWER:** ISP Defendants deny the allegations of this paragraph.

109.     This notion was, of course, impossible. Maria's parents both saw her alive after 6:30 p.m., when the television show *Cheyenne* began, and by all accounts the abduction occurred between 6:50 and 7 p.m.

**ANSWER:** ISP Defendants deny the allegations of the first sentence of this paragraph. ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the second sentence in this paragraph.

110.    In fabricating evidence, these Defendants created a false timeline to attempt to support the false idea that Plaintiff had enough time to commit the crime and then traveled to Rockford in time to meet with the Air Force officials and place the collect call to his parents.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

111.    Prior to Mr. McCullough's arrest, interrogation, and lie detector test, each of the Prosecutor Defendants had participated in the investigation of the Ridulph homicide and agreed to work with the Defendant Officers to falsely implicate Plaintiff.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

### 2011 - Defendant Campbell Joins the Investigation

112.    In November 2010, Defendant Campbell was elected State's Attorney of DeKalb County.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

113.    Shortly following his election, Defendant Campbell became personally involved in the McCullough investigation.

**ANSWER:  ISP Defendants admit that Campbell communicated with them regarding the McCullough investigation, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.**

114.    Eager to "solve" the nation's oldest cold case, Defendant Campbell took over Defendant Engerman's previous role as the main person in the DeKalb County State's Attorney's Office directing the Defendant Police Officers in the investigation.

**ANSWER:** ISP Defendants deny that Campbell directed them in the McCullough investigation, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

115. In his eagerness, Defendant Campbell indicated to the Illinois Defendant Officers that he wanted to oversee the case long before Plaintiff was even arrested.

**ANSWER:** ISP Defendants deny the allegations of this paragraph.

116. Although there was no probable cause to believe that Mr. McCullough was involved with Maria Ridulph's disappearance and murder, Defendant Campbell participated in the criminal investigation of Mr. McCullough, alongside Defendants Trevarthen, and Escarcida.

**ANSWER:** ISP Defendants deny the allegations of this paragraph.

117. In so doing, Defendant Campbell, Trevarthen, and Escarcida had agreed not to conduct a fair, impartial investigation. Instead, quite apart from seeking honest evidence or probable cause, Defendant Campbell was focuses solely in investigating and implicating Plaintiff.

**ANSWER:** ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

118. Defendants Campbell, Trevarthen, and Escarcida, worked closely with the Illinois Defendant Officers to continue the criminal investigation for several months before the investigation turned to Seattle. This included regularly consulting with the Defendant Police Officers, maintaining close communication and direction of the investigation, and using the resources of their office to investigate the crime.

**ANSWER:** ISP Defendants admit that Campbell, Trevarthen, and Escarida communicated with them regarding the criminal investigation. ISP Defendants lack

**knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

119.     Defendants Smith, Damasky, Hanley, Kot, Campbell, Trevarthen, and Escarcida knew that there was no probable cause to arrest Mr. McCullough for this cold case.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

120.     Accordingly, these Defendants sought to gather more bogus and false evidence against Plaintiff by coordinating with police officers in another state – Washington – to attempt to secure his false arrest.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

### Seattle Police Officers Agree to Work to Frame Plaintiff

121.     The individual defendants from the Illinois State Police and DeKalb County State's Attorney's Office had learned that that Mr. McCullough relocated to Seattle. To further implement their agreement, Defendants contacted officers from the Seattle Police Department, including Defendants Lau, Steiger, and Ciesynski, and possibly others.

**ANSWER:  ISP Defendants admit the first sentence of this paragraph and deny the remaining allegations of this paragraph.**

122.     After being asked to assist in investigating a homicide in Illinois, and understanding that they would be seeking to secure the prosecution of Plaintiff in Illinois (and not Washington State), Defendants Lau, Steiger, and Ciesynski agreed to work with the Illinois-based Defendants from the Illinois State Police and DeKalb County State's Attorney's Office to attempt to link Plaintiff to the homicide, even though he was innocent.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

123.     Defendants Lau, Steiger, and Ciesynski knew they had agreed to participate in investigating a "cold-case murder'" in Illinois and that any prosecution of Plaintiff would take place in Illinois, not Seattle.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

124.     These Defendants also understood that, though they would be conducting investigative activities in Washington, using their authority as Seattle PD officers, and even using the facilities and resources of the Seattle Police Department, that the aim of their investigation was Sycamore, DeKalb County, Illinois.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

125.     In so doing, Defendants Ciesynski and Steiger met with the Illinois-based Defendants Hanley and Damasky who had traveled to Seattle in an attempt to secure Plaintiff's false arrest for the Ridulph homicide.

