# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

Jack D. McCullough,         )
                                   )
        Plaintiff,        )
                                   )
v.                          )     No. 17 CV 50116
                                 )     Magistrate Judge Iain Johnston
Illinois State Police Agent   )
Brion Hanley, et al.,       )
                                 )
        Defendants.    )

## MEMORANDUM OPINION AND ORDER

## INTRODUCTION

This order addresses the scope of a waiver of the attorney-client privilege under Federal Rule of Evidence 502(a). This order finds that a clumsy invocation and waiver of the attorney-client privilege does not require subject matter waiver of privileged communications when the privilege holder has not and will not use the disclosed communications in litigation.

Litigation is a battle of narratives: Whose story should be believed?[1] This is particularly true in trials, and even more so in jury trials. Narratives are based on facts, and facts are developed in discovery. Usually, competing facts exist that are woven into the competing narratives. But, sometimes, parties cannot fully develop facts for their narratives because those facts are privileged from discovery.

In this case, some of the underlying facts are undisputed. And they are horribly sad. The undisputed facts are a parent's worst nightmare come true. On December 3, 1957, Maria Ridulph was abducted in Sycamore, Illinois. She was only seven years old at the time. Her murdered body was found months later in Galena, Illinois.

---

[1] Competing versions of events is not unique to litigation. The phenomenon exists across not only generations but also cultures of humanity. *See, e.g.,* RASHOMON (Daiei Film 1950); *The Dick Van Dyke Show: The Night the Roof Fell In* (CBS television broadcast Nov. 21, 1962); and HOODWINKED! (Kanbar Entertainment 2005).

Half a century passed without anyone being charged.  Then, in 2008, Jack McCullough's sister (Jeanne) came forward, stating that—fourteen years earlier—in 1994, her mother, while on her deathbed, stated that McCullough killed Maria Ridulph. (Go ahead and take a moment to reflect on that fact.)  In June of 2011, McCullough was indicted for the murder.  Two months after McCullough was arrested for murder, he was indicted for raping his sister, Jeanne.  But on April 11, 2012, he was acquitted of the rape charge.[2]  The acquittal occurred before the murder trial.  On September 14, 2012, McCullough was convicted for the murder of Maria Ridulph.  He was sentenced to life imprisonment.

In 2016, after an election, the new DeKalb County State's Attorney moved to dismiss the charges against McCullough, and the murder conviction was vacated. In April of 2017, McCullough was granted a certificate of innocence.  *See* 735 ILCS 5/7-702.  As happens in seemingly every case involving an overturned conviction, a civil rights suit followed, claiming a vast conspiracy to deprive the once criminal defendant-now turned civil rights plaintiff of his or her constitutional rights.

In this civil rights suit, McCullough portrays himself as a veteran and grandfather, who was wrongfully convicted and brutally attacked during his wrongful incarceration.  In contrast, Defendants[3] portray McCullough as a murdering pedophile, who sexually assaulted his own sisters, among other sinister acts.  Through the discovery process, the parties are now seeking to obtain facts to support their respective and diametrically opposed narratives.

In this process, Defendants seek to require McCullough's attorneys to answer questions relating to his alleged sexual misconduct.  Specifically, Defendants'

---

[2] McCullough's criminal defense attorneys speculated that State's Attorney Clay Campbell improperly and for political purposes indicted McCullough for rape after the murder charge but tried that charge first so that the prosecutors could obtain a conviction that could be used to impeach McCullough if he testified and to bolster the sexual motivation theory behind the abduction and murder of Maria Ridulph in the murder case. The Court is unaware whether the deposition of Clay Campbell supports this theory, in whole or in part. The Court also does not take a position that even if these were the true purposes for this litigation strategy whether this would amount to "improper" or "political."

[3] Defendants in this case are Illinois State Police Agents Brion Hanley, Todd Damasky, Larry Kot, Illinois State Police Sergeant Daniel P. Smith, the City of Seattle, Seattle Police Department Detectives Irene Lau, Cloyd Steiger, Michael Ciesynski, the former DeKalb County State's Attorney Clay Campbell, former Assistant DeKalb County State's Attorneys William Engerman, Victor Escarcida and Julie Trevarthen, and the County of DeKalb.  The City of Sycamore and its officers settled with McCullough and are no longer parties to this case.

motion to compel ("Motion") seeks an order that one of McCullough's public defenders answer the following questions "as well as any reasonable and necessary follow-up questions".

- Did McCullough ever tell her that he had sexual contact with any of his sisters[4]?
- Did McCullough ever tell her that he engaged in any sort of "sex play" with any of his sisters?
- Did McCullough ever tell her that his sisters would have reason to lie to the police because of previous sexual conduct between him and his sisters?
- Did McCullough ever tell her that he had sexual contact with his sister Jeanne that was consensual?
- Did McCullough ever tell her that he had any sexual contact with any of his sisters that was unrelated to the accusations of rape made by his sister Jeanne?
- Did McCullough ever admit that he sexually assaulted a victim identified by the initials M.W.?

One of Defendants' theories is that McCullough did, in fact, murder Maria Ridulph. In defense of McCullough's claims, they will essentially re-try McCullough for the murder. The "He-Did-It-Defense" is common in wrongful conviction cases. Consequently, Defendants are seeking as much information regarding McCullough's sexual misconduct as possible, including information known to his attorneys, to bolster the sexual motivation theory behind the abduction and murder of Maria Ridulph.

Defendants claim that by letting McCollough's criminal defense attorneys answer certain deposition questions resulting in exculpatory testimony, he has waived the attorney-client privilege as to the questions identified above. Essentially, Defendants argue that McCullough is selectively waiving the attorney-client privilege to obtain an unfair advantage: he is using the privilege as both a sword and a shield. In contrast, McCullough asserts that he has waived the attorney-client privilege as to the subject matter of "the murder case" (his term; not the Court's).[5] But, according to McCullough, he has not waived the attorney-client

---

[4] McCullough is substantially older than his sisters. And Maria Ridulph was only seven years old when she was abducted and murdered, which is the same age as one of McCullough's sisters.

