

# Transcript of Cloyd Steiger

**Date:** March 8, 2019
**Case:** McCullough -v- Illinois State Police Agent Brion Hanley, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

EXHIBIT 2

---

9

1    The next time I was -- just about a month ago I
2 was a witness because I was reviewing reports and --
3 classified report and sent it to the City Attorney's
4 office on a case that later involved a lawsuit against
5 the city. But I didn't have any -- my -- the deposition
6 lasted ten minutes. I didn't have any information
7 because I just read the report, routed it.
8    And day before yesterday I was deposed in a
9 sexually violent predator civil action about a rape I
10 investigated in 1992 where they're trying to civilly
11 commit the defendant.
12   Q. I just want to go over some of the ground
13 rules --
14   A. Sure.
15   Q. -- here so we're on the same page. Is that okay?
16   A. Okay.
17   Q. The first thing I'm going to ask you to do is to
18 just do just what you have been thus far, and that is to
19 answer my questions with a verbal yes or no if the
20 question calls for it --
21   A. Of course.
22   Q. -- and not relying on a nod of the head.
23   A. Of course.
24   Q. The second thing I'll ask you to do is to
25 answer -- to wait until I'm done with my question before

---

10

1 you begin your answer so we're not speaking at the same
2 time making life difficult for our court reporter.
3   A. Right.
4   Q. I'll try and do the same to you, and that is wait
5 until you're done with your answer before I begin my
6 next question.
7   A. Okay.
8   Q. If you do not understand any of my questions,
9 please ask me to rephrase the question, re-ask the
10 question or in some way indicate to me that you do not
11 understand my question.
12   A. Okay.
13   Q. The flip side of that is if you answer my
14 question, I will assume that you've understood my
15 question as I've posed it. Fair?
16   A. Right.
17   Q. If you need a break at any time, just let us
18 know. All that I ask is that you answer any question
19 that's pending before taking a break.
20   A. Okay.
21   Q. Do you have any medical condition or do you have
22 any medi -- are you taking any medication that might
23 impair your ability to testify fully and accurately and
24 truthfully here today?
25   A. No.

---

11

1   Q. Do you have any problem with your memory that
2 you've been made aware of?
3   A. No.
4   Q. And what year were you born?
5   A. 1958.
6   Q. And are you a high school graduate?
7   A. Yes.
8   Q. When did you graduate high school?
9   A. 1976.
10   Q. And do you have any post high school educational
11 experience?
12   A. Yeah. I went to -- I went to college for a
13 couple of years. I don't have a degree.
14   Q. Where did you go?
15   A. Green River College. I majored in criminal
16 justice.
17   Q. And why didn't you get a degree from there?
18   A. Because I got hired by the police department,
19 and -- I got hired right on my 21st birthday. I was
20 testing for the police department, and I was working as
21 an EMT on an ambulance at the same time. So once I got
22 my job, I was just -- I meant to go back and just never
23 did. You know how that is.
24   Q. When did you get hired by the Seattle Police
25 Department?

---

12

1   A. November 13th, 1979.
2   Q. And when you were first hired by the Seattle
3 Police Department, where were assigned?
4   A. The police academy.
5   Q. And how long were you in the academy?
6   A. I think like 17 or 18 weeks. I don't recall
7 exactly.
8   Q. And then what was your first assignment out of
9 the academy?
10   A. Well, first of all, after you go to the police
11 academy, they send you to another three-week or month
12 training more specifically to -- you know, like policies
13 within the Seattle Police Department, not just how to be
14 a police officer but specific policies for the police
15 department. And that lasted about a month, and then I
16 went to -- into field training.
17   Q. And where'd you go for field training?
18   A. My first assignment was in the University
19 District north of here. I worked what's called third
20 watch, which was 8:00 at night to 4:00 in the morning
21 with a field training officer. You know, we just
22 continue because there's three field training
23 assignments.
24   Q. And where'd you go after the University District?
25   A. After the University District I went up to the

---

**13**

1  Capitol Hill precinct, which is just up from downtown,
2  where I worked noon to 8:00 p.m. with a field training
3  officer.
4  Q.  And what was your third assignment in field
5  training?
6  A.  East precinct. It's on Capital Hill.
6  A.  My third assignment was Queen Anne area, which is
7  kind of where the Seattle Center and the Space Needle
8  and everything is and then up the hill, with a field
9  training officer, again, noon to 8:00.
10 Q.  And what was your assignment after you stopped
11 being a field train -- or being trained by a field
12 training officer?
13 A.  Then I got my first regular assignment, which was
14 out of the Georgetown precinct, which is southeast
15 Seattle, working 8:00 at night to 4:00 in the morning.
16 Q.  And how long were you assigned to the Georgetown
17 District?
18 A.  About five years. Actually, the precinct was in
19 Georgetown. It was actually Rainier Valley where my --
20 where I worked, which was southeast Seattle.
21 Q.  And how did your job duties change after about
22 five years?
23 A.  I transferred to east precinct up on Capitol
24 Hill.
25 Q.  Why'd you move to the east precinct?

**14**

1  A.  Because, you know, you don't want to stay
2  somewhere too long and get in a rut. Some guys stay in
3  one spot their entire careers and never leave, and I
4  wanted to do other things with my career and I went to
5  the east precinct.
6  Q.  Why the east precinct as opposed to --
7  A.  Because I just -- I'm sorry. The east precinct,
8  it was available, and I could go there.
9  Q.  How long did you remain in the east precinct?
10 A.  About five years.
11 Q.  Where'd you go after that?
12 A.  During that time I was also on the SWAT team
13 because that was -- or maybe that was during the south
14 precinct because that was at that time not a full-time
15 job. It is now. And then I went -- I got a job as a
16 precinct detective at the east precinct.
17 Q.  After about ten years on the force?
18 A.  Right.
19 Q.  How did you become a detective at the time?
20 A.  I took a detective's test. I qualified.
21 Q.  Was there a list created based on the results of
22 that test?
23 A.  It's just -- it's just an eligibility test, and
24 then you have to go out and find a job. And so I talked
25 to the lieutenant up at the east precinct, and he

**15**

1  actually told me, I'm sorry, we're not taking anybody
2  for months, and like a week later I got orders to go
3  over there. So that's how it worked.
4  Q.  And when you first made detective, where were you
5  assigned?
6  A.  East precinct. It's on Capital Hill.
7  Q.  To do what?
8  A.  Generalist detective, a lot of property crimes.
9  I guess that's about it. Mostly property crimes and
10 nuisance crimes.
11 Q.  For how long were you a generalist detective in
12 the east precinct?
13 A.  Two years.
14 Q.  How did your job duties change after those two
15 years?
16 A.  I went to sex crimes, which is a downtown
17 citywide unit. It was actually called special --
18 special assault unit then. They just call it sex crimes
19 now.
20 Q.  Why did you go to sex crimes?
21 A.  Because I didn't want to be a precinct detective
22 my whole career. I wanted to move up, and that was a
23 move up because it was a crimes against persons job.
24 Ultimately, I wanted to work homicide, so that was --
25 that was the path that would get me to homicide.

**16**

1  Q.  Why did you want to work homicide?
2  A.  Just because I -- you know, from the time I was a
3  teenager that's what I decided I wanted to do.
4  Q.  How long did you work in the sex crimes unit?
5  A.  Two years.
6  Q.  And then how did your job -- job duties change
7  after two years in the sex crimes unit?
8  A.  I went to the homicide unit in 1994.
9  Q.  And when you joined the homicide unit, did you
10 have a partner?
11 A.  Not at first. After a short time I did, but not
12 right away.
13 Q.  What partners did you have in the homicide unit?
14 A.  What partners have I ever had?
15 Q.  Or what partners -- yes, in the homicide unit.
16 A.  Okay. I had Sunny Davis, John Nordlund, Greg
17 McSale, Donna O'Neil, Mike Ciesynski and then Jason
18 Kasner.
19 Q.  Of those, which -- who was your partner for the
20 longest period of time?
21 A.  Jason Kasner.
22 Q.  When did you stop being a homicide -- or assigned
23 to the homicide unit?
24 A.  When I retired.
25 Q.  When was that?

