

# Transcript of Michael Ciesynski

**Date:** March 7, 2019
**Case:** McCullough -v- Illinois State Police Agent Brion Hanley, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

EXHIBIT 3

21

1    Q.  When you left Calumet City, were there any
2 civilian complaints against you that were pending?
3    **A.  No.**
4    Q.  Why did you leave Calumet City?
5    **A.  I wanted to get out of Illinois.**
6    Q.  Where did you move in 1982?
7    **A.  To Casper, Wyoming.**
8    Q.  And what did you do in Casper, Wyoming?
9    **A.  I was a police officer.**
10    Q.  For which department?
11    **A.  Casper, the City of Casper.**
12    Q.  For how long were you a police officer in Casper,
13 Wyoming?
14    **A.  Just for about a year and a half.**
15    Q.  And were you disciplined by the Casper, Wyoming,
16 Police Department?
17    **A.  No.**
18    Q.  When you left the Casper, Wyoming, Police
19 Department, were there any pending civilian complaints
20 against you?
21    **A.  No.**
22    Q.  In the time that you were at Calumet City's
23 department, were you -- did you act exclusively as a
24 patrol officer in uniform in a marked squad car?

22

1    **A.  Yes.**
2    Q.  How about at Casper, Wyoming, what were your
3 police duties there?
4    **A.  Patrol.**
5    Q.  In the entirety of your tenure at the Casper,
6 Wyoming, Police Department, did you patrol in uniform in
7 a marked squad car?
8    **A.  Yes.**
9    Q.  And why did you leave the Casper Police
10 Department?
11    **A.  I was hired by Seattle.**
12    Q.  When were you hired by Seattle?
13    **A.  I was -- I started up in Seattle on my birthday,**
14 **October 3rd, 1983.**
15    Q.  When you joined the Seattle department -- well,
16 let's talk about what positions you held within Seattle.
17 What was your first position with Seattle?
18    **A.  Patrol officer.**
19    Q.  Were you patrolling in a marked squad car
20 uniform?
21    **A.  Yes.**
22    Q.  And for how long did you continue acting as a
23 patrol officer in a marked squad car in uniform?
24    **A.  Until April 1st, I believe, of 1985.**

23

1    Q.  And how did your job duties change then?
2    **A.  I became a detective, an undercover detective in**
3 **the narcotics division.**
4    Q.  And how did you become a detective?
5    **A.  I took a test and promotion exam, and then I was**
6 **recruited. You take a test and just -- and anybody who**
7 **wants you, if there's an opening, you're looked at. I**
8 **didn't believe I was going to be looked at because I was**
9 **so young. I just took the test, just kind of nothing**
10 **else to do.**
11    Q.  Was there a list created based on the results of
12 that test?
13    **A.  Yes.**
14    Q.  And were you promoted off of that list?
15    **A.  Yes.**
16    Q.  So when you became a detective, where were you
17 assigned?
18    **A.  To narcotics.**
19    Q.  And you were acting undercover; is that right?
20    **A.  Correct.**
21    Q.  And for how long did you work in narcotics
22 undercover?
23    **A.  Approximately five years.**
24    Q.  And how did your job duties change in five years

24

1 in approximately 1990?
2    **A.  I'm sorry?**
3    Q.  How did your job duties change in approximately
4 1990?
5    **A.  From patrol?**
6    Q.  No, sir. From narcotics, the five years that you
7 spent in narcotics while working undercover?
8    **A.  I'm not quite sure. How did they change?**
9    Q.  Yes, sir. You said you worked for five years in
10 narcotics, right?
11    **A.  Correct.**
12    Q.  And at the conclusion of your time in narcotics,
13 what did you do next?
14    **A.  Oh, I'm sorry, I'm sorry. I worked in undercover**
15 **fencing for a year.**
16    Q.  And why did you move from undercover narcotics to
17 undercover fencing?
18    **A.  The chief of police thought it would be a good**
19 **idea to take me off point. He believed I was on point**
20 **too long.**
21    Q.  Did the chief of price tell you why he thought
22 you were on point too long?
23    **A.  Yes. Well, he said -- I said why am I being**
24 **transferred, and he said I've been on point too long.**

