

**Planet Depos**
*We Make It Happen*™

**CONTAINS CONFIDENTIAL INFORMATION**

# Transcript of Irene Lau

**Date:** March 8, 2019
**Case:** McCullough -v- Illinois State Police Agent Brion Hanley, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

EXHIBIT 4

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Irene Lau
Conducted on March 8, 2019

4 (13 to 16)

```
                                                    13
1    Q. ████████████████████████████████
     ████████████████████████████████████
     ████████████████████████████████████
  ██ ████████████████████████
     ████████████████████████████████████████
     ████████████████████████████
     █████████
     ████████████████████████████████████
     ██████████████████
  ██ ████████████████████████████████████
     ██████████████████████████
12      (Confidential testimony concluded.)
13      MS. EKL:  Agreed.  As long as you're not going to
14 ask any more medical questions.
15   Q. (BY MR. AINSWORTH)  Are you employed currently?
16   A. No.
17   Q. When did you retire?
18   A. I believe sometime in the spring of 2013.
19   Q. Have you had any employment since you retired?
20   A. No.
21   Q. What year were you born in?
22   A. 1957.
23   Q. Are you a high school graduate?
24   A. Yes.
```



```
                                                    14
1    Q. And when did you graduate high school?
2    A. 1975.
3    Q. Do you have any post high school educational
4  experience?
5    A. Yes.
6    Q. What post high school educational experience do
7  you have?
8    A. I have a college degree.
9    Q. Where do you have a college of degree from?
10   A. University of Washington.
11   Q. When did you receive that degree?
12   A. Either 1981 or 1983.
13   Q. What was your degree in?
14   A. Chinese languages.
15   Q. Was that a bachelor's?
16   A. Yes.
17   Q. Do you have any other degrees or certificates
18 from any educational institutions?
19   A. No.
20   Q. When did you start with the Seattle Police
21 Department?
22   A. In 1990.
23   Q. Did you work for any law enforcement agency prior
24 to joining the Seattle Police Department in 1990?
```

```
                                                    15
1    A. No.
2    Q. Did your pension vest at the time that you
3  retired?
4    A. Yes.
5    Q. Is it after 20 years or how many years do you
6  have to put in?
7    A. I think it's ten years, but I really don't pay
8  attention to that.
9    Q. Why did you retire in 2013?
10   A. Because I was ill ████████
11   Q. When you joined the Seattle Police Department in
12 1990, what position did you hold?
13   A. Police officer.
14   Q. And were you assigned as a police officer to
15 patrol?
16   A. Yes.
17   Q. Patrolling in a marked squad car in uniform?
18   A. Yes.
19   Q. For how long did you have that position as a
20 police officer assigned to patrol -- patrolling in a
21 marked squad car in uniform?
22   A. Approximately ten years.
23   Q. How did your duties change after approximately
24 ten years?
```

```
                                                    16
1    A. Well, I believe after eight years I was still
2  wearing a uniform and still driving patrol car, but I
3  was a school officer.  I later became a detective.
4    Q. When you were a school officer, were you doing
5  that full-time?
6    A. Yes.
7    Q. And for how long were you a school officer?
8    A. Two school seasons.
9    Q. And I assume you were -- when you were a school
10 officer, you mean assigned to be a liaison to a school
11 and actually assigned to a -- a high school within
12 Seattle?
13   A. Yes, several schools.
14   Q. And then -- so then after two school years, how
15 did your job duties change?
16   A. I became a detective.
17   Q. How did you go about becoming a detective?
18   A. I went to something that is called detective
19 school.
20   Q. Did you go to detective school before you became
21 a detective?
22   A. I don't remember.
23   Q. Did you have to apply to be a detective?
24   A. I'm sorry.  Can you repeat that?
```