**ANSWER:  ISP Defendants admit that Hanley and Damasky were based in Illinois and that they traveled to Seattle and met with Ciesynski and Steiger.  ISP Defendants deny the remaining allegations of this paragraph.**

126.     In furtherance of their agreement to coordinate their investigation, the Seattle Defendant Officers and Illinois Defendants collaborated extensively throughout the investigation; including, for example, writing police reports in conjunction with one another and exchanging other contemporaneously-generated reports when they had not been written together.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

127.    In fact, Defendant Steiger both authored and signed the Statement of Probable Cause and the Affidavit for Search Warrant that led to Plaintiff's arrest. Defendant Steiger, with knowledge and approval of Defendants Ciesynski, Hanley, and Damasky, included false information in that affidavit in an attempt to make it appear that probable cause to arrest Plaintiff existed, where it did not.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of this paragraph.  ISP Defendants deny the remaining allegations of this paragraph.**

128.    Some of the false facts in that affidavit included: falsely claiming that Sigman "immediately" identified Plaintiff from a photo array; falsely stating that Maria disappeared at 6:15 p.m., to try to cast doubt on Plaintiff's alibi; repeating the above lies that Jan Edwards did not remember seeing Mr. McCullough the night of the abduction and that her parents would not have let her out of the house on that night, when in fact she never said those things; claiming that Plaintiff had legally changed his name shortly after Maria's disappearance, when that did not occur until many decades later; and omitting the fact that Air Force personnel had verified Plaintiff's alibi, in a further effort to delegitimize Plaintiff's alibi.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

129.    Based on Defendant Steiger's false affidavit, Mr. McCullough was ultimately arrested and questioned.

**ANSWER:  ISP Defendants admit that McCullough was arrested and questioned, and deny the remaining allegations of this paragraph.**

130.    Prior to the arrest and interrogation, the Seattle Defendant Officers consulted with the Defendants based in Illinois, and agreed upon the manner in which the investigation

would proceed, how they would arrest Plaintiff, and how they would attempt to get him to provide an inculpatory statement in the decades-old, Illinois-based homicide of Maria Ridulph.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

131. To that end, Defendants Ciesynski and Steiger actively participated in the investigation, including: traveling to Plaintiff's former employer's office, going to Plaintiff's home, contacting Plaintiff under false pretenses, lying to Plaintiff about why they had gone to his former employers, and lying about why they eventually went to his home looking for him.

**ANSWER: ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

132. Thereafter, the Seattle Officers participated in the arrest and interrogation of Mr. McCullough alongside the ISP Defendants.

**ANSWER: ISP Defendants admit that certain Seattle Officers participated in the arrest and interview of McCullough alongside certain ISP Defendants, and deny the remaining allegations of this paragraph.**

133. From Seattle, the Defendant Officers Ciesynski, Steiger, Hanley, Damasky, and Lau continued the coordination of the investigation with Defendants Campbell, Trevarthen, and Escarcida.

**ANSWER: ISP Defendants admit that from Seattle, Hanley and Damasky communicated with Campbell, Trevarthen, and Escarida regarding the investigation. ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.**

134.    In doing so, Defendants Ciesynski, Steiger, and Lau knowingly participated in the investigation of Mr. McCullough for the murder of Maria Ridulph in Illinois.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

135.    At no point did any of the Seattle Defendant Officers refuse to participate in the investigation or intervene on behalf of Mr. McCullough to ensure that his constitutional rights were not violated.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

136.    Instead, in concert with the Illinois Defendant Officers, and DeKalb County State's Attorney Defendants including but not limited to Defendants Campbell, Trevarthen, and Escarcida, the Seattle Defendant Officers agreed to participate, conduct, and cooperate in the investigation just as they would have done if the crime they were investigating were in Washington.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

137.    While the Defendant Officers were in Seattle, Defendants Campbell, Trevarthen, and Escarcida thus coordinated with the Defendants who made the trip to Seattle, including maintaining frequent communication with them and providing guidance on how to conduct the on-going investigation.

**ANSWER:** ISP Defendants admit that while Hanley and Damasky were in Seattle, they communicated with Campbell, Trevarthen, and Escardia regarding the investigation. ISP Defendants deny the remaining allegations of this paragraph.

138.    Even though no new non-fabricated evidence was discovered between the FBI's initial investigation and the reopened investigation in 2009, the Defendant Officers and Defendants Campbell, Trevarthen, and Escarcida all agreed to claim that there was probable cause to arrest Plaintiff for the murder even though they knew that there was not.

**ANSWER:** ISP Defendants deny the allegations of this paragraph.

### Plaintiff's False Arrest, Interrogation, and Prosecution

139.    Nonetheless, Plaintiff was arrested in Seattle, Washington in June 2011, over fifty years after the murder.

**ANSWER:** ISP Defendants admit the allegations of this paragraph.

140.    Given the crime's notoriety and the half a century gap between crime and arrest, Mr. McCullough's arrest made headlines in media sources across the country.

**ANSWER:** ISP Defendants admit that McCullough's arrest received media coverage, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

141.    Given the widespread media coverage, the Defendants were even more determined to ensure Plaintiff's conviction.

**ANSWER:** ISP Defendants deny the allegations of this paragraph.

142.    Following Plaintiff's arrest, he was brought to Defendant Seattle Police Detective Lau to be interrogated.

**ANSWER: ISP Defendants admit that Lau conducted a polygraph examination of plaintiff and deny the remaining allegations of this paragraph.**

143.    Before doing so, and even though he was in custody, the arresting Defendants failed to provide Plaintiff with his *Miranda* warnings and launched into an interview – a mistake they would later attempt to "cure."