[5] Although McCullough has affirmatively waived the attorney-client privilege as to the "murder case" subject matter, by filing the lawsuit and making the claims he has asserted, McCullough effectively waived the privilege by placing the subject matter at issue anyway.

privilege as to the subject matter of "the rape case" (again, his term; not the Court's).  Moreover, McCullough claims that he has not waived the privilege as to "the rape case" by allowing his attorneys to answer deposition questions regarding the murder and by allowing certain testimony regarding "the rape case" and his relationship with his sisters.

For the reasons stated below, the Motion is granted, in part, and denied, in part, without prejudice.

FACTS

Four depositions are relevant to the Motion.  Three public defenders (Robert Carlson, Regina Harris, and Thomas McCulloch—pronounced the same but thankfully spelled differently than the plaintiff) and one investigator for the public defender's office (Crystal Harrolle) were deposed.  These deponents were represented by their own counsel, who were distinct from McCullough's counsel.  Unsurprisingly, the deponents' counsel took the position that the privilege belonged to McCullough and that if the attorney-client privilege was invoked by McCullough's counsel during the deposition, then the witnesses would not answer the question.  But as shown below, occasionally, the deponents triggered the objection.

### Carlson Deposition: No Privilege Invoked

Robert Carlson was deposed on February 4, 2019.  During his deposition, without objection, Carlson was asked and answered questions about discussions he had with McCullough about testifying in his own defense at the murder trial.  So, there was no objection to questions seeking attorney-client privileged communications relating to "the murder case."

### Harrolle Deposition: Attorney-Client Privilege Invoked for Both "The Murder Case" and "The Rape Case"

Crystal Harrolle was deposed the next day on February 5, 2019.  During her deposition, Defendants' counsel asked if Harrolle had "conversations with [McCullough] about the abduction of Maria Ridulph."  McCullough's counsel did not object, but Harrolle independently asked if a privilege was going to be invoked.  McCullough's attorney then asked for a recess "to see if there [were] any privilege issues."  Following a ten-minute recess, the parties went back on the record.

_See Taylor v. City of Chicago_, No. 14 CV 737, 2015 U.S. Dist. LEXIS 126352, at *7(N.D. Ill. Sept. 22, 2015).

McCullough's attorney then asserted the attorney-client privilege. So, at this point, in contrast to the Carlson deposition, McCullough's attorneys were asserting the attorney-client privilege as "any communications that [McCullough] had with Ms. Harrolle." As a result, Harrolle was instructed not to answer the question. Defense counsel then reasonably attempted to determine the scope of the privilege; specifically, whether the privilege was being asserted beyond the time of the representation. After another recess, McCullough's attorney stated that the attorney-client privilege was being invoked across the board: "Mr. McCullough is asserting a privilege over any communications with Ms. Harrolle that were about the representation in the murder case or the rape case." So, again, in contrast to the Carlson deposition, the attorney-client privilege was being asserted as to "the murder case." McCullough's counsel refused to place a temporal scope as to when the privilege may have ended, if at all. Defense counsel was rightfully stumped by the response. After repeated efforts to clarify, McCullough's counsel asserted that if the questions pertained to the representation "about the murder," then privilege was being asserted because she did not want Defendants "to later be arguing waiver." Not to be stonewalled, defense counsel drilled down again, and the following colloquy occurred:

> Q:    So my question is: Are you asserting a privilege as to those communications, regardless of when they happened, even if they happened yesterday.
> A:    We are asserting a privilege over conversations about the abduction of Maria Ridulph that were had in the context of, you know, representation, you know, and that can happen afterwards. After a criminal trial, you can still go back and have communications that were– that are, you know, that they are testifying about them at a deposition would reveal attorney-client information.

After some additional unhelpful back and forth, defense counsel asked Harrolle whether she had conversations with McCullough about the abduction of Maria Ridulph; an objection was made; and the witness was instructed not to answer.

Defense counsel then continued to ask a series of questions regarding conversations Harrolle had with McCullough about the abduction and murder of Maria Ridulph. All questions were met with objections and instructions not to answer.

During Harrolle's deposition, McCullough's counsel repeatedly asserted privilege objections relating to the abduction and murder of Maria Ridulph. No distinction existed between "the murder case" and "the rape case."[6]

**McCulloch Deposition: Privilege Invoked Only to "The Rape Case"**

Thomas McCulloch was deposed in the morning of February 27, 2019. During his deposition, the same defense counsel attempted to delineate the scope of what, if any, privilege would be invoked: "So my question to you is whether or not your client is going to waive attorney-client privilege regarding communications between him and his attorney, which would, obviously, be consistent with what you put in your 26(a) disclosures." McCullough's Rule 26(a) disclosures specifically identified McCulloch as "an individual likely to have discoverable information" and identified one of the subjects of information as "Plaintiff's consistent declarations of innocence." Counsel for McCulloch confirmed that McCullough was "waiving the attorney-client privilege." In response, McCullough's counsel stated, "We are waiving the privilege with respect to this witness as to any communications about the murder trial, that's correct." This is the first indication in the record as to any distinction of waiver between "the murder case" and "the rape case." Following that colloquy, defense counsel asked many questions about conversations between McCulloch and McCullough. These questions all related to "the murder case." All the questions were answered without any objection.

**Harris Deposition: Privilege Invoked Only to "The Rape Case"**

After McCulloch's deposition concluded, Regina Harris was deposed in the afternoon of February 27, 2019. During her deposition, while Harris was answering a question, McCullough's attorney interrupted to address a privilege issue. McCullough's counsel stated, "I am going to stop right there to clarify a privilege issue, which is we are going to assert the privilege over any communications with Ms. Harris that pertain to representation of Jack McCullough in the rape case, but not any communications about the Maria Ridulph case." Defense counsel eventually asked Harris about communications she had with McCullough regarding the abduction and murder of Maria Ridulph. Counsel for Harris stopped the questioning to ensure that McCullough was waiving the attorney-client privilege. McCullough's counsel affirmatively stated that "Mr. McCullough will waive privilege over communications about the Ridulph criminal case." Harris then testified about conversations she had with McCullough about Maria Ridulph's

---

[6] At the June 6, 2019, hearing on the Motion, McCullough's counsel wisely agreed that Defendants should be allowed to re-depose Harrolle regarding statements McCullough made about "the murder case."

abduction and murder, including McCullough's alibi defense. Defense counsel then questioned Harris about whether McCullough knew Maria Ridulph and what he said about her. Specifically, counsel asked whether McCullough told Harris what Maria Ridulph physically looked like and whether McCullough thought she was "lovely."[7] Harris testified that McCullough said, "She was a sweet little kid." Defense counsel also asked Harris about conversations between McCullough and her about his girlfriend, evidence relating to the alibi defense, and how McCullough learned about the abduction of Maria Ridulph. Harris answered these questions without McCullough's counsel invoking any privilege objection.