17

1    A.  It was actually three years ago today, March 8th,
2  2016.
3    Q.  When Brion Hanley and the other detectives came
4  to Seattle, they brought some FBI reports with them,
5  correct?
6    A.  Yes.
7    Q.  And they had a room where they had those reports
8  laid out on the table in front of them, right?
9    A.  I think it was just -- my recollection is -- the
10  cubicle where my desk is, it has four desks.  It's other
11  detectives in my squad, and there's a big table in the
12  middle.  And I think they were on that table, yes.
13    Q.  And the FBI reports were on that table, right?
14    A.  I don't -- they gave me a disk with FBI reports
15  on it.  I don't remember -- I don't think that the FBI
16  reports -- I think those were contemporaneous reports,
17  but I'm not sure.  I had a CD.  They handed me a CD with
18  all the old reports on it.  They had paper copies of the
19  more contemporaneous reports.  And my recollection is
20  that's what was on the table.  But I -- I could be
21  wrong.  I don't know.
22    Q.  So you had access to the FBI reports on the CD?
23    A.  I did.
24    Q.  And you've talked to Charles Lachman about this
25  case, about the McCullough case, right?

18

1    A.  Much later, yes.
2    Q.  And you talked to him on several occasions,
3  right?
4    A.  No.  I only -- well, other than meeting him at
5  the courthouse and talking briefly, I talked to him on
6  the phone one time after that.
7    Q.  For how long did you talk to him on the phone?
8    A.  About an hour.
9    Q.  And you told him about viewing the -- FBI
10  reports on a table.  Do you recall that?
11    MR. NOLAND:  Objection; foundation; form.  You
12  may answer.
13    A.  I don't remember telling him about that there
14  were FBI reports on the table.  I probably told him
15  there were reports on the table.
16    Q.  All right.
17    A.  Again, I'm not saying the FBI reports were not on
18  the table.  I'm just saying I don't recall them being on
19  the table, some of them.
20    Q.  I'm going to read you a passage from Footsteps In
21  The Snow, and I want you to tell me if you were the
22  source for this paragraph.
23    A.  If I -- okay.
24    Q.  Well, actually, let me -- let me ask you a
25  different question.

19

1    A.  Okay.
2    Q.  Did you tell Charles Lachman that when you looked
3  at the FBI files spread out before you, the amount of
4  pointless paperwork the FBI had amassed in its
5  investigation disgusted you and that you thought it was
6  business as usual for the FBI, federal bureaucracy of
7  investigation?
8    A.  I definitely said -- I know I said that to him
9  because I say that term all the time.  So I don't recall
10  the specific -- and I do recall something about the
11  pointless amount of paper.  I certainly didn't read
12  every report.  But, I mean, yeah, I mean, so generally I
13  probably did say that, yes.
14    Q.  Did you tell Charles Lachman that in your
15  experience a rookie cop in a small-town police
16  department had more flexibility in his decision making
17  than a 20-year veteran of the FBI?
18    A.  That's absolutely true.
19    Q.  And why do you believe that?
20    A.  Because I work with the FBI all the time, and I
21  know that they can't make any decision without having
22  the US Attorney approve it or a supervisor approve it or
23  somebody else.  That's the way they work.  It's not just
24  the FBI.  It's all federal agencies are that way.
25    Q.  And which FBI do you -- how did it come about

20

1  that you would work with the FBI?
2    A.  Well, I worked with the FBI on several cases.  I
3  had -- I had a case where we were looking for a murder
4  suspect, and he separately had fired on some federal
5  agents.  So we were working together on that to get the
6  guy.  And the bureaucracy got in the way everywhere, and
7  we finally just left them and went and got the guy.
8    I worked on a case where a guy walked into the
9  federal courthouse downtown with what looked like a
10  grenade and a bomb on his body and wouldn't follow any
11  instructions.  It was just inside the lobby of the
12  courthouse.  And a SWAT officer had to snipe him and
13  kill him, and they were spinning their wheels.  That's
14  them.  That's what they do.
15    So, again, I have friends on the FBI.  There's
16  nothing wrong with the agents at all.  It's the
17  bureaucracy of the FBI is the problem.  And I've worked
18  with the FBI on other cases too.  So I don't -- can't
19  think of them off the top of my head, but --
20    Q.  Did you tell Charles Lachman that one big hurdle
21  in the case against Jack McCullough when you were first
22  considering it was the FBI polygraph examination that he
23  had passed back in 1957?
24    A.  I'm not saying I didn't say that, but I
25  wouldn't -- I wouldn't consider a polygraph examination

37

1    A. I read some reports that Mr. Noland sent me. We
2 met a week or two ago. We went to dinner the other
3 night. I met him this morning for an hour, and we've
4 talked on the phone a few times.
5    Q. When you met a week or two ago, how long did you
6 meet for?
7    A. Well, we met for a few hours. Then we went out
8 to a bar afterwards and continued to meet for a couple
9 more hours with other people, his wife and the other
10 attorney's mother came over. It wasn't
11 really necessarily -- it wasn't really about this case.
12 It was just socializing.
13    Q. Was Mike Ciesynski there?
14    A. No.
15    Q. What reports did you review?
16    A. The affidavit, the follow-up reports that I
17 wrote, the -- let me think. Well, a copy of the place
18 mat from the Steak 'n Shake, and then -- oh, the
19 transcription of my interview with the Office of Public
20 Accountability about the affidavit. And I think that's
21 it. I may be wrong, but I think that's it.
22    Q. Did you review any transcripts of your testimony?
23    A. Oh, yeah, that's right. Yeah, my trial testimony
24 in both the pretrial and then for the -- in front of
25 Judge Stuckert and then the trial itself in front of

38

1 Judge Hallock I think his name is.
2    Q. Did you review any other documents?
3    A. Not that I can think of off the top of my head.
4    Q. Were there any inaccuracies in any of the
5 documents that you created or any of the testimony that
6 you provided?
7    MR. NOLAND: Object to the form; overly broad.
8 You may answer.
9    A. Not that I remember, no.
10    Q. You stand by everything you said in your internal
11 affairs interview?
12    A. Yes.
13    MR. NOLAND: Same objection. Go ahead.
14    A. Yes.
15    Q. How did you first learn about the Maria Ridulph
16 murder?
17    A. When Ciesynski came to me a couple of weeks
18 before they came out telling me that they were coming
19 out and he may need -- might need my help. But I didn't
20 know the name of the victim or anything. I just knew it
21 was a 1957 murder.
22    Q. And that stood out to you, right?
23    A. I'm sorry, what?
24    Q. That stood out to you that it was 1957?
25    A. Well, yeah, sure. Of course it did, yeah.

39

1    Q. And you thought this --
2    MR. NOLAND: One second, Mike -- I'm sorry,
3 Cloyd, just give it a second so that she can get it
4 down. You're not really talking over him, but you're
5 kind of getting in there quick, so --
6    A. I know that it won't surprise you. It's not the
7 first time I've been told that by a court reporter.
8    Q. And you thought at the time that 1957 might be
9 the oldest cold case ever solved in the country, right?
10    A. I didn't -- I didn't have any thoughts about that
11 at that point, no.
12    Q. You thought it was really old, right?
13    A. Oh, of course it was, yes.
14    Q. And what did you do after Ciesynski told you that
15 he might need your help?
16    A. I didn't do anything until he told me that they
17 were going to be there the next day or something.
18    Q. Who was going to be there the next day?
19    A. The Illinois people were coming out. And he, for
20 whatever reason, wasn't available, and so he asked me to
21 help them out.
22    Q. And what did he ask you to help them do?
23    A. Whatever they wanted me to do.
24    Q. And he said he wouldn't be available, but he
25 needed you to step in?