25

1    Q. Did he tell me you why he thought you had been on
2  point too long?
3    **A. Yes.**
4    Q. What did he say or she say?
5    **A. Well, the reason being that was I think my third**
6  **police shooting that I was involved in.  I was**
7  **narcotics, and during a search warrant I was involved in**
8  **a shooting with multiple suspects and I killed a man.**
9    Q. In the prior police shootings -- so in the first
10 police shooting that you were involved in, did you fire
11 your firearm?
12   **A. Yes.**
13   Q. And did you strike anyone?
14   **A. No, I don't believe I did.**
15   Q. Did someone else -- did another police officer
16 strike anyone with their firearm, a bullet from their
17 firearm?
18   **A. I believe so, yes.**
19   Q. Was that person killed?
20   **A. No.**
21   Q. Do you know what happened with that person?  Was
22 he charged?
23   **A. Yes.**
24   Q. And was he convicted?

26

1    **A. Yes.**
2    Q. And he survived the gunshot?
3    **A. Yes.  He was shot in the leg.**
4    Q. How about in the second police shooting that you
5  were involved in, did you fire your weapon?
6    **A. Yes.**
7    Q. Did you strike anyone?
8    **A. Yes.**
9    Q. And what happened to that person that you shot?
10   **A. He was convicted and he survived, minus a kidney.**
11   Q. And so in five years you were involved in three
12 police shootings?
13   **A. In three years?**
14   Q. In five years.
15   **A. Oh, five years.  No, no, it would have been my**
16 **last police shoot -- not last shooting.  In narcotics I**
17 **was -- that happened in, I believe -- I believe that**
18 **happened in 1989.**
19   Q. So in four years you shot three people or you
20 fired your weapon three times?
21   **A. So, no, I started as a policeman in 1980.**
22   Q. I thought all the three shootings came while you
23 were in undercover narcotics?
24   **A. No, no.**

27

1    Q. So when was the first time that you fired your
2  weapon at a person?
3      MR. NOLAND:  And I'm going to object.  That has
4  absolutely no relevance to this case.  I know relevance
5  isn't necessarily an objection, but I guess if you want
6  to -- this case has nothing to do with shooting a
7  firearm, so I just make that objection for the record so
8  I hope you don't go into this too long.
9    Q. (BY MR. AINSWORTH)  Do you recall the question?
10   **A. When was my first shooting?  It was in 19 -- I**
11 **believe it was 1980 or early '81 in Calumet City,**
12 **Illinois, while I was a patrol officer.**
13   Q. And where was your second shooting?  Where were
14 you for your second shooting?
15   **A. In Seattle.**
16   Q. And I take it you were in Seattle --
17   **A. As a patrol officer.**
18   Q. As a patrol officer.  And then you were in
19 Seattle for your third shooting?
20   **A. Yes.**
21   Q. Were any of those shootings deemed to be
22 unjustified?
23   **A. No.**
24   Q. How many other times have you shot your service

28

1  weapon while in the line of duty?  So not during
2  training exercises.
3    **A. I was in a shooting in 19 -- probably '88 or '89**
4  **where I shot a dog -- or numerous officers, we shot a**
5  **dog, a Pit Bull that attacked us.  And then I was in a**
6  **shooting in 19 -- I believe it was 1992 or 1993.  We**
7  **were in a fire fight and fired multiple weapons and**
8  **people were shot.**
9    Q. Was anyone killed in the 1992 or 1993 shooting?
10   **A. No.**
11   Q. But you shot somebody the 1992 or 1993 shooting?
12   **A. Yes.**
13   Q. So as I take it, there's five different occasions
14 where you shot your gun between 1980 and 1993; is that
15 right?
16   **A. That is correct.**
17   Q. After 1993 did you shoot your gun anymore at
18 people?
19      MR. NOLAND:  Object to the form of the question.
20 You may answer.
21   Q. (BY MR. AINSWORTH)  I guess I should rephrase at
22 this time.  After 1993 did you shoot your gun at people
23 or dogs?
24   **A. No.**