---

Page 45

1     MS. EKL: Objection; form.
2   A. Well, I will go in and sit down and start to talk
3 to them and ask them why they want to take a polygraph.
4 The person will tell me why they're there. And then --
5 well, first of all, we're going to have to go through
6 some of the necessary things like the Miranda rights and
7 signing of the consent forms and so on and so forth.
8   Q. I'm not asking you --
9   A. You're not asking about that?
10   Q. Ma'am, I'm not asking you how you conducted a
11 polygraph exam. I'm asking you, how did you describe
12 the polygraph to the subjects in 2011 so as to reduce
13 their anxiety about the test itself.
14     MS. EKL: Objection; form. Russel, she's trying
15 to answer your question.
16   A. Well, just, you know, I explain to them in
17 general that we're going to sit down and we're going to
18 be talking for a while, and then I'm going to obtain
19 personal information from them that will be used to
20 formulate their polygraph questions.
21   Q. That's how you describe the test to reduce
22 people's anxiety?
23     MS. EKL: Objection; form.
24   Q. (BY MR. AINSWORTH) Yes?

Page 46

1   A. Yes. I think a lot of it is done with demeanor,
2 tone of voice.
3   Q. Is Baxter School of Lie Detection an accredited
4 institution --
5   A. Yes.
6   Q. -- do you know?
7   A. Yes. I don't know if it is still, but it was
8 then.
9   Q. Did you choose Baxter or did the department?
10   A. The department did.
11   Q. Did you in general terms conduct Jack
12 McCullough's pretest interview in the same manner that
13 you conducted other criminal polygraph pretest
14 interviews in 2011?
15   A. Yes.
16   Q. How did you learn about Jack McCullough being --
17 or the Jack McCullough case?
18   A. I came to work one day and I was contacted by a
19 detective from the homicide unit, Mike Ciesynski. He
20 told me that the Illinois State Police were in town and
21 requesting assistance from the Seattle Police Department
22 to help them arrest a homicide suspect and --
23   Q. Okay. Go ahead. Did he tell you anything else?
24   A. He just asked me to stand by in case they wanted

Page 47

1 a polygraph done.
2   Q. Did he tell you about this being the oldest cold
3 case in America?
4   A. I don't -- I don't remember.
5   Q. Well, did he tell you that the crime at issue
6 occurred over 50 years before?
7   A. I don't remember who told me that.
8   Q. All right. What did you say to Mike Ciesynski in
9 that initial conversation?
10   A. I said that I would wait, I wouldn't go home.
11   Q. What was your shift back in June of 2011?
12   A. Sometimes I started at 6:00 in the morning,
13 sometimes at 7:00, sometimes at 8:00. It all depends
14 how many tests in one day, that sort of thing, what time
15 they start.
16   Q. And how long would your shift last?
17   A. I believe we were on a nine-hour schedule.
18   Q. Do you know what shift you worked on June 29th,
19 2011, which is the day that you provided the polygraph
20 to Jack McCullough?
21   A. I don't remember what time I came in.
22   Q. Do you know what time you were supposed to leave?
23   A. It varies. Depends on what time you start.
24   Q. I understand that. Do you know what time you

Page 48

1 were supposed to leave on June 29th, 2011?
2   A. I don't remember.
3   Q. Did you get overtime that day?
4   A. Yes.
5   Q. How much overtime did you get?
6   A. I can't remember now.
7   Q. How would you look that up?
8   A. By contacting the Seattle Police Department.
9   Q. And who would you contact in the Seattle Police
10 Department back when you were a Seattle police officer?
11   A. I don't know.
12   Q. What was the next contact you had with the
13 McCullough case after saying that you would agree to
14 wait and not go home that day?
15   A. At some point in the day, I met Detective Hanley.
16 I also met a gentleman who was with the Illinois State
17 Police, but I -- I don't believe he was a law
18 enforcement officer.
19   Q. Davis Zulawski?
20   A. I don't remember his name now.
21   Q. What was your purpose in meeting Hanley and the
22 other person, the civilian?
23   A. I'm sure they -- I don't know. I'm -- I think
24 they would want to meet the person who's going to do a