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

144.    Defendant Lau created a report of her interrogation, in which she attempted to falsely portray Mr. McCullough as unnaturally fixated on Maria.

**ANSWER: ISP Defendants admit that Lau prepared a report of her polygraph examination of McCullough and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

145.    Defendant Lau falsely claimed that Mr. McCullough "described [Maria Ridulph] as being very stunningly beautiful with big brown eyes and he stated that she was 'lovely, lovely, lovely.'"

**ANSWER: ISP Defendants admit that Lau's report of her polygraph examination of McCullough states: "I asked him to describe Maria" and "He stated, 'She was stunningly beautiful, with big brown eyes. She was lovely, lovely, lovely." ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

146.    As the video of the interrogation bears out, it was Defendant Lau who called Maria beautiful, not Mr. McCullough, and Mr. McCullough said nothing about Maria's appearance until Lau tried to goad him by saying "bi-racial" couples "make the most beautiful kids," suggesting that Maria had multi-ethnic parents. Mr. McCullough simply agreed with Lau

that Maria was adorable with big brown eyes. Defendant Lau's report omitted her own precursor statements about Maria's appearance.

**<u>ANSWER:</u> ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

147. Further, Defendant Lau suggested that Mr. McCullough's (fabricated) statements were even more incriminating because of his demeanor when he made them. According to Defendant Lau, when Mr. McCullough discussed Maria Ridulph, his "entire face changed. It softened and...he had just totally relaxed at this point." Driving the point further, Defendant Lau claimed that Mr. McCullough "was pretty angry" and "alternated between rage and calm," during his interview, but that when he discussed Maria he supposedly became eerily calm. The video demonstrates that there was no significant change in Mr. McCullough's volume, posture, or demeanor when he mentioned Maria, nor was there any indication that Mr. McCullough was angry or enraged during the interview.

**<u>ANSWER:</u> ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

148. Following his interrogation in Seattle, Defendants Steiger and Ciesynski assisted Defendants Hanley and Damasky with extraditing Plaintiff from Washington to Illinois. Defendants Steiger and Ciesynski accompanied Plaintiff on the flight from Seattle to Chicago, and then drove him to Sycamore, including to the scene of the abduction.

**<u>ANSWER:</u> ISP Defendants admit the allegations of the first sentence of this paragraph and lack knowledge or information sufficient to firm a belief as to the truth of the remaining allegations of this paragraph.**

149.    Throughout this transportation, Defendants Steiger and Ciesynski questioned Plaintiff continuously.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

150.    Defendants Steiger, Ciesynski, and Lau's work with the Illinois-based Defendants did not end there. Both Steiger and Ciesynski traveled to Illinois between December 16 and 22, 2011, meeting with Defendants Hanley, Campbell, Trevarthen, Escarcida, and possibly other Defendants, and discussing this case.

**ANSWER:  This allegation is not complete and therefore it is impossible to fully respond. To the extent that a response is required, ISP Defendants admit that Steiger and Ciesynski met with Hanley in December 2011, and deny the remaining allegations of this paragraph.**

151.    When Mr. McCullough's trial took place in 2012, Defendants Steiger, Ciesynski, and Lau traveled to Illinois to participate and testify in the trial. This participation included Defendant Lau reiterating the false information that was used to implicate Mr. McCullough in Maria's disappearance and murder.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

152.    At this trial, the video evidence from Mr. McCullough's polygraph interview that would disprove Defendant Lau's testimony was withheld from him and he had no means to rebut her fabricated account. The prosecution relied on Defendant Lau's false evidence in closing arguments.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

153.   According to the director of the Illinois State Police, "had it not been for the assistance of the Seattle Police Department, it is unlikely that charges against Mr. McCullough would have been approved."

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

### Defendants Fabricate False "Informant" Testimony and Conceal Their Misconduct

154.   Knowing their false case against Plaintiff rested on thin reeds, Defendant Hanley decided to manufacture more false evidence against Plaintiff through convicted felons, to whom they offered deals to falsely claim that Plaintiff had confessed.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

155.   As a result, Defendant Hanley was able to get two of the felons to falsely implicate Plaintiff in Maria's kidnapping and murder – Kirk Swaggerty and Matthew Reimann. These individuals gave false testimony that Plaintiff had suggested and even confessed that he had been involved in the crime, when, in fact, Mr. McCullough never said any such thing to anyone, let alone these men.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

156.   Defendant Hanley recruited these so-called "informants" and caused them to provide false evidence implicating Plaintiff in the crime, all while knowing that these statements were entirely false.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

157.   Defendant Hanley made improper, undisclosed promises and offered impermissible incentives to these individuals. The entire time, Defendant Hanley concealed

information about the improper promises he made and the misconduct used to secure these false statements.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

158.    At the time of Mr. McCullough's trial, both Swaggerty and Reimann had petitions before a trial court to either reconsider their sentence or vacate their convictions.