Defense counsel then started a line of questioning regarding conversations Harris had with McCullough about his sisters. McCullough's counsel then injected the privilege issue by stating, "Can we separate that for just a second, just to remind you that we are going to assert the privilege over any communications between Jack McCullough and this witness about the rape case." Defense counsel then asked about conversations between Harris and McCullough about his sisters. McCullough's counsel then asked for a recess to discuss possible privilege issues. When the deposition resumed, Defendants' counsel continued to ask questions about conversations between Harris and McCullough about his sisters. Defense counsel then asked the following question, which prompted the following answer without objection.

> Q:     Do you recall Jack [McCullough] telling you whether or not he had a good relationship or bad relationship with his sisters?
> A:     He thought he had good relationships with them and was kind of astounded by the allegations they were making.

Then the following questions and answers occurred.

> Q:     So Jack didn't tell you that he thought there was any reason why his sisters would make up stories about him or fabricate their statements to the police?
> [McCullough's Counsel]:   Objection. Form.
> A:     Wow. It's just sort of generally I recall that he felt there was – that the overall family dynamic was that there was some – some jealousy of his position with his mother, his relationship with her, you know, being the oldest and, you know – and also that his relationship with his stepfather, the father who adopted him, her husband, because

---

[7] Whether McCullough referred to Maria Ridulph as "lovely" is relevant to the case. According to the Second Amended Complaint, defendant Lau allegedly falsely stated in a report that McCullough described Maria Ridulph as "lovely, lovely, lovely."

it wasn't his kid, so he always felt a little bit on the outside with regard to that. And that it was just a – the family dynamic was not maybe the healthiest, but that's what I remember, generally speaking.

Q:    So that Jack thought his sisters were jealous of his relationship with his mother, that that was the cause of some family problems. Is that what Jack told you?

A:    It was – yes, and that was the source of some dysfunction, I guess I would say, as they were growing up, when they were kids.

These are the primary questions and answers by which Defendants believe McCullough has waived the attorney-client privilege on the subject matter of McCullough's sexual conduct. (Defendants also assert the privilege was waived because Harris was allowed to testify in her deposition that McCullough told the attorney that he was not guilty of rape.)

Defense counsel then followed up with this question:

Q:    Did Jack [McCullough] ever tell you that he had ever had any sexual contact with any of his sisters?

Then, despite no objection from McCullough's counsel, Harris stopped the deposition and asked her attorney whether she could speak with him. After returning from the break, the question was read back to Harris. McCullough's attorney then asserted the attorney-client privilege: "We are going to assert the privilege, the attorney-client privilege over that answer to that question." Harris then followed her counsel's advice not to answer the question.

Defense counsel then objected to the perceived selective invocation of the attorney-client privilege:

And I just want to state for the record that I am objecting to the selective, extremely selective, use of the attorney-client privilege. It's not only been selective through witnesses, but now it's selective of what conversations we can and cannot get into. My question is not directed to anything concerning the rape case. It was a question that was directed as to the sisters' motive and bias in the murder case. And I don't think that the objections and the way that the privilege has been invoked has been in good faith, but that's all I have to say about it at this point.

Defense counsel then asked a series of questions about whether McCullough told Harris about sexual contact he had with his sisters, including whether "he engaged in any sort of sex play[8] with any of his sisters," and whether "any of his sisters would have reason to lie to the police because of previous sexual conduct between him and that sister." All the questions were objected to based on privilege; Harris was instructed not to answer these questions; and she refused to answer them.

Defense counsel then asked Harris about the allegations of "forcible rape" by McCullough of his sister Jeanne. Harris described the horrific allegations regarding the alleged rape of Jeanne by McCullough and his friends when she was 15 or 16 years old. Defendants' counsel then asked whether McCullough told Harris that he had consensual sexual contact with Jeanne. This question drew an objection and an instruction not to answer. Harris refused to answer this question. Defense counsel attempted to avoid the voiced objection with the following question: "Did Jack ever tell you that he had any sexual contact with any of the – Jeanne or any of his other sisters that was unrelated to this accusation of rape when Jeanne was 15 or 16 years old?" It was a nice try but did not work. McCullough's counsel objected to the question. Harris was instructed not to answer. And Harris refused to answer.

## ISSUE

Before framing the precise issue, it is helpful to remove some distracting unnecessary topics, through a type of judicial lautering.[9] The following four matters are not at issue.

First, as noted above, McCullough's counsel has stipulated that Harrolle can be re-deposed and will be allowed to answer questions regarding statements McCullough made to her relating to "the murder case." So, the Motion is granted in this respect.

Second, Defendants claim that McCullough waived the subject matter of "the rape case" by allowing Harris to testify at the deposition that McCullough told her

---

[8] The Court is unsure what the term "sex play" means and is certainly not going to google the term from a U.S. court work computer to find out. The term originates in an FBI report agents wrote in 1957 after interviewing McCullough. The Court is also unsure whether McCullough disavowed making this statement. What the Court is sure of is this: Using the word "play" to describe sexual conduct between an older brother and a younger sister does not make the conduct any less disturbing.