40

1    A. Right. I don't remember why he wasn't available,
2 but I know he wasn't available that first day and --
3 yeah. And so he asked me if I would take cake of them,
4 and I said yes.
5    Q. And did you have any communication with anyone
6 regarding this case before those Illinois people
7 arrived?
8    A. Other than Mike, no.
9    Q. And what happened when the Illinois people
10 arrived?
11    A. We met. They were in our -- my office. We
12 talked about -- briefly about the case. They gave me
13 the name of the victim for the first time, so I Googled
14 her name, found a couple of things on there. I found --
15 I remember there was like an article in the LA Times
16 about the case and then there were like photographs on
17 eBay of the search for her that were taken, which I
18 thought was kind of odd. And that was all I found.
19 There wasn't a lot on her in that.
20    And then not everybody arrived at the same time,
21 so we were talking about when other people would get
22 there. And at some point I said -- they wanted to see
23 where the Four Freedoms house was, so we drove out
24 there. I don't think everybody -- I think it was just
25 Brion and Damas -- Todd at that point.

41

1    Q.  Brion Hanley and Todd Damasky?
2    A.  Yeah, Damasky.  So we -- I drove them out to -- I
3    drove them out to the Four Freedoms house, and we saw
4    his truck was in the parking lot.  His son lived nearby.
5    They thought he may be in contact with his son, so we
6    went by an address they had for that and just drove by
7    on the street.
8        And then at some point other -- the others got
9    here, but they wanted to go down to interview his
10   ex-wife, who was at work in Tukwilla.  I think this is
11   all on the first day.  In my recollection, it's all in
12   the first day.  We drove down there, and I -- we met
13   with her in a conference room, and I sat there while
14   they interviewed her.  And then they wanted to go down
15   to Tacoma to try to file ▮M.W.▮▮▮▮▮▮▮▮▮▮   So I drove
16   them to the bar in Tacoma where she was working.
17       And it was the middle of the afternoon, and I
18   don't remember what day of the week it was.  She was
19   working, and Brion talked to her.  And she wanted to go
20   to a back area of the bar and talk to him.  So we all
21   went back there, but this was a bar, you know, jukebox
22   playing.  And Todd went to a table and sat with her, and
23   Damasky and I sat a couple of tables away.  I could not
24   hear what they were saying.  I could see her quietly
25   crying.  And then when he was done, we left and then

42

1    Brion talked to me about what she said.
2    Q.  What did Brion tell you about what she said?
3    A.  I don't recall specifically, but just about how
4    she had been troubled when she was young and she was a
5    runaway.  One of her friends told her that she knew this
6    guy was a cop, he could probably stay at her place.
7    Then she went over there and how he was fine at first
8    and then he kind of slowly started, in my experience as
9    a sexual assault detective, what I would consider
10   grooming techniques, you know, let me give you a massage
11   and those type of things and then that it had proceeded
12   to the point and he described the act that he did, which
13   in this state is rape.
14       Q.  I don't know why it was pled down to a
15   communication gross misdemeanor, but -- and that was
16   basically it.  I mean, he didn't -- he didn't recite
17   everything she said.  He just gave me the highlights.
18       Q.  Well, what act did he say was rape?
19       A.  He said that she -- he performed oral sex on her.
20       Q.  What did you do after the ▮M.W.▮▮▮▮▮▮
21   interview?
22       A.  We came back downtown, and I think Tiffany and
23   Steve were showing up and then Dave Zulawski showed up.
24   I met them.  And I don't -- I think after that they went
25   to go settle in their hotels and stuff.  I don't think

43

1    we did anything more on the case that night that I
2    remember anyway.
3    Q.  And then what's the next thing that you remember
4    occurring?
5    A.  It would have been the next day.  And Mike had
6    set up this whole thing about Jack was supposed to come
7    down to the office.  And he said he got the voicemail
8    from Jack saying he wasn't coming down, so we discussed
9    it and decided that we have to get a search warrant
10   because that's the only thing left to us to go get him.
11   So that's when we -- I sat down with I know Dave and
12   Brion were in the room.  Todd was probably there.  Steve
13   and Tiffany were probably there, although most of my
14   communications was with -- were with Brion and Dave.
15   Q.  Where was Mike?
16   A.  I don't know where Mike was.  He was there.  He
17   might have been back in his office, because he was the
18   one supposed to get the call.  He may have come through
19   once or twice, but he wasn't really -- he wasn't like
20   sitting there with us the whole time.  I don't know
21   where he was.
22   Q.  Why wasn't Mike part of the team creating the
23   affidavit?
24       MR. NOLAND:  Objection to the extent it calls for
25   speculation.  You may answer.

44

1    A.  I don't know.
2    Q.  Did you guys talk about who would draft the
3    affidavit?
4    A.  No.  I think I just said I'll write it.  I think
5    I just said I'll write an affidavit and we sat down.
6    Q.  Why did you say you would write an affidavit?
7    A.  I'm just being -- doing the work, you know.
8    That's my job.  It wasn't like there was a big -- a big
9    problem with who wrote the affidavit.  It had to be
10   somebody local.  It had to be either me or Mike, and I
11   just said I'll do it.
12   Q.  Well, why not have one of the out-of-town people
13   write the affidavit?
14   A.  Because a local -- whenever you're from out of
15   town -- and it's the same when I go to other cities --
16   the local detective has to draft the affidavit.  Now, I
17   did ask if they had an affidavit written, I could have
18   incorporated it and attached it.  But they didn't.  So I
19   had to write it.  And because the local detective has to
20   write it and the local detective has to go to the judge
21   because they're not -- they're not commissioned in this
22   state, just like I'm not commissioned in Illinois.  We
23   would have to do the exact opposite, I'd take local
24   detectives with me.
25       Usually, in my case I'll have an affidavit

49

1  floor of the post office building where he met a
2  sergeant, who then helped him place a phone call to the
3  recruiting sergeant while he was in Rockford.
4  **A. That's what he said, yes.**
5  Q. Okay. And then let's look at Exhibit No. 1.
6  If you turn to the last page of Exhibit No. 1, it
7  is an interview with a Mr. Dan Schaefer, the general
8  manager of the Sycamore-Ogle Telephone Company.
9  **A. Okay.**
10 Q. Do you see that, sir?
11 **A. Yes.**
12 Q. All right. And the general manager then confirms
13 that there was a collect call placed on December 3rd,
14 1957, at 6:57 p.m., and the call was placed to Ralph
15 Tessier and the call was made by one John S. Tessier.
16 But the general manager believed that the spelling of
17 the name was merely a spelling area -- error on the part
18 of the operator who handled the call and that the call
19 was accepted by the family and lasted for two minutes.
20 **A. I see that, yes.**
21 Q. You've had murder suspects voluntarily come in to
22 speak to you, right?
23 **A. It's rare, but sometimes.**
24 Q. And many times you've had murder suspects after
25 they're arrested voluntary speak to you even though they