29

1    Q. How long were you working in undercover fencing?
2    **A. About a year.**
3    Q. And when you say --
4    **A. Maybe a little over a year. I apologize.**
5    Q. When you say undercover fencing, you're referring
6    to the fencing of stolen goods; is that right?
7    **A. Correct.**
8    Q. What was that unit called?
9    **A. Fencing.**
10    Q. And where did you go after you were working in
11    undercover fencing?
12    **A. I went to the robbery unit.**
13    Q. Why did you go to the robbery unit?
14    **A. I was -- an opening occurred, and I was recruited**
15    **to go there.**
16    Q. Who recruited you to go there?
17    **A. I don't remember if it was a sergeant or a**
18    **captain or who did.**
19    Q. How long did you remain in robbery?
20    **A. I believe it was four years.**
21    Q. What were your duties in robbery?
22    **A. I was a detective handling robbery cases,**
23    **robbery, kidnap, kidnapping.**
24    Q. Did you --

30

1    **A. I would assist the homicide unit. I was on**
2    **rotation with the homicide unit, with the homicide**
3    **squad.**
4    Q. Did you want to move from undercover fencing to
5    robbery?
6    **A. Yes.**
7    Q. Why?
8    **A. Well, the robbery unit is a very prestigious job.**
9    **That type of promotion is a top level detective position**
10    **within the police department.**
11    Q. What's the highest level detective job in the
12    police department?
13    **A. Homicide is. It's not the highest paid. Bomb**
14    **squad. But it's probably the most prestigious, or**
15    **people perceive it to be most prestigious.**
16    Q. Were you wanting to be a homicide detective?
17    **A. At one point I was, yes.**
18    Q. When was that point?
19    **A. When I was in robbery maybe halfway through my**
20    **career. I enjoyed being in robbery.**
21    Q. Did you stop wanting to be a homicide detective
22    at some point?
23    **A. When I retired.**
24    Q. Where did you go when you left robbery?

31

1    **A. Homicide.**
2    Q. So did you leave robbery in about 1995?
3    **A. Yeah, '94 or '95, something like that. I think I**
4    **was on loan. You know, they brought me over on loan and**
5    **then -- because there was an opening, and then I got the**
6    **job.**
7    Q. How'd you manage to get transferred from robbery
8    to homicide?
9    **A. How did I manage it?**
10    Q. Yeah.
11        MR. NOLAND: Object to the form.
12    **A. I was recruited.**
13    Q. Did you ask to be moved to the homicide squad?
14    **A. I was recruited to go there.**
15    Q. Did you ask to go to the homicide squad?
16    **A. No. I was recruited to go to the homicide unit.**
17    Q. Who recruited you?
18    **A. Sergeant David Ritter.**
19    Q. And how long did you remain as a homicide
20    detective?
21    **A. The rest of my career.**
22    Q. Did Seattle call the cold case unit something?
23    **A. Yes.**
24    Q. What do they call it?

32

1    **A. Cold case unit.**
2    Q. When did you join --
3    **A. Homicide cold case unit.**
4    Q. When did you join the homicide cold case unit?
5    **A. 2004.**
6    Q. Do you consider that to be an elite position?
7    **A. No.**
8    Q. Do you consider it to be an elite unit?
9    **A. Yes.**
10    Q. Why did you consider it to be an elite unit?
11    **A. Because of the detectives who worked there with**
12    **me and before me and the national recognition that we**
13    **received.**
14    Q. How did it come about that you were selected to
15    be the person to man the homicide cold case unit in
16    2004?
17    **A. There were -- there was a two-person unit --**
18    **well, three with a sergeant. And a detective was**
19    **leaving and there was going to be an opening, and I put**
20    **in for the position.**
21    Q. And so you made a written application or how did
22    you apply?
23    **A. I don't recall what the process was. I think you**
24    **just threw your hat in the ring. They ask you. The**

97

1 misremembering, correct?
2    **A. No.**
3    Q. Why not? Why?
4    **A. It's been my experience in dealing with serial**
5 **murderers and serial rapists, pedophiles, that they**
6 **remember everything about the crime because this is who**
7 **they are, this is what they do. They plan their -- they**
8 **plan and they rehearse and they live for it and they**
9 **think about it all the time, all the time. That's all**
10 **they ever think about.**
11    **They're usually sociopaths. They can carry on**
12 **conversations with you. They can act like they have**
13 **sympathy for people. All they think about is raping,**
14 **murdering, and that's what they get excited about doing.**
15 **This is all they do.**
16    Q. That's not my question, sir.
17    **A. Yes, it was your question.**
18    Q. Let me -- let me -- why don't you see if we can't
19 try it again.
20    **A. Okay.**
21    Q. If Jack McCullough did not abduct Maria
22 Ridulph --
23    **A. But he did. So you're saying hypothetically if**
24 **he didn't?**