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Irene Lau
Conducted on March 8, 2019

18 (69 to 72)

Page 69

1  Q. Did you review anything else in preparation for
2  this deposition apart from those materials that you
3  identified for me?
4  **A. No.**
5  Q. After -- you told us you spoke to Brion Hanley
6  and the civilian in the hallway, correct?
7  **A. Correct.**
8  Q. Did you speak to anyone else regarding the Jack
9  McCullough case before you started observing his
10 interview being conducted by the civilian?
11 **A. I don't remember talking to anyone.**
12 Q. Did you talk to anyone while you were observing
13 the interview?
14 **A. No. I don't remember talking to anyone.**
15 Q. What was the next thing you did after you -- or
16 what's the next thing you remember doing while you
17 observed Jack McCullough's interview?
18     MS. EKL: Objection; form. If you could just
19 clarify when you're saying next, what point you're at.
20 I don't know if it's clear.
21 Q. (BY MR. AINSWORTH) Well, while you're on there
22 doing the -- while you're observing the interview being
23 conducted by the civilian?
24 **A. And the rest of the question?**

Page 70

1  Q. The question is, what's the next thing that you
2  recall happening concerning your involvement in the Jack
3  McCullough case?
4  **A. What did I do after I left the interview?**
5  Q. Or did something happen while you were in the
6  interview?
7  **A. Not that I remember.**
8  Q. Well, what's the next thing that you recall doing
9  in regard to the Jack McCullough case?
10 **A. Well, I remember returning to my office and**
11 **sitting down and preparing some of the paperwork.**
12 Q. Preparing the what?
13 **A. Some of the paperwork, but not specifically what.**
14 Q. Why did you go to your office to prepare the
15 paperwork?
16 **A. I believe he wanted to take a polygraph.**
17 Q. How did you know he wanted to take a polygraph?
18 **A. I don't remember now.**
19 Q. How did you know what the relevant question was
20 going to be?
21 **A. Well, they were bringing in a homicide suspect,**
22 **and I felt that's what the homicide detectives wanted to**
23 **know; otherwise, they wouldn't bring him in, correct?**
24 Q. When you prepare relevant questions, do you

Page 71

1  typically consult with the referring detective to find
2  out what the relevant question should be?
3  **A. No.**
4  Q. Why not?
5  **A. Well, usually it's known.**
6  Q. And how do you know it?
7  **A. By listening to -- seeing an interview with the**
8  **test subject, the type of detective that is requesting**
9  **the work to be done.**
10 Q. All right. So you went to your office to start
11 the paperwork. What was the next thing that you did in
12 regard to the Jack McCullough case?
13 **A. To the best of my recollection, they brought him**
14 **down shortly after to meet me.**
15 Q. And then you had your pretest interview with him?
16 **A. Yes.**
17 Q. And then what happened after your pretest
18 interview with Jack?
19 **A. I went out and told the detectives that he did**
20 **not want to continue on with the test and that we were**
21 **done.**
22 Q. And what did you do thereafter?
23 **A. I tried to play the audio/video recording, and it**
24 **appeared to me the time that it did not record.**

Page 72

1  Q. Why did you try to play the audio/video
2  recording?
3  **A. Because I wanted to let the detectives know I had**
4  **it.**
5  Q. Well, why did you need to try to play the
6  audio/video recording in order to let the detectives
7  know that you had it?
8  **A. Why did I need to play it?**
9  Q. Yeah.
10 **A. Well, just to make sure that everything was okay.**
11 Q. So the reason that you tried to play the audio
12 and video recording was to make sure that everything was
13 okay, right?
14 **A. No. Actually, I wanted to see the video.**
15 Q. Okay. So it had nothing to do with wanting to
16 tell the detectives that you had the video or making
17 sure it was okay? It was because you wanted to watch
18 the video, right?
19 **A. I wanted to watch the video and also to let them**
20 **know I had it.**
21 Q. So then let's go back to that second part of your
22 answer.
23 **A. Okay.**
24 Q. Why did you need to play the video in order to