**ANSWER: ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

159.    When they testified at Mr. McCullough's trial, both Swaggerty and Reimann stated that they were not offered anything in return for their testimony, and that no deals or promises had been made. These statements were false.

**ANSWER: ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

160.    To elaborate, Kirk Swaggerty was another inmate housed at the DeKalb County Jail while Plaintiff was incarcerated there awaiting trial.

**ANSWER: ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

161.    In February 2012, Defendant Hanley traveled to Menard Correctional Center to meet with Swaggerty. Defendant Hanley knew that Plaintiff was innocent, but nonetheless wanted to see if he could induce Swaggerty to falsely implicate Mr. McCullough.

**ANSWER: ISP Defendants admit the allegations of the first sentence of this paragraph. ISP Defendants deny the remaining allegations of this paragraph.**

162.    Although Swaggerty was initially reluctant, he agreed to make falsely claim that Plaintiff had confessed to him.

**ANSWER:** ISP Defendants deny the allegations of this paragraph.

163. After two days of meeting with Defendant Hanley, Swaggerty agreed to implicate Plaintiff, but his account of Mr. McCullough's purported confession lacked enough detail to be believable. Hanley indicated to Swaggerty that if he fabricated an account of how Mr. McCullough committed the murder, his account would be more believable and he would be eligible to get a deal from the prosecution on his current sentence. Hanley also suggested to Swaggerty that he could help their prosecution of Plaintiff if he claimed that Mr. McCullough was fixated on Maria's beauty, thereby corroborating Defendant Lau's lies detailed above.

**ANSWER:** ISP Defendants deny the allegations of this paragraph.

164. Sure enough, less than two weeks after meeting with Hanley, Swaggerty wrote Hanley claiming that he had just "remembered" that Plaintiff suffocated Maria and that he described Maria as "very pretty."

**ANSWER:** ISP Defendants admit that on or about February 27, 2012, Hanley received a letter from Swaggerty stating in part: "After you left I started thinking about what all Jack told me and I remembered Jack saying he suffocated her. He said it was an accident that he didn't mean to kill her. Then he said, as if reminiscing, 'she was very pretty'!" ISP Defendants deny any remaining allegations in this paragraph.

165. At Plaintiff's trial, Mr. Swaggerty testified to these false statements as a direct result of Hanley's manipulation and promises of leniency. Swaggerty did not disclose the incentives he had been promised.

**ANSWER:** ISP Defendants deny the first sentence of this paragraph. ISP Defendants deny that Hanley made any promises to Swaggerty, and therefore deny the second sentence of this paragraph.

166. When Plaintiff was convicted, he did not know that Swaggerty's testimony was fabricated by Hanley or provided based on a promise that the prosecution would assist him to get a reduced sentence.

**ANSWER:** ISP Defendants deny that Hanley fabricated testimony or made any promises to Swaggerty, and therefore deny the allegations of this paragraph.

167. Likewise, Matthew Reimann was briefly incarcerated at the DeKalb County Jail from August 30, 2012 to September 5, 2012 while his post-conviction petition was pending. During this time, Reimann and Plaintiff were both housed at DeKalb County Jail.

**ANSWER:** ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

168. On September 6, 2012, Reimann returned to Stateville Correctional Center near Joliet, a maximum security prison. The next day, Defendant Hanley visited him at Stateville to interview him about his interactions with Plaintiff, but he was reluctant to cooperate.

**ANSWER:** ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of this paragraph. ISP Defendants admit that Hanley interviewed Reimann at Stateville about his interactions with McCullough and deny the remaining allegations of the second sentence of this paragraph.

169. Nevertheless, Defendant Hanley persisted. To coax Reimann into providing false testimony, and in exchange for his agreement to testify, Defendant Hanley told him he would have the prosecutor waive an untimeliness defense for Reimann's post-conviction petition and to reduce his security classification so that he would receive a favorable transfer to a preferable facility. Defendant Hanley also agreed to obtain a gag-order to conceal Reimann's identity.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

170. On September 12, 2012, Reimann was remanded back to the DeKalb County Jail and was placed in an interrogation room with Defendants Hanley, Escarcida, and Trevarthen During this meeting, Defendants assured Reimann that his identity would be concealed. They also instructed Reimann to deny that there was a "deal" or any "promises" relating to his agreement to testify, as this would undermine the value of his testimony.

**ANSWER: ISP Defendants admit that Reimann met with Hanley, Escarcida, and Trevarthen. ISP Defendants admit that Escarcida and Trevarthen told Reimann that his identity would not be disclosed. ISP Defendants deny the remaining allegations.**

171. As a result of the incentives that he was promised, Reimann made inculpatory statements about Plaintiff during the trial, falsely claiming that Plaintiff had confessed to him and that he had not received anything in exchange for his testimony.