[9] *Beer 101: The Fundamental Steps of Brewing*, The Beer Connoisseur (June 30, 2016) https://beerconnoisseur.com/articles/beer-101-fundamental-steps-brewing.

that he was not guilty. But that statement was never meant to be confidential and is not privileged. *United States v. Teller*, 255 F.2d 441, 447 (2d Cir. 1958) (private communications between client and attorney are not privileged if it is understood that the information would be conveyed to others); *In re Langswager*, 392 F. Supp. 783, 786 (N.D. Ill. 1975) (when communications between client and the attorney are intended to be made public, the communication is not privileged). Indeed, McCullough reasonably assumed his counsel would say he was not guilty when asked, particularly when the court required McCullough to plea to the charge. This communication is not privileged. So, no waiver is involved. *See Trustees of Elec. Workers Local No. 26 Pension Trust Fund v. Trust Fund Advisors, Inc.*, 266 F.R.D. 1, 11 (D.D.C. 2010) (disclosure of non-privileged communications can never result in waiver).

Third, at the Harris deposition, in correspondence from McCullough's counsel to Defendants' attorneys, and before this Court, McCullough has argued that the topic of McCullough's sexual misconduct is not relevant and inadmissible under Federal Rule of Evidence 404(b). This is a losing argument. Initially, relevance at a deposition is determined under Federal Rule of Civil Procedure 26, not the Federal Rules of Evidence. *Rangel v. Mascorro*, 274 F.R.D. 585, 590 (S.D. Tex. 2011). And "relevance" under Federal Rule of Civil Procedure 26 is broader than "relevance" under Federal Rule of Evidence 401. *In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1189 (10th Cir. 2009). Moreover, relevance is simply not a basis to instruct a witness not to answer a question in a deposition. *Rojas v. X Motorsport, Inc.*, 275 F. Supp. 3d 898, 903 (N.D. Ill. 2017). Indeed, that action would be sanctionable. *Rangel*, 274 F.R.D. at 590.

Fourth, in McCullough's 256 paragraph complaint, he asserts in three paragraphs that statements made in the probable cause affidavit were false. Notably, the probable cause affidavit makes several references to McCullough's alleged rape of his sister as well as other sexual misconduct. Specifically, the affidavit states that when FBI agents interviewed McCullough back in 1957, he admitted to "be[ing] involved in some 'sex play' with a younger sister," and that Jeanne told the FBI that McCullough "sexually abused her on numerous occasions." The affidavit also alleges that McCullough sexually abused "other neighborhood girls." Understandably, Defendants seize on this point, arguing that if McCullough is asserting a claim for the allegedly false statements regarding the rape and sexual misconduct in the probable cause affidavit, then McCullough has placed the statements "at issue." So, the at-issue doctrine would waive the privilege. *See Taylor*, 2015 U.S. Dist. LEXIS 126352, at *7 (N.D. Ill. Sept. 22, 2015). To combat this reasonable syllogism, McCullough's counsel noted that no claims exist in the Second Amended Complaint based upon these statements regarding the rape and

sexual misconduct. A review of the claims in the Second Amended Complaint supports that assertion. And, to further remove the issue, McCullough's counsel stipulated at the June 6, 2019, hearing that McCullough was "not alleging that the police officer Defendants lied in the probable cause affidavit regarding sexual misconduct." Because there are no claims in the Second Amended Complaint based upon the allegedly false statements in the probable cause affidavit relating to "the rape case," and, more importantly, because McCullough's counsel has stipulated that they will not assert a claim as to those statements, McCullough has not waived the attorney-client privilege by placing those statements at issue. If McCullough later reneges on this stipulation and asserts a claim that that these statements in the probable cause affidavit are false, then Defendants would likely be entitled to question witnesses, including counsel, about those claims.

The framing of the issue has been complicated by McCullough's counsel's shifting assertions of privilege and rationales relating to the non-waiver of the privilege. Making the issue even more difficult to frame is McCullough's counsel's representations that they have been consistent in their invocation of the privilege and the scope of the waiver. They haven't. Furthermore, McCullough did not raise Federal Rule of Evidence 502 until the response brief to the Motion. Rule 502 was not raised at any of the depositions, in any of the post deposition meet-and-confer correspondence, or at the May 9, 2019, hearing when the Motion was presented.[10] Defense counsel's frustration is understandable. Unlike the carnival version, discovery whack-a-mole isn't fun.

But having finally raised Rule 502(a) to support his contention that he has not waived the subject matter about "the rape case," the Court will address it. Defendants were given the opportunity to respond in writing to the invocation of Rule 502(a) and did so. They also argued the applicability of the rule at the June 6, 2019, hearing. By the time the issue was presented to the Court, McCullough's position is that he waived the privilege as to "the murder case," but not "the rape case," so there has been no selective waiver at all, but even if there were a selective waiver, the subject matter is different and fairness does not require a waiver of the undisclosed communications. In contrast, Defendants accept that McCullough has waived the attorney-client privilege as to "the murder case," but assert that the

---

[10] McCullough's brief contains hyperbolic indignation because of Defendants' failure to address Rule 502 in the Motion, complaining "[t]ellingly, Defendants do not reference Rule 502 in their Motion." Of course, Defendants failed to reference Rule 502 in the Motion. McCullough never raised Rule 502 until his response brief. Defense counsel in this case (indeed, all counsel in this case) are good. But Defendants' counsel are not mind readers. They could not reasonably be expected to know that McCullough would raise yet an additional argument against waiver, let alone the nature of that argument.

communications concern the same subject matter and that it is unfair to allow the privilege to protect the undisclosed communications.

As a result, here's the issue as framed by the parties: Has McCullough waived the attorney-client privilege as to the communications about his sexual contact with his sisters and whether they had reasons to lie to law enforcement by allowing one of his criminal defense attorneys to answer questions about the abduction and murder of Maria Ridulph, McCullough's relationship with his sisters, his and his sisters' relationship with their mother and whether the sisters would lie to law enforcement about these topics? The answer is no. McCullough's invocation of privilege and, more importantly, his waiver of privilege was clumsy, but not done to unfairly gain a litigation advantage. There are two caveats to the answer, however. First, the Court will bar McCullough's use of any testimony of his criminal defense attorneys as to statements he made to them regarding his alleged sexual misconduct as well as testimony from McCullough that he told others that he did not engage in sexual misconduct.[11] Second, if, despite this Court's barring order, McCullough later affirmatively attempts to use evidence regarding his communications with his criminal defense counsel about his alleged sexual misconduct or testifies that he told others that he did not engage in sexual misconduct, then Defendants are free to raise the issue again. *G&S Metal Consultants, Inc. v. Cont'l Cas. Co.*, No. 09 CV 493, 2014 U.S. Dist. LEXIS 5900, at *12-13 (N.D. Ind. Jan. 15, 2014).