50

1  have a constitutional right not to, right?
2  **A. Yes.**
3  Q. And sometimes they'll voluntarily talk to you at
4  length about whatever crime it is that you're
5  investigating, right?
6  **A. Yes.**
7  Q. Even though they're guilty, they may voluntarily
8  choose to speak to you, right?
9  **A. Yes.**
10 Q. And sometimes they'll say, you know, if I
11 didn't -- if I did it, I wouldn't be talking to you
12 because, you know, why would I be talking to you if I --
13 if I did it?
14 MR. NOLAND: Objection; form; foundation.
15 **A. I've never specifically heard that, but -- no,**
16 **I've never heard that.**
17 Q. You've never heard that?
18 **A. No.**
19 Q. All right.
20 **A. I mean, I'm not saying it hasn't happened to**
21 **somebody, but I have never heard it uttered to me by a**
22 **murder defendant.**
23 MR. AINSWORTH: Let's mark this as Exhibit 14,
24 please.
25 / / /

51

1  (Deposition Exhibit No. 14 was marked for
2  identification.)
3  Q. (BY MR. AINSWORTH) All Right. You've reviewed
4  this document before, Exhibit 14, correct?
5  **A. Yes.**
6  Q. All right. So this is an interview of you by
7  Internal Affairs, correct?
8  **A. Yes.**
9  Q. What do you call your internal af -- oh, the
10 Office of Professional Accountability, right?
11 **A. Yeah. They change its name every couple of**
12 **years.**
13 Q. We've got the same thing.
14 **A. I know.**
15 Q. So OPA questioned you, right?
16 **A. Right. Well, let me be clear. OPA called me and**
17 **told me there had been a complaint against me and what**
18 **it was about and acknowledged I had no duty to talk to**
19 **them about it because I was no longer employed there.**
20 **And I said, no, I'll come over and talk to you about it.**
21 **So I voluntarily came over to talk to them about it.**
22 Q. All right. So let's turn to the third page of
23 Exhibit 14.
24 **A. Okay.**
25 MR. NOLAND: Just because you have it

52

1  double-sided, Russell, what's -- what's the Bates that
2  you're talking about?
3  Q. (BY MR. AINSWORTH) It says page 3 of 8.
4  **A. What'd you say? Oh, 3 of 8 here. Okay. I**
5  **thought he said Bates. Okay.**
6  Q. It says -- you were asked the question "Did you
7  prepare this warrant?" And you say "I did," about five
8  lines down?
9  **A. Oh, yes. Okay, yes.**
10 Q. And you were asked if you typed it in its
11 entirety or were there other people who worked on
12 portions of it. And you said, "Well, I physically typed
13 it. I was at my office, and there were two agents from
14 the Illinois State Police there with me as well as
15 another third person they had with him, a private
16 citizen that was assisting in the investigation and had
17 certain expertise. And I believe the Sycamore
18 detectives from Sycamore, Illinois, were there."
19 And is that a correct recitation of who was there
20 for the typing of the affidavit?
21 **A. To the best of my knowledge. There could have**
22 **been other people walking through or people sitting at**
23 **desks there that weren't involved in it, but that's what**
24 **I remember.**
25 Q. All right. So then in the next question you're

53

1 asked -- the lieutenant talks about information that's
2 in the affidavit, and then it asks you "Where did this
3 information come from?" And you say it came from,
4 verbally, from the -- well, verbally and through copies
5 of archived reports that I have in front of me, from
6 Illinois State Police detectives and Sycamore, Illinois
7 detectives?
8 **A. Right.**
9 Q. And -- and is it fair to say that the verbal
10 information that was being provided to you was being
11 provided to you mainly by Special Agent Hanley?
12 **A. It was about equally between him and Zu --**
13 **Zulawski.**
14 Q. Zulawski?
15 **A. Yeah.**
16 Q. All right. So the two of them were both together
17 and providing you information?
18 **A. Correct.**
19 Q. All right. And you also had archived reports.
20 And when you refer to archived reports, you're talking
21 about the FBI reports?
22 **A. I think I'm talking about this FBI report because**
23 **that's the one I had open.**
24 MR. NOLAND: And just for the record, the witness
25 pointed to Exhibit 2.

54

1 **A. Yeah, right.**
2 Q. So you had Exhibit 2 as well, right?
3 **A. I believe so, yes.**
4 Q. And you -- on that CD -- and you got that Exhibit
5 2 from the CD --
6 **A. Right.**
7 Q. -- that was provided to you, right?
8 **A. I'm sorry. Right. I pulled it up from the CD.**
9 Q. And there were a whole bunch of other FBI reports
10 on that CD, right?
11 **A. There are.**
12 Q. And you were -- and the CD wasn't broken, it
13 wasn't like there was only one FBI report that you could
14 access from that CD?
15 **A. No. I could access any report on there.**
16 Q. All right. Let's turn to the next page of
17 Exhibit No. 14.
18 **A. Page 4?**
19 Q. Yes.
20 **A. Okay.**
21 Q. Actually, let's go to page 5.
22 **A. Okay.**
23 Q. All right. And then there's a very long
24 paragraph at the bottom --
25 **A. Okay.**

55

1 Q. -- and it's where you're addressing why the
2 affidavit says that the victim was last seen playing at
3 about 6:00 p.m. --
4 **A. Right.**
5 Q. -- right?
6 MR. NOLAND: Object to the form of that question;
7 foundation.
8 Q. (BY MR. AINSWORTH) And so then you provide a --
9 a long answer at the bottom of page 5 going onto page 6,
10 and your answer is correct, right?
11 MR. NOLAND: Objection to form; foundation. You
12 may answer.
13 **A. You mean my -- you mean my answer is correct? I**
14 **don't understand what you mean by that.**
15 Q. Yeah, your answer is correct.
16 **A. You're saying this is correct?**
17 Q. Yes.
18 **A. That's what I believe, yes. I'm sorry. My**
19 **answer is not the word "correct." That's why I was**
20 **trying to be clear.**
21 Q. Fair. All right.
22 And -- and you write here or you say here --
23 **A. Just to be clear, we're on page 6 now?**
24 Q. No, page 5.
25 **A. Oh, page 5. I'm sorry. Yeah, okay. Page 5.**

56

1 All right. I thought you said go on to the next page.
2 Okay. Go ahead.
3 Q. So about four lines down you say, "And he got
4 back to, to Rockford, which is where the train stopped,
5 around 7:00 p.m." Do you see that?
6 **A. Right.**
7 Q. And so you knew that Jack was in Rockford at
8 around 7:00 p.m., right?
9 MR. NOLAND: Objection; foundation. But go
10 ahead.
11 **A. Yes, I believe Jack was in Rockford at 7:00 p.m.**
12 Q. Okay. And then it says, "Okay. It later turned
13 out he didn't use that train ticket at all because the
14 detectives not only actually found the unused train
15 ticket 50 years later, so he had put a false alibi at
16 the time. Crime analysts with the Illinois State Police
17 did an extensive review of the information, these are
18 civilian crime analysts, and determined that the actual
19 kidnapping time was about 6:00 p.m. All the information
20 about 7:00 p.m. came from Jack himself. As a matter of
21 fact, if I believe the Illinois State Court of Appeals
22 decision based on this case and he said it couldn't have
23 been me because it was 7:00." Do you see that there,
24 sir?
25 **A. "It couldn't have been me because it was 7:00,"**

89

1      AFTERNOON SESSION
2          2:38 p.m.
3          --oOo--
4
5      VIDEOGRAPHER:  We are back on the record.  This
6  begins Media 2 in the deposition of Cloyd Steiger.  The
7  time -- the time is 2:37.  Please proceed.
8
9          CONTINUING EXAMINATION
10 BY MR. AINSWORTH:
11   Q.  Let's show you what we previously marked as
12 Exhibit 11.  That's your Affidavit, correct?
13   **A.  Yes.**
14   Q.  All right.  And you wanted to be fair to Jack
15 McCullough in this affidavit, right?
16      MR. NOLAND:  Object to the form of the question;
17 foundation.
18   **A.  I want to be accurate, yeah, in the affidavit.**
19   Q.  And -- and by being accurate, you're being fair
20 to Jack, right?
21   **A.  I'm being fair to everybody --**
22      MR. NOLAND:  Object to form.
23   **A.  I'm being fair to everyone involved, so yes.**
24   Q.  Yeah.  All Right.  So in this affidavit, you
25 signed it, right?