98

1    Q. I'm just -- for purposes of this question, sir,
2 if Jack McCullough did not abduct Maria Ridulph, then
3 his inability to recall exactly what happened on the
4 date of Maria Rudolph's disappearance could be
5 attributed to the fact that 54 years had passed and
6 because he wasn't a participant, it just wasn't as
7 meaningful for him, right?
8    MR. NOLAND: Object to the form. You can answer.
9    MR. STEPHENSON: Object to the form as well.
10    **A. But he was a participant. If he did not abduct,**
11 **he was a participant because he was there when all of**
12 **this was going on and he was interviewed by the local**
13 **authorities and his parents. And so I think it was, as**
14 **Jack told me, this was a big event. Now, if none of**
15 **that happened and he was living somewhere else, I**
16 **gather, yeah, he wasn't -- that may have faded.**
17    MR. AINSWORTH: If you want to take a break, we
18 can do so now.
19    (Recess taken.)
20    Q. (BY MR. AINSWORTH) Dd Jack McCullough have an
21 alibi for the murder of Maria Ridulph?
22    MR. NOLAND: Object to the form. You can answer.
23    **A. I believe he had several alibis.**
24    Q. Did any of those alibis hold up in your view?

99

1    **A. No.**
2    Q. Why not?
3    **A. Because I believe that he was lying from the**
4 **start. With his alibis, he changed what he said about**
5 **his transportation to and from, told us he had a great**
6 **memory or a photographic memory and said he took the**
7 **train -- what I recall that he took the train to Chicago**
8 **to the AFIS station and then the train to Rockford and**
9 **then back -- back to Sycamore, that he drove a car**
10 **there, that his car -- what else did he say he did?**
11 **That he drove the car -- oh, hitchhiked in the bitterly**
12 **cold winter.**
13    **So that -- obviously that was pretty big for his**
14 **alibi. I remember he -- what else do I think about his**
15 **alibi? He later in a television interview, as I recall,**
16 **admitted that his parents lied for him, like his sister**
17 **said, when they were saying was he home that night. And**
18 **one of his sisters was standing there with his parents**
19 **when his parents said, oh, yeah, he was. And then he**
20 **later admitted that they lied for him.**
21    **What else would I say about his alibi? That's**
22 **all I can think about right now.**
23    Q. And according to -- so you said that Jack's
24 parents said he was home at the time of the abduction?

100

1    **A. Yes, or that he -- that's what I recall.**
2    Q. How were you first alerted about the Jack
3 McCullough case?
4    **A. I had a Post-it note that was placed on my desk.**
5    Q. By whom?
6    **A. By Sergeant Bob Vallor, V-a-l-l-o-r.**
7    Q. And what did the Post-it note say?
8    **A. Contact Illinois State Police on a 1957 murder or**
9 **kidnap/murder case and the telephone number. And I**
10 **think it was like probably Hanley's contact information,**
11 **Special Agent Hanley, I believe it was.**
12    Q. What did you do when you got that note?
13    **A. I don't recall if I contacted my sergeant or I**
14 **got it that day or the next day, but eventually I**
15 **contacted the Illinois State Police and spoke to Hanley,**
16 **Special Agent Hanley.**
17    Q. And what did you say to Hanley and what did he
18 say to you in that conversation?
19    **A. I introduced myself, asked him what assistance we**
20 **could provide. He gave me a real short version of what**
21 **they were investigating and that they were planning on**
22 **coming out to Seattle. They wanted to know where the**
23 **suspect McCullough, Tessier, whatever they had him as at**
24 **that time, working, as I recall where he was working. I**