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Irene Lau
Conducted on March 8, 2019

19 (73 to 76)

Page 73

1  tell the detectives that you had the video?
2      MS. EKL: Objection; form.
3   A. Sorry, I don't understand the question.
4   Q. You -- you said that part of the reason why you
5  wanted to play the video was to let the detectives know
6  that you had the video, right?
7   A. In case they wanted to see it.
8   Q. All right. Why did you need to play the video in
9  order to let the detectives know that you had the video?
10     MS. EKL: Objection; form.
11  A. I -- I think most normal people would want to
12 look at their work product.
13  Q. So you wanted to look at your work product,
14 right?
15  A. Yes.
16  Q. All right. So you wanted to watch the video?
17  A. Yes.
18  Q. And you didn't need to watch the video in order
19 to tell the detectives that you had it, correct?
20  A. Not necessarily.
21  Q. All right. So what happened when you tried to
22 play the video?
23  A. There was a span of time where there was just
24 nobody in the room. It was pointed at the wall and

Page 74

1  there was nothing on it.
2   Q. When you say nothing on it, do you mean --
3   A. Well, there was no recording of Jack, nothing.
4   Q. Did you scroll through to find out if there was
5  any audio or video anywhere?
6   A. I just let it play.
7   Q. And nothing came up?
8   A. Nothing came up.
9   Q. How do you turn on the video recording equipment
10 in the polygraph unit in 2011?
11  A. I don't remember now.
12  Q. Did you know at the time?
13  A. I -- I don't know. I mean, I had to have in
14 order to --
15  Q. Have you ever seen that blank video again?
16  A. Yes.
17  Q. When?
18  A. Counsel sent me a copy.
19  Q. Of the blank video, the video would nothing on
20 it?
21  A. Oh, oh, oh, I'm sorry.
22     MS. EKL: Objection; form.
23  A. I didn't understand your question. Okay. Can
24 you ask it again?

Page 75

1   Q. Yes. Have you seen that blank video again?
2      MS. EKL: Objection to form.
3   A. No.
4   Q. Do you know what happened to it?
5   A. No.
6   Q. How did you go about playing the video when you
7  tried to play the video?
8   A. I don't remember.
9   Q. Did you have the opportunity to play the video in
10 the polygraph unit?
11  A. Yes.
12  Q. You didn't have to leave the room to play it?
13  A. No.
14  Q. Was it your practice to play the video after you
15 conducted a polygraph examination?
16  A. I don't remember.
17  Q. Why did you want to see your work product?
18  A. Because it was an important case.
19  Q. And why was it an important case?
20  A. Because it was a homicide.
21  Q. And so you wanted to make sure anything -- strike
22 that.
23     You wanted to make sure things were accurate in
24 this homicide case, right?

Page 76

1   A. No, because there's nothing -- you know, a tape
2  is a tape.
3   Q. You didn't want things to be accurate in this
4  homicide case?
5      MS. EKL: Objection; form. What was your answer?
6   A. I haven't given one yet. Sorry. Can you ask
7  that again?
8   Q. Sure. Did you or did you not want things to be
9  accurate in this homicide case?
10  A. Yes.
11  Q. You did?
12  A. Yes.
13  Q. All right. So Jack McCullough did not confess in
14 your interview with him, right?
15  A. No.
16  Q. That's correct?
17  A. That's correct.
18  Q. So if he didn't confess, why did you want to
19 review the polygraphing, the video of your interview
20 with him?
21  A. Because it's still a homicide case.
22  Q. And what were you looking for or what was your
23 purpose for wanting to review that video?
24  A. I wasn't looking for anything in particular.