**ANSWER: ISP Defendants deny that they promised any incentives to Reimann, and lack knowledge or information sufficient to form a belief as to the truth of the allegations remaining in this paragraph.**

172. When Plaintiff was convicted, Plaintiff had no idea that Reimann had been provided incentives for his testimony.

**ANSWER:** ISP Defendants deny that they provided any incentives to Reimann, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

173.   Upon his return to Stateville Correctional Center, Reimann became concerned that his identity had been revealed. He wrote his attorney several times to inquire about potential violations of the gag-order and to determine when he would receive the incentives he had been promised.

**ANSWER:** ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

174.   In response, and as an act of further misconduct, Defendant Hanley arranged to have a secret meeting with Reimann on November 30, 2012. The November 30 entry from the Stateville visitor log reflects that Hanley used an alias, Quinn Brady, in order to disguise his identity when he signed in to see Reimann. In addition, Hanley listed his address as "506 N. County Road, Wheaton, Illinois," an address which does not exist. The DuPage County Sheriff's Department, however, resides at 501 N. County Farm Road, Wheaton, Illinois, and the DuPage County Courthouse is located at 505 N. County Farm Road, Wheaton, Illinois.

**ANSWER:** ISP Defendants admit that Hanley met with Reimann, deny that they engaged in any misconduct, and deny the remaining allegations of the first sentence of this paragraph. ISP Defendants admit the second through fourth sentences of this paragraph and further state that Reimann requested that Hanley meet with him undercover to limit the risk of retaliation for him cooperating with the police.

175.   Within a few months, Reimann's classification was reduced in accordance with the undisclosed agreement he had made with Defendants.

**ANSWER:** **ISP Defendants deny that they made any agreement with Reimann, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

176.     Defendant Hanley's misconduct was not limited to the two witnesses that he actually succeeded in getting to provide false testimony, but also included others who, when offered the deal, refused to provide false testimony against Plaintiff. For example, sometime between November 2012 and January 2013, Defendant Hanley and another investigator contacted Mike Greenwall, an inmate at Stateville who had spent time at DeKalb County Jail.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

177.     Defendant Hanley met with Greenwall to see if he could persuade Greenwall to provide false testimony against Plaintiff.

**ANSWER:** **ISP Defendants admit that Hanley met with Greenwall and deny the remaining allegations of this paragraph.**

178.     Greenwall was unwilling to lie for Hanley.

**ANSWER:** **ISP Defendants deny that Hanley asked Greenwall to lie for him, and therefore deny the allegations of this paragraph.**

179.     Nevertheless, at the conclusion of their meeting, Defendant Hanley asked Greenwall whether Reimann had been reclassified yet and stated that he was working on obtaining a transfer for him, in hopes that Greenwall would understand that Hanley could provide similar services for him as well. Defendant Hanley then left a card with Greenwall with instructions to let him know if there was ever anything that he could for him.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

180. The suppression of the foregoing information was prejudicial to Plaintiff. If Mr. McCullough had been given access to this information about witnesses, it would have been powerful evidence of his innocence and critical evidence by which he could have impeached the prisoners who testified falsely against him.

**ANSWER:** **ISP Defendants deny that they suppressed any information, and therefore deny the allegations of this paragraph.**

181. However, Defendant Hanley concealed the misconduct described above from Plaintiff and his criminal defense attorneys.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

182. The Defendants' misconduct deprived Plaintiff of evidence that would have established further that he had no connection to the kidnappings and murder of Maria Ridulph.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

183. On September 10, 2012, Plaintiff's bench trial began in the DeKalb County Circuit Court.

**ANSWER:** **ISP Defendants admit the allegations of this paragraph.**

184. The next day, September 11, 2012, the State called Kathy Sigman Chapman as a witness. During her examination, Defendant Trevarthen questioned Chapman about the identification she made from the photo lineup she was shown by Defendants Hanley, Damasky, and Smith—the same lineup that was approved by Defendant Engerman.

**ANSWER:** **ISP Defendants admit that the State called Kathy Sigman Chapman as a witness on September 11, 2012, that Trevarthen questioned Chapman about the identification she made from the photo lineup that Hanley presented to her, and that**

Engerman approved the lineup.  ISP Defendants deny the remaining allegations of this paragraph.

185.    On the stand, Kathy Sigman Chapman testified that she had identified Plaintiff from that photo array.  This unreliable and impermissibly suggestive identification undermined the fairness of Plaintiff's criminal trial.

**ANSWER:  ISP Defendants admit the first sentence of this paragraph and deny the second sentence of this paragraph.**

186.    On September 14, 2012, Jack McCullough was wrongfully convicted of the kidnapping and murder of Maria Ridulph. On December 10, 2012, Mr. McCullough received a life sentence.