The analysis of the issue is conducted within the framework of Rule 502(a) only. Rule 502(b) was not raised or argued. Therefore, the Court takes no position on its applicability under these facts. The fight is being waged on a Rule 502(a) battleground. This order is limited to Rule 502(a).

## ANALYSIS

In many ways, Federal Rule of Evidence 502 is a big deal. Indeed, the rule abolished the dreaded subject-matter waiver rule. *Trustees*, 266 F.R.D. at 11. The 2008 amendments to the rule have far reaching consequences, most of which are beyond the scope of this order.[12] This order is limited to the unusual application of Rule 502(a) in this case—and that is plenty.

---

[11] It is difficult, but not impossible, to imagine how this type of testimony would be presented before a jury. It seems McCullough's testimony in this regard might only come into evidence if it were offered to rebut a charge that he recently fabricated testimony. Fed. R. Evid. 801(d)(1)(B)(i). And that's even a stretch.

[12] Useful commentary on Rule 502 exists. *See, e.g.,* Paul W. Grimm, Lisa Yurwit Bergstrom, & Matthew P. Kraeuter, *Federal Rule of Evidence 502: Has It Lived Up To Its Potential*, 17

Obviously, amendments to rules are to remedy perceived existing shortcomings. Generally, the reasons for amendments to rules are found in committee notes. That is true with Rule 502. Extensive committee notes exist regarding the 2008 amendments. Fed. R. Evid. 502 Advisory Committee Note (2008). But unlike many amendments, the 2008 amendments to Rule 502 also come with a "Committee Letter" and an addendum to the Advisory Committee Notes, which is called the "Statement of Congressional Intent Regarding Rule 502 of the Federal Rules of Evidence." *Id.* Consider all this information to be the "Rule 502 User's Manual."

**Federal Rule of Evidence 502(a)**

Federal Rule of Evidence 502(a) states the following:

(a) Disclosure Made in a Federal Proceeding or to a Federal Office or Agency; Scope of Waiver. When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if:
(a) the waiver is intentional;
(2) the disclosed and undisclosed communications or information concern the  same subject matter; and
(3) they ought in fairness to be considered together.

Fed. R. Evid. 502(a).

The rule is dense. There is a lot to unpack. First, consider the title of the rule. The title addresses the circumstances when the rule may be applicable. And, importantly, the title establishes that the rule addresses the scope of the waiver;

RICH. J.L. & TECH. 1 (2011). In contrast, the screed in 23A Wright and Graham, Federal Practice and Procedure, §5441 at 265 (2018) is unhelpful. For years, the Court has consulted this treatise to obtain thoughtful analysis on federal civil procedure. Surprisingly, the consultation as to Rule 502 was an exception. The section covering the 2008 amendments to Rule 502 is breath taking, eye popping and jaw dropping in tone and substance. Particularly unhelpful are the conspiratorial allegations. *See, e.g.,* 23A Wright and Graham, Federal Practice and Procedure, §5441 at 281-82 ("So apparently the Advisory Committee on Rules of Evidence had been planning this coup for sometime [sic]."). The Court was fully expecting an allegation that The Pentaverate was somehow involved in the amendments. *See* Michael Anderson, *So I Married An Axe Murderer (colonel sanders scene)*, YOUTUBE (Feb. 8, 2008), https://www.youtube.com/watch?v=TPMS6tGOACo.

how far any waiver extends. Second, the rule carefully distinguishes between the concepts of "waiver" and "disclosure." "Waiver" and "disclosure" are not synonymous. Disclosure alone does not result in waiver. Third, the scope of the waiver extends to undisclosed communications and information only if all three requirements of the rule are established.

The first step is to determine whether Rule 502(a) is the applicable rule to consider. Because the disclosures were made in depositions in a federal case, there is not much dispute that this requirement is met. A deposition in a federal case is a "federal proceeding." Nobody has argued otherwise. Next, the Court needs to determine whether there was a waiver. No doubt, there was a waiver. McCullough freely admits to a waiver. But here's the tricky part of the rule: Does the waiver extend to the undisclosed communications between McCullough and his criminal defense attorneys? To answer that question, the Court needs to address the three specified requirements, all of which must be met.

### Intentional Waiver

The first requirement is easily met here. Again, there is no doubt that McCullough's waiver was intentional. Not only did McCullough's attorneys state a waiver, but they also sat mum and did not invoke a privilege, thereby allowing witnesses to testify about certain topics. *Liang v. AWG Remarketing, Inc.*, No. 14 CV 99, 2015 U.S. Dist. LEXIS 168139, at *17 (S.D. Ohio Dec. 16, 2015) ("In addition, 'courts have held that . . . a failure to object to deposition questions or testimony on grounds of attorney-client privilege operates to waive a claim of privilege as to this testimony.'"). As shown above, the scope of the waiver and its implementation are problematic. But the mental state of intent is established.

### Concern Same Subject Matter

Next, the Court must determine whether the disclosed communications concern the same subject matter of the undisclosed communications. Here, the "disclosed communications" consist of not only communications about the abduction and murder of Maria Ridulph, but also McCullough's relationship with his mother and sisters, the family's dynamic/dysfunction and whether the sisters had reasons to lie to law enforcement. The "undisclosed communications" is the criminal defense counsel's testimony as to what McCullough told them about sexual contact he had with his sisters, whether his sisters would have reasons to lie to law enforcement about McCullough because of his sexual conduct and contact with his sisters, and whether McCullough had consensual sexual contact with Jeanne or any sexual contact with any of his sisters unrelated to the accusation of rape by Jeanne. There

are no undisclosed communications as to the abduction and murder of Maria Ridulph.[13] It is critical to remember that the Court is not comparing whether the subject matter of "the murder case" concerns the subject matter of "the rape case." Unfortunately, the parties appear to be making this comparison. The analysis is not comparing any overlap or relationship between the two cases. Instead, the analysis requires the Court to compare disclosed communications to undisclosed communications.