90

1    **A.  Yes.**
2    Q.  You swore under oath that the contents of your
3  affidavit were true, right?
4    **A.  Yes.**
5    Q.  How did it come about that you went to Judge
6  Heavey for this search warrant to be signed?
7    **A.  You just call the clerk's office when you have a**
8  **warrant, and they check on it and they call you back and**
9  **say go to Judge Heavey.  So they pick the judge.**
10   Q.  All right.  If you go down to the paragraph that
11 begins "On December 3rd, 1957," on the first page of
12 Exhibit 11, do you see that last sentence there says,
13 "They were last seen at about" -- sorry, "They were last
14 seen playing at about 6:00 p.m. on that date."
15   **A.  Right.**
16   Q.  Where did you get that information?
17   **A.  I got it from the Illinois people.**
18   Q.  And so Brion Hanley?
19   **A.  Brion or Zulawski, one of them gave me that**
20 **information.**
21   Q.  All right.  And if Brion gave you that
22 information, Zulawski was there to hear it, right?
23   **A.  Right.**
24   Q.  And if Zulawski gave you the information, Brion
25 was there to hear it?

91

1    **A.  Yes.**
2    Q.  Did anyone say, no, it wasn't about 6:00 p.m., it
3  was actually later when Maria was abducted?
4    **A.  No.**
5    Q.  Have you considered the possibility that the
6  Illinois investigators might have engaged in tunnel
7  vision in this case, in the Jack McCullough case?
8    **A.  I have not considered that.**
9    Q.  Is that something that should be considered?
10      MR. NOLAND:  Objection; form; foundation.  Go
11 ahead.
12   **A.  Okay.  I wasn't there --**
13      MR. DIERKES:  I'll join.
14   **A.  Yeah.  Okay.  I wasn't there for their**
15 **investigation.  I didn't know what steps they'd taken or**
16 **how they'd done it, so I wasn't in a position to make**
17 **that judgment one way or the other.**
18   Q.  I know.  But should -- should somebody have been
19 looking to see if the Illinois investigators were
20 engaging in tunnel vision in the way they approached
21 this case?
22      MR. NOLAND:  Object to form.
23      MR. DIERKES:  Object to form.
24   **A.  I don't -- I don't know that anybody did or did**
25 **not do that.  I mean, you know, DeKalb County**

92

1  **prosecut -- or state attorney might have done that,**
2  **their supervisor might have done that.  I don't know, so**
3  **I have no opinion one way or the other.**
4    Q.  So that's why I was asking shouldn't they do
5  that.  I know -- I understand you don't know if it was
6  done or not, but should they have done that?
7      MR. NOLAND:  Objection; asked and answered.
8    **A.  Should someone have checked to see if they were**
9  **doing double -- I mean, nobody looks over me to make**
10 **sure I'm doing it.  It's up to the individual detective**
11 **to do the best job they can, or group of detectives.  So**
12 **I don't know.  It's not -- I don't have enough**
13 **information to say whether someone else should have**
14 **looked at their work, I don't know, if that's what**
15 **you're asking me.**
16   Q.  That's not what I'm asking you.
17   **A.  Oh, okay.  I'm sorry.  Then I misunderstood the**
18 **question.**
19   Q.  Should the detectives or agents from Illinois
20 have determined themselves whether they were engaging in
21 tunnel vision?
22      MR. DIERKES:  Object to form; also asked and
23 answered.
24   **A.  I mean, I don't know enough information to make**
25 **a -- I mean, generally you have to keep it -- that aware**

93

1  yourself, but I don't know these guys. When they showed
2  up there, I don't know what the situation was, so --
3  Q. So there's some investigations where you don't
4  have to be concerned with tunnel vision. Is that what
5  you're saying?
6  A. No, that's not what I'm --
7  MR. NOLAND: Objection; mischaracterizes.
8  A. That's not what I'm saying at all. I'm just
9  saying that wasn't something that I was thinking about
10  or that I had any reason to doubt or what -- it didn't
11  even occur in my mind about these guys because I'm
12  not -- I'm not trying -- when -- detectives from out of
13  state come all the time and we help them all the time,
14  and I don't know -- I'm not going to go and do a
15  background check on them or reinvestigate their case.
16  I'm just there to help them with what they need, and
17  that's what the situation was.
18  Q. Maybe I can clarify this.
19  A. Okay.
20  Q. I'm not asking you what you did or what you
21  should have done.
22  A. Right.
23  Q. All right. I'm asking you, as an experienced
24  homicide detective who teaches homicide classes, should
25  the Illinois detectives have considered whether they

94

1  were engaging in tunnel vision during their
2  investigation of the Jack McCullough case?
3  MR. NOLAND: Objection; form; foundation; asked
4  and answered.
5  A. I'll say that all detectives should be aware of
6  that, not that they have to stop and go back and see if
7  they were. That's more of a conscious thing. It should
8  be a practice rather than a conscious decision. It
9  shouldn't have to be. It should just be a natural way
10  of doing your case, and I don't know -- I didn't know
11  these guys at all before this date or anything about
12  them.
13  Q. So the Illinois detectives should have been
14  checking themselves as they went along to see if they
15  were engaging in tunnel vision, right?
16  MR. NOLAND: Object to the extent it
17  mischaracterizes prior answer and is asked and answered.
18  MR. DIERKES: Also join.
19  A. You want me to answer that question? I'm sorry.
20  Q. Please.
21  A. Again, I don't think it's something that's an
22  affirmative thing to do. It's just something that you
23  should have -- that just it should be done by habit.
24  It's not something you affirmatively go back and check
25  to make sure things -- that mischaracterizes what you

95

1  do. It should be just your general practice not to get
2  tunnel vision in my opinion.
3  Q. All right. If you'd look down to the next
4  paragraph below, "They were last seen playing at 6:00
5  p.m." --
6  A. Okay.
7  Q. -- you see where it says in the second line
8  "Johnny was described as wearing a multicolored
9  sweater."
10  A. Yes.
11  Q. All right. Why did you include that information?
12  A. Because that's the information I got from the
13  Illinois people.
14  Q. Well, it's a discussion about what information to
15  include in the affidavit?
16  A. Well, there was a discussion about what to write
17  in the affidavit, so, I mean, I was asking questions. I
18  understood generally about what went on in this case,
19  but like what happened next or who did what and what was
20  this. So I'm filling in things that way. It wasn't
21  like include this, don't include that. There was no --
22  there was no discussion about excluding anything. It
23  was just of what to put in the affidavit, so -- and
24  that's one of the things we put in the affidavit.
25  Q. So Jack McCullough wasn't missing a right

96

1  eyetooth, right?
2  A. No. I mean, as far as I know. I don't know.
3  Q. But the day after the abduction, Kathy reported
4  that the perpetrator was missing a right eyetooth,
5  right?
6  MR. NOLAND: Objection; lacks foundation; calls
7  for speculation.
8  A. I didn't have any of that information at the
9  time.
10  Q. Well, you had access to the FBI reports. You
11  just don't -- you didn't look at that particular FBI
12  report. Is that what you're saying?
13  A. I only looked at the one having to do with the
14  alibi. I didn't read the thousand or whatever, 2,000
15  pages on there. Because it's not -- it's not my job to
16  go back and redo the case. If I was reviewing this case
17  as an independent person, I certainly would have. But
18  in this case, I'm just assisting the out-of-state
19  detectives.
20  So I didn't go back and read -- I read that one
21  because it specifically addresses his alibi and things
22  they found out later that seemed to contradict his
23  alibi, so that's why I looked at that one.
24  Q. Do you know why your affidavit includes a
25  description of Johnny wearing a multicolored sweater but