105

1  when I was interviewing him and he was telling me the
2  different stories about how he got from point A to point
3  B to point C and how he could never do that.
4     Q.  Did you assist in the preparation of the
5  affidavit in support of the arrest warrant for Jack
6  McCullough?
7     A.  No.
8     Q.  Where were you at that time?
9     A.  In my office.
10    Q.  Why were you in your office as opposed to
11 assisting your fellow Officer Cloyd Steiger and the
12 other members of the team drafting the affidavit?
13    A.  Because it would get crowded in there and
14 wouldn't have keyboards.
15    Q.  So the reason that you give for why you weren't
16 present for the -- or why you didn't assist in the
17 preparation of that affidavit was because you're saying
18 there wasn't sufficient room?
19    A.  It was because Cloyd was doing it.
20    Q.  And --
21    A.  Detective Steiger was writing the affidavit, and
22 I don't know who else was assisting him at that point.
23    Q.  Did you assist him?
24    A.  No, I did not.

106

1     Q.  Why not?
2     A.  Because it wasn't my case and I wouldn't be
3  assisting him.  It would be a member of the
4  investigative agency to be doing that.
5     Q.  Why didn't -- why did Cloyd Steiger draft the
6  affidavit as opposed to you?
7        MR. STEPHENSON:  Objection; foundation.
8        MR. NOLAND:  Join.  You can answer.
9     A.  I don't know.  He was -- he probably was talking
10 with Brion more about the case than I was.  I mean, I
11 know he was talking more about the case than I was.  And
12 I didn't even know they were doing the affidavit until I
13 walked by the cubicles.  I had my own office, and I
14 walked out and I was -- I was working another case.  I
15 was working -- I forgot which one, but I'm working a
16 serial murder case.  And so that's why I was not
17 invested as much.
18       And I walked by and I seen Brion Hanley, Special
19 Agent Hanley standing next to Cloyd.  And I'm pretty
20 sure he was standing next to Cloyd, and Cloyd was at his
21 cubicle with their backs to me.  And other members of
22 their team were in the cubicle, and I just walked by.
23 And someone either told me, yeah, they're writing the
24 affidavit or preparing the affidavit.

107

1        And I just kept walking to get something out of
2  the office.  And I was walking by to go down to the copy
3  machine, which was down the hallway, and my right-hand
4  side was where Detective Steiger was and Detective
5  Hanley and the other members of the crew.
6        So then that's the only time I knew anything --
7  that was the first I heard about it.  I was out of the
8  office working a case, and so I don't know what else I
9  was doing.  I mean, I was working a case, but I was
10 quite busy.  I don't remember what case it was.
11    Q.  So you distinctly recall that you were not
12 present for the affidavit and you walked past the room
13 where the affidavit was being draft and somebody while
14 you were walking past you remember told you that what
15 they were doing as you walked past the room was they
16 were drafting the affidavit?
17    A.  Or I may have asked that also.  I may have asked
18 what's going on.  Somebody told me -- but it wasn't
19 Special Agent Hanley or Steiger because they were doing
20 kind of a thing.  And there were quite a few people in
21 the room there, in the cubicle.  It was a pretty large
22 cubicle.  And that's all I recall.  I didn't look over
23 their shoulder or anything like that.
24    Q.  Do you know whether or not Jack McCullough was in

108

1  Rockford at the time that Maria Ridulph was abducted?
2        MR. NOLAND:  Object to the form.
3     A.  Could you say that again, please?
4     Q.  Do you know whether or not Jack McCullough was in
5  Rockford at the time that Maria Ridulph was abducted?
6     A.  Do I know?
7     Q.  Yeah.
8     A.  Yes, I know.
9     Q.  And what -- what's the answer?
10    A.  He was not.
11    Q.  When was Maria Ridulph abducted?
12    A.  In the early evening.
13    Q.  Do you know any more specific than the early
14 evening?
15    A.  No.
16    Q.  All right.  When was Jack McCullough in Rockford?
17    A.  I believe it was the -- later after that point.
18    Q.  How much later?
19    A.  I don't recall how much it was.
20    Q.  If you don't know when Maria Ridulph was
21 abducted, then how can you be certain that Jack
22 McCullough wasn't in Rockford at the time that she was
23 abducted?
24    A.  Because Jack was the one who abducted her.