**Page 77**

1  Q. Did you have any police purpose for reviewing the
2  video?
3  A. Well, yes, I am a police officer. I was a police
4  officer.
5  Q. Did you think it would assist you to watch the
6  video?
7  A. Yes.
8  Q. Assist you in doing what or how would it assist
9  you?
10 A. In writing my police report.
11 Q. So did you create your police report that same
12 day?
13 A. No, I did not.
14 Q. Why didn't you create your police report that
15 same day?
16 A. It was getting late. It was very late.
17 Q. How late was it?
18 A. I don't know exactly what time it was, but it was
19 not at a time that was safe for me to walk to a ferry.
20 Q. So how did you get home that night?
21 A. I asked for a ride.
22 Q. Who gave you a ride?
23 A. I believe Detective Ciesynski gave me a ride to
24 the ferry.

**Page 78**

1  Q. How far was the ferry?
2  A. It's -- you can see the water. It's just right
3  down on the waterfront right below us.
4  Q. I don't know where you were coming from, so how
5  far was it from where you were coming from?
6  A. I would say -- what is the address here? It's
7  got to be more than five blocks up. I would say half a
8  mile.
9     (Mr. Noland entered room: 10:54 a.m.)
10 Q. (BY MR. AINSWORTH) And then you wrote your
11 report the next day?
12 A. Yes.
13 Q. Did you review the video the next day?
14 A. No.
15 Q. So at the time you reviewed the video, you
16 believed the video to not have been captured, correct?
17 A. Correct.
18 Q. Who did you tell to report that the video
19 equipment had malfunctioned and had not captured your
20 interview with Jack McCullough?
21    MS. EKL: Objection; form.
22 A. I told a group of the detectives out in the
23 hallway.
24 Q. Which group of detectives?

**Page 79**

1  A. The ones that are pertinent to this case.
2  Q. And that was on June 29th, 2011, correct?
3  A. I believe so.
4  Q. And that would have included Detective Steiger
5  and Detective Ciesynski and Special Agent Hanley, right?
6  A. I don't know for sure who was there.
7  Q. Well --
8  A. It had to be the one, if not more, Illinois State
9  Police detectives, Seattle Police detectives, homicide
10 detectives.
11 Q. And so you told Detective Steiger on the way to
12 the ferry that your equipment had malfunctioned, right?
13 A. No.
14 Q. Why not?
15 A. Detective Steiger didn't take me to the ferry.
16 Q. Sorry, you're right. You told Detective
17 Ciesynski on the way to the ferry that your equipment
18 had malfunctioned and you were unable to video record
19 your interview with Jack McCullough, right?
20 A. I don't recall what conversation I had with him
21 in the car.
22 Q. Well, how did you document the fact that you
23 believed your video equipment to have malfunctioned and
24 didn't record your interview with Jack McCullough?

**Page 80**

1  A. How did I document it?
2  Q. Yeah.
3  A. I didn't.
4  Q. Why didn't you document the fact that you
5  believed in this homicide case, this very important
6  homicide case, that your video equipment had
7  malfunctioned and not recorded your interview with Jack
8  McCullough?
9     MS. EKL: Objection; form.
10 A. Sorry. Can you ask me that again?
11 Q. Sure. In this very important homicide case, why
12 didn't you document the fact that your video equipment
13 had malfunctioned and prevented you from recording your
14 interview with Jack McCullough?
15 A. I don't know.
16 Q. You are supposed to document if your video
17 equipment malfunctions, right?
18    MS. EKL: Objection; form.
19 A. I don't -- I don't know. It hasn't --
20 Q. It hasn't happened before, right?
21 A. I don't know if it has or has not.
22 Q. You can't remember another time when your video
23 equipment didn't work and failed to record your
24 interview with a subject, right?