**ANSWER:  ISP Defendants admit that McCullough was convicted of the murder of Maria Ridulph on September 14, 2012, and that he received a life sentence on December 10, 2012. ISP Defendants deny that they engaged in any misconduct and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

187.    Neither Plaintiff nor his criminal defense counsel were aware at the time of Plaintiff's criminal trial of the concealment of exculpatory evidence, fabrication of inculpatory evidence, and manipulation of the eyewitness that is set forth in this Complaint. Had these facts been disclosed, Plaintiff would not have been convicted.

**ANSWER:  ISP Defendants deny that they engaged in any misconduct, and therefore deny the allegations of this paragraph.**

**Plaintiff's Exoneration**

46

188.   Throughout his wrongful incarceration, Jack McCullough maintained his innocence and that he was wrongfully convicted.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

189.   Mr. McCullough spent four years incarcerated for a crime that he did not commit.

**ANSWER:  ISP Defendants admit that McCullough was incarcerated but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

190.   In 2016, Plaintiff's conviction was vacated and he was released from prison. Plaintiff's conviction was vacated after the new DeKalb County State's Attorney Richard Schmack – who had replaced Defendant Campbell – moved to dismiss all charges against Plaintiff.

**ANSWER:  ISP Defendants admit the allegations of this paragraph.**

191.   In so doing, the DeKalb County State's Attorney's office declared that the People of the State of Illinois were compelled to admit the existence of clear and convincing evidence showing that Plaintiff was convicted for a crime he did not commit. In so doing, acting on behalf of the People of the State of Illinois, State's Attorney Schmack admitted that the FBI's initial investigation of Plaintiff was accurate in excluding him as being the perpetrator. On behalf of the People of the State of Illinois, District Attorney Schmack further admitted that there had not ever been a reasonable hypothesis for the false claim proffered by the Defendants that the abduction happened earlier in the day than previously reported.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

192.     In addition to admitting many of the other claims alleged above, the State also acknowledged that the warrant for Plaintiff's arrest contained false and materially misleading statements, and that Plaintiff's indictment was secured through false and/or misleading testimony.

**ANSWER:  ISP Defendants deny that they engaged in any misconduct, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

193.     Subsequently, in April of 2017, Plaintiff was granted a Certificate of Innocence by the Circuit Court for the Twenty Third Judicial Circuit in DeKalb County, Illinois.

**ANSWER:  ISP Defendants admit the allegations of this paragraph.**

194.     After four years of incarceration, and over seven years of struggles and difficulties as a result of Defendants' misconduct, Plaintiff has been made free – as a formal matter – from his wrongful conviction.

**ANSWER:  ISP Defendants admit that McCullough was incarcerated for four years and is now free, deny that they engaged in any misconduct, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.**

**Plaintiff's Damages**

195.   However, Plaintiff is not free of the severe damages that have been inflicted upon him over the greater part of the last decade due to Defendants' misconduct.

**ANSWER:** ISP Defendants deny that they engaged in any misconduct, and therefore deny that McCullough suffered any damages due to their conduct. ISP Defendants deny any remaining allegations of this paragraph.

196. Mr. McCullough spent over 4 years in prison for a crime he did not commit, and over 7 years fighting to clear his name. While in prison, Plaintiff was targeted owing to the nature of the crime for which he had been wrongfully convicted and given a life sentence. Plaintiff was attacked, despite being at a physical disadvantage due to his age. As but one example, a fellow inmate tried to kill Mr. McCullough by stabbing him in the eye, which Plaintiff survived only by using combat technique he learned in the military.

**ANSWER:** ISP Defendants admit that McCullough spent four years in prison and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

197. Although exonerated, Mr. McCullough must now attempt to resume his life despite the horrors he endured while imprisoned for a crime he did not commit.

**ANSWER:** ISP Defendants deny that they engaged in any misconduct, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

198. Plaintiff was due to retire, but those efforts have been hampered by his wrongful conviction. In addition, Plaintiff has lost the precious time to be with his family, and watch his grandchildren age – something he can never get back.

**ANSWER:** ISP Defendants deny that they engaged in any misconduct, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

199. As a result of the foregoing, Mr. McCullough has suffered tremendous damage, including physical harm and mental suffering, all proximately caused by Defendants' misconduct.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

## COUNT I – 42 U.S.C. § 1983
### Suppression of Exculpatory Material

200. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER: ISP Defendants restate and incorporate by reference all answers to all paragraphs above as though fully set forth herein.**

201. As described more fully above, all of the Defendant Police Officers while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

202. In the manner described more fully above, the Defendant Police Officers and individually, jointly, and/or in concert and in conspiracy:

    a) fabricated evidence including but not limited to police false police reports, false informant testimony, and unreliable "identification" evidence;

    b) used improper and suggestive procedures to taint the pretrial identifications of Plaintiff and caused Plaintiff to be misidentified as the perpetrator; and

    c) deliberately withheld and concealed exculpatory evidence-including but not limited to their misconduct in procuring, or attempting to procure, false informant testimony, as well as secreting other misconduct related to interviews they took.