Unfortunately, the Rule 502 User's Manual contains no discussion on the phrase "concern the same subject matter." So, this Court must turn to case law since the enactment of Rule 502. The case law addressing whether communications "concern the same subject matter" is not particularly helpful, probably due to the fact specific nature of the analysis. *See Cooey v. Strickland*, 269 F.R.D. 643, 654 (S.D. Ohio 2010) (determining how broadly to construe a waiver is "dependent on the factual circumstances presented"). Indeed, some case law is reminiscent of the less than specific guidance found in *Psalm* 37:27: "Avoid evil, do good, and live forever". For example, in *Yarberry v. Gregg Appliances*, No. 12 CV 611, 2013 U.S. Dist. LEXIS 117198 at *8 (S.D. Ohio Aug. 19, 2013), the court noted that subject matter can be broadly or narrowly defined but ultimately a waiver must be based on the facts and guided by fairness. While recognizing that the scope of the "same subject matter" has not been precisely defined, some courts caution that "same subject matter" should be narrowly interpreted. *Colley v. Dickenson Cty. Sch. Bd.*, No. 17 CV 3, 2018 U.S. Dist. LEXIS 184461, at *9 (W.D. Va. Oct. 29, 2018). In fact, most case law lands on the side of narrowly interpreting "same subject matter." *See, e.g., Murray Energy Corp. v. Cassidy, Cogan, Chappell & Voegelin, L.C.*, No. 18 CV 440, 2019 U.S. Dist. LEXIS 87612, at p. *9 (S.D. Ohio May 24, 2019) ("courts have generally held that the 'same subject matter' is to be viewed narrowly"); *Liang*, 2015 U.S. Dist. LEXIS 168139 at *17. Not surprisingly, because the scope of "same subject matter" is narrowly construed, the scope of subject-matter waiver itself is often narrowly construed. *See, e.g., Banneck v. Fannie Mae*, No. 17 CV4657, 2018 U.S. Dist. LEXIS 185050, at p. *4 (N.D. Cal. Oct. 29, 2018); *Enea v. Bloomberg L.P.*, No. 12 CV 4656, 2015 U.S. Dist. LEXIS 111901, at p. *16 (S.D.N.Y. Aug. 20, 2015); *United States v. Benavente*, No. 14 CR 17, 2015 U.S. Dist. LEXIS 18312, at p. *10 (D.N.Mar.I. Feb. 12, 2015).

Defendants offer three main arguments as to why the undisclosed communications concern the same subject matter as "the murder case" and the

---

[13] Technically, currently, there are undisclosed communications between Harrolle and McCullough regarding "the murder case." But because McCullough's counsel stipulated to reopening Harrolle's deposition to obtain testimony about those communications, they will be disclosed.

unobjected to deposition testimony. Initially, Defendants assert that the undisclosed communications concern the same subject matter because information about McCullough's sexual misconduct was included in the probable cause affidavit for his arrest on the murder charge. This is an understandable position because it goes to both the criminal prosecution's and civil Defendants' theory of the case that McCullough's abduction and murder of Maria Ridulph was sexually motivated.[14] But, according to counsel, there was no attempt by the prosecution in the murder trial to elicit evidence of sexual misconduct. Additionally, it does not follow that just because information is contained in a probable cause affidavit, that the information concerns the same subject matter for purposes of Rule 502(a)(2). Moreover, such a finding would provide prosecutors a perverse incentive to lard probable cause affidavits with all types of irrelevant evidence.

Next, Defendants assert that the undisclosed communications regarding McCullough's alleged sexual misconduct concern the same subject matter because the requested information would go to bias and impeachment. Although not specifically stated, the implication seems to be that the information would go to the bias and possible impeachment of the sisters because they all testified at the murder trial. This seems odd. In the best-case scenario for Defendants, the undisclosed communications they seek would be that McCullough told Harris that he sexually abused his sisters and engaged in other sexual misconduct. Presumably, the sisters have already made that assertion. So how would this undisclosed information be used to impeach or show bias? Defendants don't say. Certainly, McCullough wouldn't attempt to use this undisclosed information to impeach his sisters or show their bias. His counsel is not going to cross exam these witnesses to show that their testimony about McCullough abducting and murdering Maria Ridulph should not be believed because they are biased against him because he sexually assaulted them. The best the Court can piece together without help from Defendants' counsel[15] is that assuming McCullough testifies at the trial in this case that his sisters are liars, Defendants would then cross examine McCullough by arguing that, of course, he claims they are liars because he sexually assaulted them. But, again, Defendants already have access to this information. *See, e.g., Banneck v. Fannie Mae*, No. 17 CV 4657, 2018 U.S. Dist. LEXIS 185050, at *6 (N.D. Cal. Oct. 29, 2018) (other sources of the same information exists). The Court is unsure how any of those scenarios play out at trial, and without further development by Defendants is not inclined to find subject matter waiver on this argument.

---

[14] The subject matter of McCullough's alleged sexual assault of M.W. simply does not concern the same subject matter as any of the disclosed communications. Indeed, Defendants do not spend much time arguing this point.

[15] The Court dropped the ball on this one. Although Defendants should have developed this argument, the Court did not fully question counsel at the hearing to flesh out this position.

Finally, along a similar vein, Defendants contend the undisclosed communications concern the same subject matter that the family dynamic was part of the murder trial in that the sisters testified at the murder trial and the mother's statement initiated the investigation of McCullough for murder. Setting aside the fact that what initiates an investigation and the ultimate matters that are charged and tried can be very different (Whitewater comes to mind), again, it does not follow that the undisclosed information concerns the same subject matter. The Court finds that these undisclosed communications do not concern the same subject matter as the disclosed communications about "the murder case."