129

1  mentioned multiple times in this affidavit.
2     Q.  Do you think that Jack McCullough is guilty of
3  the murder of Maria Ridulph?
4     A.  I do.
5     Q.  Do you think he should be sentenced to death for
6  that crime?
7     A.  It's not for me to decide what people are
8  sentenced to.  I just do the investigation.  I think he
9  should be in prison.  I don't -- whether he gets the
10 death penalty or not is not something that's in my
11 ballpark.
12    Q.  Should he be in prison for the rest of his life?
13    A.  He should be in prison for whatever amount of
14 time is appropriate for the crime he's charged to,
15 whatever that is.
16    Q.  Right.  What do you think is appropriate for the
17 crime?
18    A.  I think -- well, because he's so old, it would be
19 the rest of his life.  If he had been arrested when he
20 was younger, it wouldn't have been.
21    Q.  So you think that Jack McCullough should be in
22 prison for the rest of his life?
23    A.  I think Jack McCullough should be in prison as
24 long as whatever the sentence is.  But, again,
25 punishment is not my thing.  I just investigate.  I

130

1  don't do -- I don't have anything to say about the
2  punishment or what happens.
3     Q.  After Jack McCullough's interrogation, you and
4  Ciesynski and the Illinois detectives drank bourbon
5  together, right?
6     A.  That was much after.  He was already in jail by
7  that time, so it was way after the interrogation.  Like
8  we'd taken him to jail and come back.
9     Q.  So you took him to jail and then you came back --
10    A.  About three o'clock, four o'clock in the morning,
11 yeah.
12    Q.  Right.  And you celebrated with bourbon, right?
13    A.  We all had a bourbon.
14       MR. NOLAND:  Object to the form of the question.
15 Go ahead.
16    A.  Yeah, we all had a bourbon.  It'd been a long day
17 at work.
18    Q.  And you got on the phone with Clay Campbell,
19 right?
20       MR. NOLAND:  Object to the form of the question
21 "you."
22    A.  I did not get on the phone with Clay Campbell.
23    Q.  Well, there -- Clay Campbell was put on
24 speakerphone?
25    A.  Right.

131

1     Q.  In your presence, right?
2     A.  Right.
3     Q.  And you told Clay Campbell "this is your fucking
4  guy, that's what I think, if you watch this video you
5  will know this is the right guy"?
6       MR. NOLAND:  Object to the form of the question.
7     A.  Okay.  I -- I -- Brion Hanley was on the phone
8  with Clay Campbell.  It was on speakerphone, and I heard
9  it.  And Brion said, "Cloyd, tell him what you think."
10 And I said "This is the fucking guy, and if you watch
11 the video you'll think so too," or something along those
12 lines, yeah.
13    Q.  So you told Clay Campbell that Jack McCullough
14 was guilty, so to speak?
15    A.  I was asked my opinion.  Guilt or innocence is
16 also not my job.  I said he was the correct suspect.
17 That was my opinion.  I'm not the trier of fact.  I'm
18 just the investigator.  I'm not even the investigator in
19 this case.  I'm just a guy helping out the Illinois
20 State Police.
21    Q.  What's the difference in your mind between saying
22 this is the right suspect and saying this guy's guilty?
23    A.  Well, it's semantics, I know that.  But, you
24 know, I get this question all the time.  Isn't there a
25 presumption of innocence?  Well, there isn't with me

132

1  because if I presume someone's innocence, it's pretty
2  unethical to have me try to get them charged with
3  murder, isn't it, if my presumption is that they're
4  innocent?  That's for the court and the jury to have
5  presumption of innocence.  There's nothing that says
6  that the detective investigating has to have a
7  presumption of innocence.  Again, it would be unethical
8  for me to have him charged if I thought he was innocent.
9     Q.  I'm not asking about presumption of innocence.
10    A.  You said is he guilty.
11    Q.  I -- I asked you what's the difference between
12 saying this is the right suspect and this guy is guilty?
13    A.  Well, in my opinion he was guilty.  But, again,
14 that doesn't matter.  That's my opinion.  It doesn't
15 matter to -- it doesn't matter to Clay Campbell, who
16 doesn't know me from Adam, had never met me or spoken to
17 me before that day.  And it doesn't matter to the trier
18 of fact later what I think.
19    Q.  All right.  If you go back to Exhibit 11, the
20 next paragraph on page 4 --
21    A.  11.  Okay.  Next para -- on page 4.  Next from
22 what?
23    Q.  "In September 2010" is what it begins with.
24    A.  Oh, on page 5.  Okay.  Okay.  I got you.
25    Q.  All right.  In the third line from the bottom,

133

1  there's a sentence that begins the right-hand side of
2  the page, it says -- well, it says, "They read a montage
3  admonition form to her and asked her to look at the
4  photos. She immediately pointed to the photo of Tessier
5  and said, 'that's him.'" Do you see that?
6  **A. Yes.**
7  Q. Who told you that Kathy Sigman immediately
8  pointed to the photo of Tessier?
9  **A. It was either Brion or Todd. I don't remember**
10 **which one.**
11 Q. Did they tell you actually her identification
12 took four minutes in length and she first narrowed it
13 down to six photos to three photos and then narrowed it
14 down from three photos to two photos, and then looked at
15 the two remaining photos and immediately picked one of
16 those two photos?
17 **A. They didn't -- I've heard that since then. I**
18 **didn't have that information then. But, I mean, that**
19 **just tells me that she was -- she had the instructions**
20 **to carefully look at all of the photos. She was being**
21 **conscientious. You want your witnesses to take their**
22 **time and look at those photos. Now, immediately --**
23 **apparently at some point there was the word immediately**
24 **used. When she got down to two, immediately said one.**
25 **But that's -- that's information -- I didn't have**

134

1  **all of that information when I wrote this affidavit. I**
2  **just had that she -- that was the word used, and that's**
3  **what I put in the affidavit.**
4  Q. All right, sir. I'm going to hand you two pieces
5  of paper, Exhibits -- let's say Exhibits 2 and 12. I
6  want you to look at those two pieces -- no, put them on
7  the table in front of you. Can you please immediately
8  point to one of them?
9  **A. (Witness complies.)**
10 Q. Thank you.
11 **A. Again, that's just semantics. I mean, what do we**
12 **mean by immediately? What does the mean? You know,**
13 **that' the thing, it's parsing. That's to me -- your**
14 **immediately might be different than my immediately, and**
15 **I don't know. But that's not my case, so I don't know.**
16 Q. Have you ever had a dispute about what the word
17 immediately means?
18 **A. No. I have had disputes about whether a house**
19 **was white or not, but it was another innate subject but**
20 **not that.**
21 Q. Did you talk to Clay Campbell before that
22 conversation on the speakerphone where you said that
23 Jack McCullough was the fucking guy? Did you talk with
24 him before that time?
25 **A. No.**