141

1    A. We don't have the extradition in here.
2    Q. I said as of June 29, 2011. The extradition
3 occurred after June 29, 2011; is that right?
4    A. Oh, so any time before this time?
5    Q. Or as of the date of June 29, 2011.
6    A. Well, I believe I did the -- I conducted the --
7 not conducted. I was part of the interview of Jack on
8 that same date. I believe it was on that same date.
9    Q. I mean, it's referenced in Exhibit 4.
10    A. Say that again. I'm sorry.
11    Q. The interview is referenced in Exhibit 4, the
12 last sentence.
13    A. Last sentence, yeah, later assisted in the
14 interview of McCullough.
15    Q. So, again, sir, is there anything that you did as
16 of -- on the McCullough case as of June 29, 2011, that's
17 not reflected in Exhibit No. 4?
18    A. I cannot recall.
19    Q. Is there anything that would assist your memory?
20    A. Not that I can think of.
21    Q. And Exhibit No. 4 was created to assist you to
22 remember the things that you did on the McCullough case,
23 correct?
24    MR. NOLAND: Object to the form. You can answer.

142

1    A. That is correct.
2    MR. AINSWORTH: All right. Let's mark this as
3 Exhibit No. 5, please.
4    (Deposition Exhibit No. 5 was marked for
5 identification.)
6    Q. (BY MR. AINSWORTH) Who created Exhibit No. 5?
7    A. I believe this was my partner, Cloyd Steiger.
8    Q. Why do you believe --
9    A. Or Detective Cloyd Steiger.
10    Q. Why do you believe it was Defendant Steiger who
11 created this?
12    A. That was my recollection is that he did this.
13    Q. When you were referencing documents that you
14 reviewed in preparation for today's deposition, was
15 Exhibit No. 5 one of those documents?
16    MR. NOLAND: Object to the form. You can answer.
17    A. I believe it may have been. I'm not 100 percent
18 sure if it was or wasn't.
19    Q. You reference a statement by your partner
20 Steiger. Was this the statement by Steiger that you
21 were referencing, or is that a different document?
22    A. Which statement are you saying?
23    Q. You told me that you reviewed a statement that
24 you gave and a statement from your partner, and I

143

1 said -- and I asked you whether it was a follow-up
2 report.
3    A. Oh, okay. I thought you meant he made a
4 statement to me.
5    Q. Is Exhibit No. 5 accurate?
6    A. I believe so.
7    Q. Is it complete?
8    MR. NOLAND: If you need to read the entire
9 thing.
10    A. Yeah, I'm going to do a little reading here now.
11    MR. NOLAND: I will object to the form of the
12 question.
13    A. (Witness reviewing document.)
14    Can you ask the question again? I'm sorry.
15    Q. Now you've had the opportunity to review Exhibit
16 No. 5. Is there anything that you recall about the
17 extradition of Jack McCullough that's not reflected in
18 Exhibit No. 5?
19    MR. NOLAND: Object to the form of the question.
20    A. Not that I can recall.
21    Q. During the extradition, Jack McCullough told you
22 that he was innocent, right?
23    A. I don't recall if he ever said those words, that
24 he was innocent.

144

1    Q. Did he ever tell you something to the effect that
2 he was innocent or that he didn't commit this crime or
3 he didn't abduct Maria Ridulph or he didn't have
4 anything to do with this crime during the extradition?
5    MR. NOLAND: Object to the form. You can answer.
6    A. Let me refer to this. (Witness reviewing
7 document.)
8    Q. So you've reviewed Exhibit No. 5?
9    A. Correct.
10    Q. Can you answer the question, sir?
11    A. You asked me -- I believe the question was, did
12 he ever tell me that he did not do this.
13    Q. Something to that effect.
14    A. Something to that effect. There was something to
15 that effect on the second page in the first line,
16 "Ciesynski talked about the possibility that he had
17 given Maria piggy-back rides, but he had left before
18 someone else had kidnapped her. Ciesynski suggested
19 that McCullough may be covering up for someone else.
20 McCullough seemed to ponder this for a moment and then
21 said that didn't occur."
22    Q. So my question wasn't -- well, I appreciate your
23 pointing out something from Exhibit No. 5. My question
24 is, regardless what's written in Exhibit 5, Jack