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Irene Lau
Conducted on March 8, 2019

21 (81 to 84)

---

**Page 81**

1  A. I don't remember.
2  Q. Can you tell us of any time this has ever
3  happened to you where your video equipment didn't
4  actually record the interview that you were conducting?
5  A. Say that again.
6  Q. Can you tell us of any incident, any time when
7  your --
8  A. There was equipment failure?
9  Q. Let me just ask the question. Can you tell us --
10  strike that.
11      Can you tell us of any time that your video
12  equipment malfunctioned and did not record your
13  interview with a subject?
14  A. I don't remember any other time.
15  Q. Seems like the kind of things that you should
16  document, right, would you agree with that, if your
17  video equipment in a homicide case malfunctions, doesn't
18  record your interview with a subject?
19      MS. EKL: Objection; form.
20  A. On hindsight now.
21  Q. On hindsight now what?
22  A. I could have documented it. It's not necessary
23  for me to document.
24  Q. Why do you say it's not necessary for you to

**Page 82**

1  document?
2  A. There's no hard fast rule to require me to
3  document that.
4  Q. And why do you say there's no hard fast rule to
5  require you to document it?
6  A. That I know of.
7  Q. Well, is there a hard fast rule that requires you
8  to document any of the information that you learned
9  during an interview with a subject?
10  A. Not all of it.
11  Q. It's up to you, right?
12  A. It is up to me.
13  Q. You get to decide, right?
14  A. I decide.
15  Q. And you decided not to document the fact that you
16  believed your video equipment to have malfunctioned and
17  not captured the video of your interview with Jack
18  McCullough, right?
19  A. Can you start that first part again?
20  Q. Sure.
21  A. It's a long question.
22  Q. You decided not to document the fact that your
23  video equipment had malfunctioned and not recorded your
24  interview with Jack McCullough?

**Page 83**

1  A. I did not -- I don't remember making a conscious
2  effort to do something or not to do something.
3  Q. Well, you didn't include it in your report,
4  right?
5  A. That's right.
6  Q. So did you indicate in your report that the --
7  that the interview with Jack McCullough was video
8  recorded?
9  A. Yes.
10  Q. So tell us, why did you indicate in your report
11  that the interview with Jack McCullough was video
12  recorded when you believed that it was not video
13  recorded?
14  A. Say that one more time.
15  Q. Why did you include in your report the fact that
16  the video -- that the interview with Jack McCullough was
17  video recorded when you believed at the time it was not
18  video recorded?
19  A. Because I wanted to ensure that he had his legal
20  rights, that he knew he was being audio and video
21  recorded in a police facility. Is that the question
22  you're asking?
23  Q. I understand you wanted to tell Jack McCullough
24  at the time when you were conducting the interview that

**Page 84**

1  it was being video recorded in order to preserve his
2  rights, correct?
3  A. Yes.
4  Q. Because at that time you thought the video was
5  working, right?
6  A. Yes.
7  Q. I'm talking about after the interview when you're
8  preparing your report at the time you believed the video
9  equipment had malfunctioned and had not recorded your
10  interview, when you were completing your report, why did
11  you say that the video -- that the interview was video
12  recorded when, in fact, you believed it was not?
13      MS. EKL: Objection; form; assumes facts not in
14  evidence.
15  A. I don't remember why I put that in now.
16  Q. And you reviewed that report in preparation for
17  this deposition, right?
18  A. Yes.
19  Q. When you answered interrogatories initially, you
20  refused to answer any questions about your interactions
21  with Jack McCullough or this case on grounds that your
22  Fifth Amendment right to silence was implicated, right?
23  A. I don't know how to answer that question.
24  Q. Well, let me show you what we'll mark as Exhibit

---

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Irene Lau
Conducted on March 8, 2019

23 (89 to 92)