In doing so, the Defendants violated their clearly established duty to disclose and

report all material exculpatory and impeachment information.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

203.    Absent these Defendants' misconduct, Plaintiff' could not and would not have

been further prosecuted, and Plaintiff would not have been convicted.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

204.    These Defendants' misconduct directly and proximately resulted in the unjust

and wrongful criminal conviction of Plaintiff and his continuing wrongful imprisonment,

thereby denying him his constitutional right to a fair trial, in violation of the Fifth Amendment

and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

205.    As a direct and proximate result of this violation of his constitutional rights to

due process and to a fair trial, Plaintiff suffered injuries, including but not limited to loss of

liberty, physical harm, and emotional distress.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

206.    The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established

constitutional rights.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**


### COUNT II – 42 U.S.C. § 1983
### Suggestive Identification


207.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:  ISP Defendants restate and incorporate by reference all answers to all paragraphs above as though fully set forth herein.**

208.    As described more fully above, Defendants Hanley and Smith, acting individually and in conspiracy with each other, used improper and suggestive procedures to cause Plaintiff to be misidentified as the perpetrator. This misconduct tainted the pretrial identification of Mr. McCullough, which was offered at trial.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

209.    As a result of this violation, Plaintiff was deprived of his right to a fair trial and was falsely convicted of a crime for which he was innocent.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

210.    These Defendants were acting under color of law and within the scope of their employment when they took these acts.

**ANSWER:  ISP Defendants deny that they engaged in the alleged "acts" and therefore deny the allegations of this paragraph.**

211.    As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries including the period of time following his arrest and before his conviction, as set forth above, including pain and suffering.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

**COUNT III – 42 U.S.C. § 1983**
**Failure to Intervene**

212.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:  ISP Defendants restate and incorporate by reference all answers to all paragraphs above as though fully set forth herein.**

213.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, each of the Defendants stood by without intervening to prevent the violation of Plaintiffs constitutional rights, even though they had the opportunity to do so.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

214.    As a direct and proximate result of the Defendants' failure to intervene to prevent the violation of Plaintiffs constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

215.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

## COUNT IV – 42 U.S.C. § 1983
### Fabrication of Evidence

216.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:  ISP Defendants restate and incorporate by reference all answers to all paragraphs above as though fully set forth herein.**

217.    In the manner described more fully above, all of the Defendants, individually, jointly and in conspiracy with each other, fabricated evidence, including fabricated testimony offered at trial proceedings.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

218. The Defendants knowingly fabricated this evidence. A reasonable likelihood exists that the false evidence affected the decision of the jurors and the courts that considered this false evidence.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

219. Defendants were acting under color of law and within their scope of employment when they took these actions.

**ANSWER: ISP Defendants deny that they engaged in the alleged "actions" and therefore deny the allegations of this paragraph.**

220. The Defendants' misconduct directly resulted in Plaintiff's unjust incarceration, thereby denying his constitutional right to due process as guaranteed by the U.S. Constitution. Absent this misconduct, there would have been no probable cause for Plaintiff's detention, and Plaintiff's prosecution could not and would not have been pursued.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

221. As a direct and proximate result of the Defendant' actions, Plaintiff's constitutional rights were violated and Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

**COUNT V – 42 U.S.C. § 1983**
**Unreasonable Pretrial Detention**

222. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER: ISP Defendants restate and incorporate by reference all answers to all paragraphs above as though fully set forth herein.**

223. In the manner described above, all of the Defendant Police Officers and Prosecutor Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional rights.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

224. The Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

225. In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

226. As a result of Defendants' false allegations and fabricated evidence, Plaintiff was seized in June 2011 and remained incarcerated from that day continuing on through his trial and until his eventual exoneration.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

227. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

228. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

## COUNT VI – Federal Law
### Conspiracy to Deprive Constitutional Rights

229.     Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** **ISP Defendants restate and incorporate by reference all answers to all paragraphs above as though fully set forth herein.**

230.     In an effort to implicate Plaintiff in solving a "cold case," each the Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to be free of detention in the absence of probable cause, his right to due process, and his right to a fair trial, all as described in the various paragraphs of this Complaint.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

231.     Additionally, before and after Plaintiff's conviction, the Defendants further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more timely exoneration.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

232.     In this manner, each of the Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER:** **ISP Defendants deny the allegations of this paragraph.**

233.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above and was an otherwise willful participant in joint activity.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

234.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

235.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

## COUNT VII – State Law Claim
## Malicious Prosecution

236.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:  ISP Defendants restate and incorporate by reference all answers to all paragraphs above as though fully set forth herein.**

237.    The Defendant Police Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

238. These Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

239. Statements of these Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false. Information presented to secure a warrant for Plaintiff's arrest was false and the officers knew, or were recklessly ignoring, the false and/or misleading nature of the information they used to procure Plaintiff's arrest. These Defendants also fabricated evidence through their actions in obtaining an "identification." The Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the Ridulph abduction and homicide.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

240. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

241. In 2016, the prosecution terminated in Plaintiff's favor when, after his conviction was vacated, the State dismissed the charges against him.