But Defendants sneak in a fourth argument on the last page of their brief: "[McCullough] has waived the privilege to allow his attorney to testify as to communications related to his relationships with his sisters and the family dynamic in his home growing up, but then asserted the privilege regarding communications about 'sexual contact' with his sisters." This is the strongest argument supporting the position that the disclosed communications concern the same subject matter as the undisclosed communications.

Perhaps the following visual will help understand the analysis:

# RULE 502(a)(2) SAME "SUBJECT MATTER"

**DISCLOSED STATEMENTS**

**DO STATEMENTS CONCERN THE SAME SUBJECT MATTER?**

**UNDISCLOSED STATEMENTS**



Abduction and murder of Maria

NO

Plaintiff's alleged sexual contact with his sisters

YES

Plaintiff's relationship with his mother and sisters/"family dynamic"

NO

Whether sisters have reason to lie because of alleged sexual contact

YES

YES

Whether sisters have reasons to lie

So, the disclosed communications regarding the murder of Maria Ridulph do *not* concern the same subject matter as the undisclosed communications regarding whether McCullough had sexual contact with his sisters and whether his sisters had reasons to lie to investigators because of the sexual contact. But the disclosed communications regarding McCullough's relationship with his mother and sisters *do* concern the same subject matter regarding his relationship with his sisters and the family dynamic. Similarly, the disclosed communications regarding whether McCullough's sisters had reasons to lie to investigators because of the sexual contact concerns the same subject matter regarding whether the sisters had reasons to lie about the abduction and murder of Maria Ridulph.

As a result of this analysis, two undisclosed communications meet the "same subject matter" requirement of Rule 502(a)(2).

### Fairness

Rule 502(a)(3)'s fairness component is fully addressed in the Advisory Committee Notes.[16] The Rule 502 User's Manual is chocked full of helpful

---

[16] This Court parts company with those decisions that contend that this discussion in the Advisory Committee Notes addresses subdivision (1), rather than subdivision (3). *See Mills v. Iowa*, 285 F.R.D. 411, 416 (S.D. Iowa 2012); *Bear Republic Brewing Co. v. Central City Brewing Co.*, 275 F.R.D. 4348-9(D. Mass. 2011). Subdivision (3) specifically uses the word "fairness". These provisions in the Advisory Committee Notes specifically discuss that concept by, not surprisingly, using terms such as "fairness," and "unfair" and a reference Federal Rule of Evidence 106, which incorporates the rule of completeness—a rule created to prevent unfairness when the partial introduction of a writing or recorded statement would be misleading. Fed. R. Evid. 106 Advisory Committee Notes; *see also* Grimm, Bergstrom, & Kraeuter, *supra* note 12, at p. 24-25 ("If the language in Rule 502(a)(3), 'out in fairness,' sounds somehow familiar, it is because it originates in Federal Rule of Evidence 106, the so-called 'rule of completeness.' The 'rule of completeness' prevents a party from selectively referring only to part of a document or statement in a manner that is unfair or misleading. This concept fits well with the underlying purpose of Rule 502(a)(3): to prevent selective disclosure of helpful portions of privileged or protected information, while concomitantly withholding related information that is not helpful."). The decisions in *Mills* and *Bear Republic Brewing* seem to have mixed the fairness inquiry of subdivision (3) with the scope inquiry. *Bear Republic Brewing Co.*, 275 F.R.D. at 48, n.6. But Rule 502(a) makes those inquires separate and distinct. *Heranos, Inc. v. Fuisz Techs. Ltd.*, No. C 11-5236, 2013 U.S. Dist. LEXIS 70564, at *11 (N.D. Cal. May 16, 2013) ("Before the enactment of Rule 502, some courts permitted waiver for all documents on the same subject matter *because* it was fair, although the scope of the subject matter often involved a fairness inquiry. Rule 502 makes that fairness inquiry separate and explicit." (emphasis in original)). When the Advisory Committee Notes use the same word and derivations of that word as the word in the rule, it seems reasonable to assume that those words relate to the word in the rule, not a different aspect of the rule that does not use that word. This

information with respect to the fairness requirement.    The Advisory Committee Notes state the following:

> The rule provides that a voluntary disclosure in a federal proceeding or to a federal office or agency, if a waiver, generally results in a waiver only of the communication or information disclosed; a subject matter waiver. . .  is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary. . .  Thus, subject matter waiver is limited to situations in which a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner. . .
>
> The language concerning subject matter waiver —"ought in fairness"— is taken from Rule 106 because the animating principle is the same.  Under both Rules, a party that makes a selective, misleading presentation that is unfair to the adversary opens itself to a more complete and accurate presentation.

Fed. R. Evid. 502 Advisory Committee Notes.

The Advisory Committee Notes then further state that "[s]ubdivision (a) provides that if a waiver is found, it applies only to the information disclosed, unless a broader waiver is made necessary by the holder's intentional and misleading use of privileged or protected communications or information." *Id.*

The Court reads both the language of Rule 502(a) and the Advisory Committee Notes to focus on the *use* of the disclosed communications and information, meaning communications and information that would have been privileged but for the intentional waiver. So, if a party is going to use the disclosed communications or information (which were previously privileged) in a misleading way, then Rule 502(a) authorizes a boarder, court-imposed waiver of other undisclosed, privileged communications and information that concern the same subject matter to avoid unfairness.

Both the language of Rule 502(a) and the Advisory Committee Notes establish that the use of the disclosed communication is critical to the fairness inquiry.  Consider the word "considered" in Rule 502(a)(3).  Communications and information must be used to be considered.  Moreover, the Advisory Committee

---

interpretation is supported by the cases finding that the use of the disclosed communications and information is critical.