135

1  MR. NOLAND: Russell, I need to use the bathroom
2  and take a break.
3  MR. AINSWORTH: Sure. Let's go off the record.
4  VIDEOGRAPHER: We're going off the record at
5  3:31.
6  (Recess taken.)
7  VIDEOGRAPHER: We are back on the record. The
8  time is 3:39. Please proceed.
9  Q. (BY MR. AINSWORTH) Showing you what we've marked
10 as Exhibit No. 3 previously, this document appears to me
11 to be a reproduction of the information in the search
12 warrant with a slight variation at the top. But I
13 didn't know if you knew where this came from or what it
14 is?
15 **A. It looks like a cut and paste of the information**
16 **like I said. I was shown this earlier, and I don't have**
17 **any specific information. The only thing I can think of**
18 **is maybe this is what I sent up to Okanogan County, but**
19 **I don't know that for a fact because it's -- you know,**
20 **it's dated on the 31st of October.**
21 Q. Right.
22 **A. And I don't know why I would have done anything**
23 **unless that -- because it's the date it was transferred**
24 **to this form, it may have auto-populated that. So I**
25 **don't know. It is pretty much the affidavit, and I**

136

1  **don't know why -- it doesn't have obviously the language**
2  **in there or Seattle Police detective blah, blah, blah,**
3  **that you put in an affidavit. But I don't know why,**
4  **what that's from.**
5  Q. Was there a way to electronically sign documents
6  in 2011?
7  **A. Yes.**
8  Q. How would you do that?
9  **A. Push a button, sign it there and it fills it in.**
10 Q. And where it says at the very end of Exhibit 3
11 from the WASPD0000, do you know what that refers to?
12 **A. That's the ORI for the Seattle Police Department,**
13 **which is an NCIC that identifies the Seattle Police**
14 **Department. And 0000 is a generic one. Each terminal**
15 **has a number. Each car that has one has a number. So**
16 **0000 means the generic Seattle Police Department, not**
17 **from a specific terminal necessarily. And that's**
18 **just -- that's auto-populated too because when you --**
19 **when you book it -- like, for example, this looks like a**
20 **booking form where you file it and you click sign and it**
21 **will auto-populate that.**
22 **And when they enter it in NCIC, they'll show that**
23 **and that's the ORI they'll put in there or -- I don't**
24 **know what ORI stands for. But every court has its own**
25 **ORI, O-R-I. Every police department, the attorney**

137

1 general's office has its own ORI. That's just a
2 computer identification of where it came from.
3 Q. Do you agree that the Seattle Police Department,
4 including yourself, Detective Ciesynski and Detective
5 Lau, played a substantial role in Jack McCullough's
6 arrest and prosecution?
7 MR. NOLAND: Object to the form.
8 A. I would say -- no. I would say we were there to
9 assist the Illinois State Police and we did everything
10 that was asked of us. I mean, significant, what does
11 significant role mean?
12 Q. Substantial.
13 A. Substantial role. I mean, yes, we drove them to
14 the scene; yes, we got them a search warrant. We
15 assisted every way we could with their case, which we do
16 when any agency comes here, hoping that when we have to
17 go there they give us a the same courtesy. That's just
18 standard procedure. There's nothing unusual about this
19 at all. The LAPD coming up here, they do it all the
20 time, and we do the same thing for them. And when we go
21 down there, they do the same thing for us.
22 MR. AINSWORTH: Let's mark that as Exhibit 25,
23 please.
24 (Deposition Exhibit No. 25 was marked for
25 identification.)

138

1 Q. (BY MR. AINSWORTH) Turning your attention to the
2 bottom of this page of Exhibit 25, there's an e-mail
3 from you to Sean Whitcomb dated March 4th, 2013. It
4 says, "Sean, just to let you know, the 48 Hours episode
5 regarding the 1957 kidnap murder of seven-year-old Maria
6 Ridulph and the arrest of Jack McCullough in which SPD
7 played a substantial role will air on CBS this Saturday
8 night, March 9th at 10:00 p.m."
9 A. Right. We -- again, we did play a substantial
10 role in the arrest of Jack McCullough.
11 Q. So when you said the 48 Hours episode regarding
12 the 1957 kidnap murder of seven-year-old Maria Ridulph
13 and the arrest of Jack McCullough in which SPD played a
14 substantial role --
15 A. SPD certainly did not have a -- play a
16 substantial role in her kidnap and murder, so that's the
17 only thing left, I mean. That was my -- that was what I
18 was trying to get acro -- Sean, by the way, was the
19 director of the public information office. That's why I
20 sent it to him.
21 Q. Yes. And so you appeared on 48 Hours, right?
22 A. Yes.
23 Q. You appeared on the documentary Footsteps In the
24 Snow?
25 A. Yes.

139

1 Q. Did you go to the Dr. Phil show?
2 A. No.
3 Q. Why not?
4 A. I was never invited and I never asked. I don't
5 know. That was Mike's deal. I didn't go.
6 Q. Did you talk to him about why he went and you
7 didn't?
8 A. Why he went to what?
9 Q. Why he went and you did not?
10 A. No. I mean, I didn't care that he went. He told
11 me he was going before he went. I -- I actually didn't
12 have a lot of desire to go to Dr. Phil. I mean, I don't
13 care. I'm not a big Dr. Phil fan, so --
14 Q. Why did you go on 48 Hours?
15 A. Because they were covering the crime from the
16 beginning, and I got to know a couple of the producers
17 and they asked me and I said yeah.
18 Q. I want to ask you about what we've previously
19 marked as Exhibit No. 5, please. This is your report,
20 correct?
21 A. Yes.
22 Q. You typed this report?
23 A. Yes.
24 Q. Do you know why it's -- why the box for "officer
25 submitting report" is blank?

140

1 A. What are you -- what are you talking about?
2 Q. Bottom left.
3 A. Bottom left. You mean the certification?
4 Q. Sure, yes.
5 A. We don't -- we don't do that. That's on there
6 for whatever reason. I've never signed one of those
7 because you can't transfer an electronic copy -- you
8 know, these are sent -- when you send them out, that
9 signature is not on there because it's electronic, so --
10 we don't do that.
11 Q. So you didn't certify under penalty of perjury
12 that the report is true and correct?
13 A. No.
14 Q. Why not?
15 A. Because I never do.
16 Q. Are you supposed to?
17 A. It's not an order or a policy to do it as far as
18 I know. I've done this my whole career, and nobody's
19 ever said, hey, you need to certify that. It's never --
20 you know, it's not even an issue, it's a non-issue.
21 Whoever created the form put that on there in case you
22 need to certify it. I don't know why it's on there. It
23 wasn't me, so I don't know. But I never -- I have never
24 done it, and I don't -- I know that -- I don't know of
25 another detective certainly in the homicide unit that

**181**

1   about eight o'clock at night?
2   **A. Everything that's in my affidavit is information**
3   **that was given to me by the Illinois State Police or**
4   **Dave Zulawski. Everything. It's not anything I had**
5   **independent knowledge of.**
6   Q. All right. So --
7       VIDEOGRAPHER: Counsel, I just want to let you
8   know we have ten minutes left on the video.
9       MR. AINSWORTH: Thank you.
10  Q. (BY MR. AINSWORTH) So are you aware that Kathy
11  Caulfield or Caulfield never provided a time to the
12  investigators when they asked her about when her dad
13  picked her up?
14      MR. NOLAND: Object to the form; foundation.
15  That calls for speculation.
16  **A. I don't have any information one way or the other**
17  **about that.**
18  Q. And are you aware that Kathy Caulfield didn't
19  report anything about being picked up by her dad the
20  night of December 3rd until over 50 years after Maria's
21  abduction?
22      MR. NOLAND: Form; foundation. You can answer.
23  **A. I don't have any information one way or the other**
24  **on that. I was relying on things told to me by the**
25  **Illinois State Police. I didn't -- this is not my**

**182**

1   **investigation.**
2   Q. So after you drafted the search warrant, what did
3   you do, or the affidavit?
4   **A. Well, then I called over for a judge and waited**
5   **for the call back to tell me where to go, and then we**
6   **went to the courthouse.**
7       MR. AINSWORTH: Let's actually change the tape.
8   Let's go off the record.
9       VIDEOGRAPHER: We're going off the record. The
10  time is 4:37.
11      (Recess taken.)
12      VIDEOGRAPHER: We are back on the record. This
13  begins Media 3 in the deposition of Cloyd Steiger. The
14  time is 4:44. Please proceed.
15  Q. (BY MR. AINSWORTH) When you met with your
16  counsel a week or two ago, how long did you meet with
17  your counsel?
18  **A. Like I said, it was five or six hours during the**
19  **day and then we went to a bar. Like I said, the bar was**
20  **mostly socializing. It wasn't talking about the case.**
21  Q. And which attorneys did you meet with?
22  **A. Both of them. I forgot her name again.**
23  Q. Beth and --
24  **A. Beth, yeah, and --**
25  Q. -- Dan?