**Page 89**

1  was convicted of murder at age 71, right?
2     MS. EKL: Objection; form.
3     **A. I did not consciously think about that. I was**
4  **concerned about giving him a good test.**
5     Q. And you were concerned about making sure that
6  your paperwork was fair and accurate, correct?
7     A. Yes.
8     Q. Making sure that your police report was fair to
9  Jack McCullough, right?
10    A. Yes.
11    Q. Making sure that your police report didn't shade
12 the truth in the prosecution's favor and to Jack
13 McCullough's detriment, right?
14    **A. What do you mean by shade the truth?**
15    Q. Meaning painting a picture that misrepresented
16 what actually occurred between you and Jack McCullough
17 in that pretest interview room.
18    **A. Are you asking me if I purposely misrepresented?**
19    Q. Did you take steps to ensure that you did not
20 purposely misrepresent the interview that you conducted
21 with Jack McCullough on June 29th, 2011?
22    **A. To the best of my memory.**
23    Q. To the best of your memory what?
24    **A. That I would -- that I did not shade my report**

**Page 90**

1  one way or another.
2     Q. So you tried to maintain an objective focus,
3  right?
4     A. Yes.
5     Q. And you thought it was important to be objective
6  in your report writing of your conversation with Jack
7  McCullough, right?
8     A. Yes.
9     Q. You knew that your report would be used to aid
10 the prosecutor in his charging decision in that case,
11 right?
12    A. Yes.
13    Q. You knew that your report would be shared with
14 both the prosecution and the criminal defense for all
15 the criminal proceedings that would occur, right?
16    A. Yes.
17    Q. And so you knew it was important to be truthful
18 and accurate in your police report, right?
19    A. Yes.
20    Q. Were you truthful and accurate in your police
21 report?
22    **A. On a hindsight, my report was inaccurate.**
23    Q. All right. Well, at the time that you prepared
24 your report, you believed that there would be no video

**Page 91**

1  to contradict anything you wrote in your police report,
2  right?
3     **A. I did not consciously think about it.**
4     Q. Well, you believed at the time you wrote your
5  police report that there would be no video to
6  demonstrate what really happened between you and Jack
7  McCullough, right?
8     **A. I did not carry that thought completely through**
9  **like what you just said. I just knew that there was no**
10 **video.**
11    Q. All right. So at the time you wrote the report,
12 you knew there was no video, correct?
13    **A. Correct.**
14    Q. So you knew that whatever you wrote down would be
15 the contemporaneous account of your interview with Jack
16 McCullough, right?
17    **A. What does contemporaneous mean?**
18    Q. Meaning close in time to the time of the
19 interview.
20    **A. I'm sorry. Can you ask that question again --**
21    Q. Sure.
22    **A. -- in plain language?**
23    Q. You believed that in the absence of the video,
24 your report would be the only police record of your

**Page 92**

1  interview with Jack McCullough, right?
2     **A. Yes.**
3     Q. All right. So let's turn to Exhibit 1, if you
4  would. I'm going to direct your attention to the second
5  paragraph of the narrative portion. And three lines
6  from the bottom it says, "McCullough's demeanor
7  alternated between calm and rage."
8       Did Jack McCullough's demeanor alternate between
9  calm and rage during the interview?
10    **A. I believe so.**
11    Q. Can you demonstrate for us what Jack did to make
12 you think that he was expressing rage?
13       MS. EKL: I'm going to object to your request for
14 her to demonstrate anything.
15    **A. Well --**
16       MS. EKL: If you can, but I object that this is
17 completely irrelevant. Are you able to?
18       THE WITNESS: No.
19       MR. AINSWORTH: Well, Counsel, excuse me.
20    Q. (BY MR. AINSWORTH) Ma'am, demonstrate for us
21 the rage that you say Jack depicted during, you know,
22 when he was alternating between calm and rage.
23       MS. EKL: She just indicated that she can't.
24       MR. AINSWORTH: Excuse me, Counsel. No speaking

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Irene Lau
Conducted on March 8, 2019