**ANSWER: ISP Defendants admit the allegations of this paragraph.**

242. As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including pain and suffering.

**ANSWER: ISP Defendants deny the allegations of this paragraph.**

**COUNT VIII – State Law Claim**
**Intentional Infliction of Emotional Distress**

243.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:  ISP Defendants restate and incorporate by reference all answers to all paragraphs above as though fully set forth herein.**

244.    The acts and conduct of all of the Defendants, as set forth above, were extreme and outrageous. The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

245.    As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

### Count IX – State Law Claim
### Civil Conspiracy

246.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:  ISP Defendants restate and incorporate by reference all answers to all paragraphs above as though fully set forth herein.**

247.    As described more fully in the preceding paragraphs, all of the Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

248.    In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

249.    The misconduct described in this Count was undertaken intentionally, with

malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

250.    As a direct and proximate result of the Defendants' conspiracy, Plaintiff

suffered damages, including severe emotional distress and anguish, as is more fully alleged

above.

**ANSWER:  ISP Defendants deny the allegations of this paragraph.**

### COUNT X – State Law Claim
### Respondent Superior

251.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:  ISP Defendants restate and incorporate by reference all answers to all**

**paragraphs above as though fully set forth herein.**

252.    In committing the acts alleged in the preceding paragraphs, Defendants Lau,

Steiger, and Ciesynski were members of, and agents of, the Seattle Police Department, acting at

all relevant times within the scope of their employment and under color of law.

**ANSWER:  The allegations in these paragraphs are not directed to the ISP Defendants, and**

**accordingly, no response by ISP Defendants is required. To the extent that a response is**

**required, ISP Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations in this paragraph.**

253.    Defendant City of Seattle is liable as principals for all torts committed by its

agents.

**ANSWER:  The allegations in these paragraphs are not directed to the ISP Defendants, and accordingly, no response by ISP Defendants is required. To the extent that a response is required, ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

**COUNT XI – State Law Claim**
**Indemnification**

254.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:  ISP Defendants restate and incorporate by reference all answers to all paragraphs above as though fully set forth herein.**

255.    Illinois and Washington law provide that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

**ANSWER:  ISP Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

256.    The Individual Defendants are or were employees of either the City of Seattle, the Illinois State Police, or the County of DeKalb, Illinois, who were acting within the scope of their employment in committing the misconduct described herein.

**ANSWER:  ISP Defendants admit that they were employees of the Illinois State Police and that they acted within the scope of their employment.  ISP Defendants deny that they committed any misconduct, and lack knowledge of information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

**ANSWERING FURTHER, defendant denies each and every allegation not heretofore answered.**

## ISP DEFENDANT'S AFFIRMATIVE DEFENSES

**First Affirmative Defense:  Qualified Immunity**

ISP Defendants in their individual capacities are entitled to qualified immunity from monetary damages, as their conduct was objectively reasonable and did not violate any of plaintiff's clearly established constitutional rights.

**Second Affirmative Defense:  Public Official Immunity**

ISP Defendants are entitled to absolute immunity to plaintiff's state-law claim under the Illinois public official immunity doctrine because their actions fell within the scope of their official discretion.

**Third Affirmative Defense:  Absolute Immunity**

ISP Defendants are entitled to absolute immunity for testifying in court proceedings, including proceedings relating to the Ridulph murder.  *See, e.g.*, *Briscoe v. LaHue*, 460 U.S. 325 (1983).

**Fourth Affirmative Defense:  Statute of Limitations**

Plaintiff's claims are untimely and barred by the applicable statute of limitations.

**Fifth Affirmative Defense:  Collateral Estoppel/Res Judicata**

Plaintiff's claims are barred by the doctrine(s) of collateral estopped and/or res judicata because he had a full and fair opportunity in his criminal proceeding to litigate the same issues and/or claims raised in his complaint.

**Sixth Affirmative Defense:  Failure to Mitigate Damages**

Plaintiff has failed to mitigate his alleged damages related to this matter.

**Seventh Affirmative Defense:  Intervening/Superseding Cause**

The chain between any ISP Defendant's actions and plaintiff's conviction and/or imprisonment was broken by one or more intervening/superseding exercises(s) of independent judgment by another, including but not limited to plaintiff, prosecutors, non-ISP officers, witnesses, judges, and jurors.

ISP Defendants reserve the right to supplement these affirmative defenses as more information becomes available throughout the litigation of this matter. ISP Defendants' investigation continues.

WHEREFORE, ISP Defendants deny that plaintiff is entitled to any relief and request that this Court dismiss plaintiff's complaint and grant any other relief that the Court deems just.

Dated: September 19, 2018

LISA MADIGAN
Attorney General of Illinois

Respectfully submitted,

*/s/ Michael T. Dierkes*

Michael T. Dierkes
T. Andrew Horvat
Sarah H. Newman
Michael C. Stephenson
Office of the Illinois Attorney General
General Law Bureau
100 West Randolph Street, 13th Floor
Chicago, Illinois 60601
(312) 814-3000

Counsel for the ISP Defendants