Notes use the following phrases that establish that the waiving party's use of the disclosed communications or information is critical:

- "*presentation* of evidence" (which is a fancy lawyer way of saying "using evidence")

- "a party intentionally *puts protected information into the litigation*"

- "a party that makes a selective, misleading *presentation* that is unfair"

- "a broader waiver is made necessary by the holder's intentional and misleading *use* of privileged or protected communications or information"

Likewise, case law addressing Rule 502(a) focuses on how the privilege-holding party is using the now disclosed communications or information to determine if a broader waiver is available under the rule. *See, e.g., Noval Williams Films LLC v. Branca*, No. 14 CV 4711, 2016 U.S. Dist. LEXIS 173279, at *11-12 (S.D.N.Y. Dec. 14, 2016) (discussing attempts to use privileged information for a tactical advantage). As Magistrate Judge Francis articulated in *Freedman v. Weatherford Int'l Ltd.*, 12 CV 2121, 2014 U.S. Dist. LEXIS 102248, at *10 (S.D.N.Y. July 25, 2014), subject matter waiver is reserved for rare cases in which a party attempts to use privileged information as both a sword and a shield in litigation. Subject matter waiver is justified when a party uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged materials potentially capable of rebutting the assertion. *Id.* Relying on *Freedman*, the court in *Mitre Sports Int'l, Ltd. v. HBO, Inc.*, 304 F.R.D. 369, 372 (S.D.N.Y. 2015) found no subject matter waiver when a deposition witness's answers disclosed privileged information because there was no attempt to use that previously privileged/now disclosed information to influence a decisionmaker. "[T]he mere fact that a party makes a partial disclosure of privileged or protected information in a deposition does not result in a subject-matter waiver because there is no use of the testimony by the party holding the privilege." *Id.* at 373. "[T]he critical inquiry is whether protected information has been partially disclosed to a decisionmaker in an effort to influence a decision." *Id.* Without any use of the previously privileged/now disclosed information, the sword has not been wielded. *Id.* When a privilege holding party will not or does not use the disclosed information affirmatively to influence a decisionmaker, no subject-matter waiver is found because unfairness is lacking. *See, e.g., Banneck*, 2018 U.S. Dist. LEXIS 185050 at *6-7 ("Fannie Mae has reiterated that it has no intention of introducing or relying on any of the six disclosed privileged email communications that plaintiff seeks to unredact."); *G&S*

*Metal Consultants, Inc.*, 2014 U.S. Dist. LEXIS 5900 at *8-9 (privileged emails introduced not for substantive communications but simply to establish time line).

In this case, the disclosures occurred in response to deposition questions posed by Defendants. McCullough did not affirmatively place the disclosed communications into the litigation. And McCullough certainly has not placed his criminal defense counsel's testimony before this Court to influence it. (And by barring this testimony, this Court has prevented McCullough from attempting to use the disclosed testimony to influence any decisionmaker this case.) McCullough did not make a strategic attempt to use the waiver as both a sword and a shield. He has not attempted—and will not be allowed to attempt—to use the disclosed communications by his criminal defense counsel regarding his relationship with his mother and sisters, the family dynamic/dysfunction and whether his sisters had reasons to lie about McCullough's alleged involvement in the abduction and murder of Maria Ridulph. McCullough is not *using* the disclosed information to obtain a tactical advantage, so there is no unfairness. Defendants have suffered no harm. McCullough may have unsheathed the communications by allowing them to be disclosed in the depositions, but he has not wielded the communications in litigation to unfairly influence a decisionmaker. In contrast, it would be unfair to allow Defendants to obtain a tactical advantage because of McCullough's counsel's clumsy invocation and waiver of the attorney-client privilege. Defendants are attempting to use the disclosure of the privileged information in response to their own deposition questions as the thin end of a wedge[17] to gain access to undisclosed information to which the privilege was not waived.

None of the cases cited by Defendants requires a different result. First, the only case mentioning Rule 502(a) is an inapplicable Freedom of Information Act case. *See Appleton Papers, Inc. v. EPA*, 702 F.3d 1018 (7th Cir. 2012). The other cases do not address or cite Rule 502(a). Although *Taylor v. City of Chicago* is somewhat factually similar and the analysis is solid, the decision does not address Rule 502, probably because the parties did not argue the rule to that court. *See*

---

[17] The Court recognizes that this idiom is British and may have limited acceptance or understanding. As George Bernard Shaw recognized long ago, the Brits and Americans are a people separated by a common language. Just ask a Brit to say any of the following words and try not to laugh at the response: "controversy," "aluminum," or "vitamin." *See* Collins A-Z, *How To Pronounce CONTROVERSY In British English*, YOUTUBE (Mar. 27, 2018) https://www.youtube.com/watch?v=kT1JbN26ktQ; BBC Learning English, *British and American English Pronunciation – Stop Saying*, YOUTUBE (Apr. 21, 2016) https://www.youtube.com/watch?v=R88DnnyhfsI. Sometimes, they put the emphasis on the wrong syllable. thewiz2004, *The wrong emPHASis on the wrong sylLABle*, YOUTUBE (Oct. 22, 2016) https://www.youtube.com/watch?v=pmh_6z9AWfc (scene from "View From The Top," 2003).

*Taylor*, No. 14 CV 737, 2015 U.S. Dist. LEXIS 126352 at *7-9, *22-23 (N.D. Ill. Sept. 22, 2015). Similarly, although *Patrick v. City of Chicago*, 154 F. Supp. 3d 705 (N.D. Ill. 2015) addresses Rule 502, it does not address Rule 502(a) and its requirements. Again, although somewhat factually similar and containing good analysis, the case does not address the rule at issue in this case. Moreover, to the extent the case is applicable, the decision in *Patrick* notes that the use of the information is key in determining fairness. The party asserting the privilege was not seeking to use the disclosed communication, so the waiver was not extended. *Patrick*, 154 F. Supp. 3d at 716.

## CONCLUSION

The Court grants the Motion in part and denies it in part. The Motion is granted as to re-deposing Harrolle on the questions for which the attorney-client privilege was invoked. Reasonable related follow up questioning will also be allowed. But the Motion is denied in all other respects. The Court bars McCullough from using testimony from his criminal defense attorneys regarding statements he made to them about his alleged sexual misconduct as well as McCullough from testifying that he told others that he did not engage in sexual misconduct. If McCullough attempts to use testimony concerning these subject matters, Defendants may again assert their waiver arguments and seek any appropriate relief.

Entered August 12, 2019.

By: _____

Iain D. Johnston
United States Magistrate Judge