**183**

1   **A. -- Mr. Noland here.**
2   Q. All right. And did you meet with anyone earlier
3   this week?
4   **A. Other than yesterday, I met with -- was it**
5   **yesterday or the day before yesterday?**
6       MR. NOLAND: I think that's been asked and
7   answered, but go ahead.
8   **A. Oh, yeah, and we talked yesterday briefly at**
9   **least and we talked over the phone, so I don't think so.**
10  **I don't know.**
11  Q. How long did you meet yesterday?
12  **A. When I came over here and my phone went off and I**
13  **left. So I was -- and then we talked downstairs -- we**
14  **went to get something to eat and talked downstairs for**
15  **half hour and I had to go somewhere and they came back**
16  **up.**
17      MR. NOLAND: Oh, the deposition, yeah.
18  Q. (BY MR. AINSWORTH) Did you -- you then went to
19  the judge with the affidavit; is that correct?
20  **A. Yeah. Me, Brion and Todd went to the judge.**
21  Q. Why did the three of you go?
22  **A. Well, I always -- whenever I'm getting a warrant**
23  **for an outside agency, I always bring a representative**
24  **of that agency with me because if the judge has a**
25  **question they can answer them because I don't know.**

**184**

1   **It's not my case.**
2   Q. And did the judge have any questions for you?
3   **A. No. Not about the case, no.**
4   Q. Did he have questions about other things for you?
5   **A. Well, not questions. He was talking a lot about**
6   **Amanda Knox because he's a family friend. So he was**
7   **talking about that.**
8   Q. What was he saying about Amanda Knox?
9       MR. NOLAND: Objection; relevance. Go ahead.
10  **A. Just how outraged he was that she'd been put**
11  **through the ringer, she's a family friend of his and**
12  **things like that. That's what I remember.**
13  Q. That she was wrongfully convicted?
14  **A. He didn't specifically say that, but I'm sure**
15  **that's what he was thinking.**
16  Q. What'd you do after you got the warrant signed?
17  **A. We came back to the office and then made**
18  **arrangements to go out to the apartment and got Bob**
19  **Valor and Hal Cruz went with me and we decided who was**
20  **going to ride with who. It was decided that Dave and**
21  **Brion would stay in the office, Todd and I went in the**
22  **car, Ciesynski drove separately and then Bob Valor drove**
23  **a car with Al Cruz. And I think Tiffany and Steve were**
24  **in the car with them.**
25      **And we all went out, and it was we would make the**

185

1 arrest and come back immediately and they would stay and
2 do a search of the apartment. That's what we talked
3 about doing.
4     Q. Do you know why Brion and Dave were -- remained
5 behind?
6     A. Probably to get ready for the interview, you
7 know, to set things up or -- there was no reason for
8 them to go out there. We had plenty of people.
9     Q. Was there a discussion of how the suspect
10 interview would be conducted?
11     A. Not with me. That was between Brion and Dave. I
12 didn't -- I wasn't -- they may have done that while I
13 was gone, but I didn't hear it.
14     Q. When you -- were you present when the door was
15 opened into Jack McCullough's apartment for the arrest?
16     A. Yes.
17     Q. What did you see when the door was opened?
18     A. He was standing there in a white T-shirt. I just
19 saw the hallway behind him, and there was a shelf -- or
20 maybe it was a washer and dryer to the right, I don't
21 remember, and he was there. He said "you're not welcome
22 to come in" to Ciesynski, and I said, "Well, we have a
23 warrant, Jack."
24         And I walked in and set the warrant down, and I
25 said put your hands up, you're under arrest, patted him

186

1 down. Then I had the conversation, "Now, listen, we
2 don't want to embarrass you, let's walk downstairs, as
3 long as you cooperate we won't put the handcuffs on
4 until we get to the car." And he agreed to that, and
5 that's what happened.
6     Q. Did you have your gun drawn when you entered the
7 71-year-old's apartment?
8     A. I had my gun drawn when we knocked on the door
9 and he opened it, yes, but I holstered it once we went
10 in.
11     Q. Did Jack McCullough appear to be a threat to you
12 at any point?
13     A. We were arresting a murder suspect. We always
14 draw our guns. I didn't -- I don't make any judgement
15 whether -- who knows what a threat is until it's too
16 late to know. So, like I said, once he opened the door,
17 it was under control, I immediately holstered my gun.
18 But my gun was out when we knocked on the door. That's
19 just what we do when we're arresting a suspect in a
20 murder.
21     Q. Try and listen to my question.
22         Did you consider Jack McCullough to be a threat
23 when you saw him?
24     A. I didn't --
25         MR. NOLAND: Objection; asked and answered I

187

1 think; argumentative. Go ahead.
2     A. I didn't know if Jack McCullough was a threat or
3 not. I'd never met Jack McCullough.
4     Q. When the door opened and you saw Jack, you said
5 you immediately holstered your weapon; is that correct?
6     A. When I handed him -- when I held up the warrant,
7 yes, I did holster my weapon.
8     Q. And why did you do that?
9     A. Because it was under control. I mean, he wasn't
10 armed with anything. There was no reason to have my gun
11 out.
12     Q. Was Jack McCullough hiding his hands in any way?
13         MR. NOLAND: Objection; foundation.
14     A. I don't believe so. I don't remember. He might
15 have had one hand when he opened the door like that
16 (indicating) and maybe we said bring your other hand
17 out. I don't remember, though.
18     Q. Did you ever have a concern that he was holding a
19 gun in one of his hands?
20     A. No.
21     Q. Or a weapon?
22     A. No, not once the door was open.
23     Q. Did you walk Jack McCullough out of his apartment
24 building?
25     A. Yes. I was -- well, Ciesynski, Damasky and I,

188

1 and I was behind Jack. They were on either side of him,
2 and I was behind him.
3     Q. While you were in the apartment, did anyone tell
4 you that Jack McCullough was on medication?
5     A. He might have said something and -- yeah.
6     Q. Did his wife --
7     A. At some point he did.
8     Q. Did his wife tell you he was on medication and he
9 needed to take his medicine?
10     A. I didn't talk to his wife at all.
11     Q. Did his wife talk about him being a survivor of a
12 quadruple bypass before?
13         MR. NOLAND: Objection; foundation based on the
14 last answer.
15     A. Again, I didn't talk to him -- to her at all. I
16 mean, he had mentioned that to us at some point.
17     Q. Well, did his wife talk to you even if you didn't
18 talk to her?
19     A. I did not have any conversation either way with
20 his wife that day.
21     Q. What did -- what do you recall being said about
22 Jack McCullough's medication while you were in the
23 apartment?
24     A. I don't remember anything -- I'm sorry.
25         MR. NOLAND: Objection; mischaracterizes. You