24 (93 to 96)

```
                                              93
1  objections. I will ask the witness and the witness can
2  answer.
3     Q. (BY MR. AINSWORTH) Are you -- demonstrate for us
4  the rage that Jack McCullough was demonstrating that you
5  document in your report.
6     A. I -- I cannot imitate -- I'm not a good imitator
7  of what his body language was like.
8     Q. So describe for us, ma'am. Describe the rage
9  that you saw from Jack McCullough that you documented
10 was alternating between calm and rage.
11    A. Silently angry, very --
12    Q. Silent --
13    A. -- very angry over certain questions, a silent
14 type of rage, a cold rage.
15    Q. A cold rage. When you viewed the videotape of
16 Jack McCullough's demeanor in preparation for this
17 deposition, did you see him express any rage?
18    A. It depends on your interpretation of what a
19 rageful person looks like.
20    Q. I'm not asking about -- I'm not asking you to
21 testify as to what I may have seen on that video. I
22 just want to know, did you see Jack McCullough express
23 rage on the video when you reviewed it in preparation
24 for this deposition?
```

```
                                              94
1     A. Yes.
2     Q. All right. At what point in time did you see him
3  express rage?
4     A. Well, I can't pinpoint exactly. I'd have to be
5  looking at the video.
6     Q. What did Jack do that made you believe that he
7  was expressing rage?
8     A. Some of the emotions expressed as we discussed
9  earlier, clenched jaw, furrowed brow, turning red.
10    Q. You saw him turn red in the video?
11    A. Yes. Refusal to answer certain questions.
12    Q. That's rage, refusal to answer certain questions?
13 That's rage to you?
14    A. The accompanying emotions --
15    Q. Well, I'm just --
16    A. -- illustrate rage.
17    Q. I'm sticking to the emotions. I'm trying to get
18 you to testify as to what you saw that led you to
19 believe that he was expressing rage.
20    A. He was not happy. He was -- he was angry.
21    Q. How many times did Mr. McCullough alternate
22 between calm and rage?
23    A. I don't know. I can't say now.
24    Q. What does the phrase "kept stating" mean to you?
```

```
                                              95
1     A. That he -- it means -- okay. Sorry. Start that
2  question again.
3     Q. What does the phrase "kept stating" mean to you?
4     A. That he repeated something more than once.
5     Q. Okay. And more than once throughout the course
6  of the interview, right?
7     A. Yes. I -- I -- I don't -- I don't know. I'm
8  unclear.
9     Q. What are you unclear about?
10    A. How many times that he did that in the interview.
11    Q. Oh, I'm not asking you how many times he did
12 anything in the interview. I'm asking you, what does
13 the phrase "kept stating" mean to you?
14    A. Something stated more than once.
15    Q. And more that once over the course of an
16 interview, right?
17    A. Yes.
18    Q. Okay. So in your report you wrote, "He," meaning
19 Jack McCullough, "vehemently denied any involvement with
20 the crime," right?
21    A. Yes.
22    Q. And that's true, right?
23       MS. EKL: I'm sorry. Where are you?
24       MR. AINSWORTH: I'm picking up after the last
```

```
                                              96
1  sentence I just read, right after calm and rage. "He
2  vehemently denied any involvement with the crime,"
3  right?
4     A. Yes. I wrote that.
5     Q. And that's true, correct?
6     A. Yes.
7     Q. And you wrote, "and kept stating that he didn't
8  remember what day or even what time of year Maria
9  Ridulph had been abducted and killed," right?
10    A. Yes.
11    Q. Was that accurate or inaccurate?
12    A. I'd have to look at the video again.
13    Q. All right. So why don't you just tell me all the
14 things that were inaccurate or untruthful about your
15 report, in your view.
16       MS. EKL: Objection; form.
17    A. There is nothing untruthful in my report.
18    Q. All right. Well, what is inaccurate in your
19 report?
20    A. I stated that he said that he described Maria as
21 lovely, lovely, lovely.
22    Q. And that is the -- that's inaccurate? Is that
23 what you're saying?
24    A. Yes.
```